UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **JAMIE BRUCE McCOSKEY** | § | |
| | § | |
| **VS.** | § | |
| | § | |
| **RICK THALER, DIRECTOR,** | § | **Cause No. 4:10-cv-00123** |
| **TEXAS DEPARTMENT OF CRIMINAL** | § | |
| **JUSTICE–INSTITUTIONAL DIVISION** | § | |

---

**FIRST AMENDED PETITION FOR WRIT OF HABEAS CORPUS
OF A PERSON IN STATE CUSTODY**

---

TO THE HONORABLE SIM LAKE, U.S. DISTRICT COURT JUDGE:

Petitioner, Jamie Bruce McCoskey, through undersigned counsel, files this petition for writ of habeas corpus of a person in state custody as follows:

### JURISIDICTION

This court has personal jurisdiction pursuant to 28 U.S.C. § 2241(d) because Mr. McCoskey was convicted in a Harris County, Texas, court. Subject matter jurisdiction is conferred by 28 U.S.C. § 2254.

### STATEMENT OF FACTS

*a.     The criminal episode*

The state alleged that on November 13, 1991, Mr. McCoskey kidnapped Michael Keith Dwyer and stabbed him to death. Tr. Transc. vol. 26 at 43-44. Laurie Collins, Dwyer's fiancée, was a witness to the crime. *Id.,* at 78 *et sequiter.* She was attending an arts academy and was pregnant. Dwyer also worked part time for a bail bondsman in Orange County, Texas, and had some equipment from that trade, including handcuffs. *Id.,* at 83.

1

According to State's evidence, McCoskey accosted Dwyer and Collins at their apartment in the Las Rosas complex, 414 Fairview St., in the Montrose district of Houston, Texas, and demanded that the couple give them a ride.  Collins said she could see that McCoskey had a hunting knife in a sheath tucked in the front of his pants.  The three left the apartment and got into Collins white Ford Escort.  Dwyer drove.  McCoskey gave directions.  However, Collin's testimony indicated that McCoskey had no idea where he was going, or what he was doing.

After getting gas, the three found their way to the I-10 freeway.  Mr. McCoskey had Dwyer stop at an embankment of I-10.  McCoskey exited the vehicle taking the keys after telling Collins and Dwyer that he was going to inform two individuals parked nearby in a Suburban that they were on private property and had to leave.

After the Suburban left, McCoskey got back in the car.  Collins maintained that events unfolded rapidly after that.  According to Collins, McCoskey put a knife to Dwyer's throat and told Collins to handcuff him.  *Id.,* at 83-86.  McCoskey took Dwyer out and put him in the back hatch of the car.  *Id.,* at 89.  McCoskey took the wheel, although he was not familiar with a stick shift, and drove away from the embankment.  He ordered Collins to take off her pants and shirt off, which she did.  McCoskey could not figure out how to get out of the neighborhood and slowed down, according to Collins, in order to ask several construction workers how to get downtown.  Collins said he did not want to stop with Collins naked beside him.

McCoskey managed to find the freeway entered it and began fondling Collins who was naked in the passenger's seat as he drove.  *Id.*, at 93-94.  McCoskey also forced Collins to perform oral sex.  From the back of the car, Dwyer pleaded for McCoskey not to hurt Collins or her fetus. *Id.,* at 96.

McCoskey exited the freeway and made his way to house at 1806 Drew Street. *Id.,* at 213. The house was abandoned, but, according to a neighbor, used by a lot of "young women," evidently for prostitution. *Id.* McCoskey took Collins inside, leaving Dwyer in the car and raped her after promising to take care not to hurt the fetus. *Id.,* at 103-104. McCoskey then returned to the car. Collins got in, and Mr. McCoskey got Dwyer out and took him inside the abandoned house.

Collins said she heard a sound, not a scream, but a loud thud as when you get the wind knocked out of you. At that point, she said she got out of the car and ran across a field to the first inhabited house she saw, which was on Chenevert street,[1] and banged on the door. *Id.,* at 109. Collins said McCoskey followed her and was standing on the porch of the Chenevert home, shaking his head, when the owner opened the door a crack and she wedged her way inside. *Id.,* at 110-111.

Collins called 911. McCoskey ran off. At 8:44 PM, Officer Martinez arrived at the scene and found Dwyer's body in the kitchen of the abandoned home. *Id.,* at 214. Martinez called Officer Carol Pahl to help with Collins. *Id.,* at 216. An ambulance took Collins to Herman Hospital for a rape test kit. There, Collins gave a statement to police mentioning that Mr. McCoskey had said his name was "Lurch" and describing the teardrop tattoo on Mr. McCoskey's face. *Id.,* at 115.

### b. *Mental health and mitigating evidence.*

Evidence of Mr. McCoskey's mental illness and status as a social misfit began to mount with the State's first witness. Collins testified that McCoskey's moods changed every five minute while they travelled. *Id.,* at 171. Collins said McCoskey also talked to himself at least on one occasion, blurting out to no one, as far as Collins could tell, that "I'm frying." *Id.,* at 172.

---

[1] 2711 Chenevert, Houston, Texas. *Id.* at 203.

McCoskey's conversations with Collins were not connected, *Id.,* at 173, and he "appeared strange," *id.,* and displayed peculiar mannerisms; he popped his jaw constantly, and he kept headphones even while the car radio was playing.  *Id.,* at 171.

Before the killing, Mr. McCoskey was being treated at Harris County Mental Health and Mental Retardation (MHMR) outpatient clinics. *Id.,* at 343.   To his landlady, Audrey Birmingham, and her acquaintances, he was known only as "Lurch McCoskey." *Id.,* at 366.  She testified that he "acted weird … like somebody sick." *Id.,* at 369.  During a conversation, he could not stay on topic, but rather kept "switching, jumping back and forth." *Id.,* at 370. Birmingham testified that took him once for psychological treatment on the north side of town and thought that he was mentally ill. *Id.,* at 370, 374.

Mr. McCoskey's mental and social problems stemmed from childhood. His adoptive mother, Patricia McClelland, testified that at age nine Mr. McCoskey wet the bed frequently," *id., vol.* 28, at 50, and would have continued to if not for medication. *Id.,* at 52.  "He couldn't behave in class … [and] most of the children would not play with him after any exposure [to him] at all." *Id.,* at 50.  According to McClelland, her adopted son "had periods of calm followed by periods of excitement… [and] was unable to concentrate on anything for very long."  Indeed, from being very loving "he would become hyperactive, hyperemotional, screaming at us, …, belligerent." *Id.,* at 56.  Sometimes he was "simply out of control." *Id.*  As a result, she said, Jamie "began receiving individual therapy on a weekly basis." *Id.*, at 58.  Soon he was constantly at MHMR, and being evaluated at Children's Psychiatric Section of the Austin State School. *Id.,* at 58, 61.  As a teenager, Mr. McCoskey would go on crying jags, and had irrational fears and responses to his emotions. *Id.,* at 69.  When he lost control in these instances it was apparent to Ms. McClelland that he did not realize what he was doing was wrong. *Id.,* at 71.  In March of

4

1977, Jamie was, therefore, admitted to Shoal Creek Hospital in Austin, Texas, a psychiatric hospital for juvenile.

The cause of Mr. McCoskey's ("Jamie's") mental illness may have been environmental. Before he was adopted he had been severely abused. Medical records indicate that at the age of one he was admitted to a Dallas County Hospital "with a skull fracture and multiple bruises" and "burns." *Id.*, at 75-76, and 94. Before they adopted Jamie, Ms. McClelland and her husband received information that Jamie had been a "battered … by his natural parents." *Id.,* at 77. He suffered abuse in the foster homes in which he was place, as well, *id.,* and his childhood records "indicate[d] that Jamie had suffered from severe neglect and abandonment." *Id.,* at 95.

By age 12, when he entered Shoal Creek Hospital's psychiatric ward for three months, *id.*, at 82, Jamie was on a battery of drugs, including Mellaril and Thorazine, prescribed by Dr. Nelson Caballos. *Id.*, at 81. The treatment was not sufficient, and Jamie was taken from Shoal Creek to Children's Psychiatric Hospital of the University of Texas at Galveston for long-term psychiatric care where he remained for eight more months. *Id.,* at 83-84. Ms. McClelland thought that Jamie benefited from the therapy at Galveston, but upon release his adoptive father's health deteriorated and he died of heart attack.[2] The public school also refused to accept him into the junior high program. Jamie decompensated as a result and Ms. McClelland therefore had to enroll him in the Brown School Program for profoundly disturbed children, *Id.*, at 104, which in turn advised that he be admitted to Ranch Treatment Center "due to a history of sever dysfunctional behavioral, and impaired social, familial and educational functioning." *Id.,* at 110. These impairments, Ms. McClelland reported, persisted into young adulthood. *Id.,* at 125.

---

[2] This was the second time that Jamie faced the death of an adoptive parent. Before he was adopted by Ms. McClelland and her husband, another couple had adopted him, but apparently gave Jamie up three years later after the adoptive father in this family died. *Id.,* at 405-406.

Two psychiatrists provided a clinical description of Mr. McCoskey's mental problems. Dr. Melissa Ferguson testified that in November of 1991, when Mr. McCoskey was first incarcerated, she assessed and treated Mr. McCoskey. *Id.,* at 193. As a result, she prescribed Lithium Carbonate, which she testified was for "people who have disturbances in mood." *Id.,* at 199-200. "It is used to treat affective disorders" in persons who are "having symptoms of a mental illness." *Id.,* at 201. In her 1991 report, Dr. Ferguson diagnosed Mr. McCoskey with a "bipolar **affective** disorder" and "possibly a poly-substance disorder." *Id.,* at 21.

Dr. Ferguson testified that in May of 1992, Mr. McCoskey was taken off of Lithium and placed on Tegratol by another physician. *Id.,* at 279. The records also reflected that he was placed on Thorazine during this period for a 30 day period, which Dr. Ferguson explained, is used to treat psychosis and for insomnia. *Id.,* at 279-80. At times, the records indicated that Mr. McCoskey received a cocktail, Lithium in the morning and night on top of Thorazine, which she said was likely to help calm Mr. McCoskey down. *Id.,* at 282.

Dr. Ferguson also explored Mr. McCoskey's history of child abuse. From his childhood records, she was able to confirm the skull fracture and determined that the burns on Jamie's bodies mentioned by Ms. McClelland were from cigarettes, *Id.,* at 285, which lead to the termination of parental rights. *Id.,* at 388. Dr. Ferguson added that "as an infant" Jamie "had been addicted to paregoric." *Id.,* at 285. She explained that paregoric contains opiates and alcohol and that it could have a substantial effect on a child. *Id.,* at 287.

On cross examination, Dr. Ferguson said that her review of Mr. McCoskey's records did not indicate that Mr. McCoskey was bipolar or suffered from a serious mental illness. *Id.,* at 311. However, she did not say that the numerous psychiatrists who had diagnosed him were necessarily wrong. *Id.* Instead, she indicated that there could be reasonable disagreement in Mr.

McCoskey's case about whether he suffered from a range psychiatric diseases, including bipolar disorder and intermittent explosive personality disorder. *Id.*

Psychologist  James Ray Hayes also testified regarding Mr. McCoskey's mental health. Dr. Hayes was on faculty of the University of Texas Medical School in the Department of Psychiatry and Behavioral Science. *Id.*, at 369.  He performed clinical duties principally at the Harris County Psychiatric Center. *Id.,* 370.  According to Dr. Hayes, the most he would receive for his testimony, if the trial court approved it, would be $800.00.  *Id.,* at 374.  As a result, Dr. Hayes service was limited to the March 1992 testing, the interpretation and reporting of the results, and to testifying at trial.  Given the limits on funds, trial counsel did not have an expert present in the courtroom during Mr. McCoskey's November 1992 trial, or available to examine Mr. McCoskey during trial.

In addition to reviewing Mr. McCoskey's medical history and, on March 10, 1992, interviewing him, Dr. Hayes administered or supervised the administration of a battery of tests, including the Ray Memory Test, the Trail Making Test, the Bender Visual-Motor Gestalt Test or Shock Ink Blot Test, Wechsler Adult Intelligence Scale Revised, and the Minnesota Multiphasic personality inventory and the Shipley Institute of Living Scale.

Dr. Hayes review of the medical records confirmed Mr. McCoskey's history of childhood abuse.  Dr. Hayes added that the records showed that Mr. McCoskey's siblings also had suffered serious physical harm at the hands of their natural parents. *Id.*, at 392.  However, Mr. McCoskey appeared to have been treated the worst. *Id.*  This resulted in retarded development and intelligence. *Id.,* at 392, 398.  When tested for IQ at the age of 7, McCoskey scored a 71.  Dr. Hayes also explained that the institutionalization that Mr. McCoskey experienced at Shoal Creek,

Galveston and in the Brown school indicated that he suffered from severe psychological disturbances, since these settings were for "the severely disabled and dysfunctional." *Id.,* at 408.

Based on his review of Mr. McCoskey's psychological records, and the testing that Dr. Hayes administered, Dr. Hayes determined that the proper diagnosis of Mr. McCoskey was bipolar disorder, *Id.,* at 426, and maintained that the evidence did **not** support the conclusion that Mr. McCoskey suffered from an adult antisocial disorder. *Id.*, at 460.  Dr. Hayes also explained that the alternative Axis I diagnosis seen in Mr.  McCoskey's records, such as explosive personality disorder, were not incompatible diagnoses. *Id.*, at 426-27.  According to Dr. Hayes, the appropriate medication for  Mr. McCoskey was Lithium, *id.*, at 426, which he pointed out Mr. McCoskey had been prescribed but had stopped taking four months before Dwyer's murder. *Id.,* at 446.

According to Dr. Hayes, on November 13, 1991, when Dwyer died, Mr. McCoskey was undergoing a manic episode.  He explained that, in general, "an individual in the middle of a manic phase [would not] understand[] anything about their conduct." *Id.,* at 447.  Dr. Hayes' review of the record indicated that Mr. McCoskey had experienced an episode that undermined his mental functioning to that extent, and that when he stabbed Dwyer he did not understand that what he was doing was wrong.  *Id.,* at 448-49.

## CLAIM ONE

Jurors in Mr. McCoskey's case received a highly irregular "nullification instruction,"[3] as follows:

---

[3] In its 1989 decision in *Penry I,* the Supreme Court ruled that Texas's special issues – future dangerousness  and deliberateness – did not provide the jury, in Penry's particular case, to give effect to his mitigating evidence. In Penry's second trial, the trial court gave a "nullification instruction," that essentially told jurors to go back and change their answer to the special issues to a response that would require the court to impose life in prison if jurors concluded that there was sufficient evidence mitigating against the death penalty. In 2001, the Court ruled that this

> "You are instructed that when you deliberate on the questions posed in the special issues, you are to consider all relevant mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the State or the defendant.  A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character, background, record, emotional instability, intelligence or circumstances of the crime which you believe could make a death sentence inappropriate in this case. If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any, and thereafter, give effect and consideration to them in assessing the defendant's personal moral culpability at the time you answer the special issue. If you determine, when giving effect to the mitigating evidence, if any, that a life sentence, as reflected by a [sic] affirmative finding to the issue under consideration, rather than a death sentence, is an appropriate response to the personal moral culpability of the defendant, a [sic] affirmative finding should be given to that special issue under consideration."

*State v. McCoskey*, no. 71, 629 (Tex. Crim. App., June 25, 1993) (unpublished opinion) at 29 (quoting the trial court's charge).  Later in the charge, they were given the following special issues to answer in light of the nullification instruction:

> SPECIAL ISSUE NO.1
> Is there a probability that the defendant, Jamie Bruce McCoskey, would commit criminal acts of violence that would constitute a continuing threat to society?
>
> * * *
>
> SPECIAL ISSUE NO.2
> Taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, do you find that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?
>
> You are instructed that the term "mitigating evidence" or "mitigating circumstances" means evidence that a juror might regard as reducing the defendant's moral blameworthiness.

---

instruction did not cure the constitutional defect. *See, Penry v. Johnson,*532 U.S. 782 (2001) ("Penry II").  The nullification instruction in Penry II differs from the one in Mr. McCoskey's case.  At the trial from which Penry II arose, juror were instructed to change an affirmative answer to the future danger issue to 'No' if they found sufficient evidence mitigating against the death penalty.  In Mr. McCoskey's case they were instructed to answer the future danger issue *affirmatively* if, in assessing the defendant's personal moral culpability at the time jurors answered the special issue, they found sufficient mitigating evidence. The Supreme Court has re-affirmed the holding of Penry II as following from clearly established law in several cases, including *Tennard v. Dretke*, 542 U.S. 274, 124 (2004) and *Smith v. Texas*, 549 U.S. 948 (2006).

*Id.* (quoting the charge).

The verdict form showed that jurors unanimously answered the first special issue affirmatively, and the second special issue negatively. *Id.*

On direct appeal, Mr. McCoskey emphasized that the Texas and Unites States Supreme Court law required the court to presume that jurors followed their instructions.   App. I, Appellant's Brief, at 16-17 (citing *United States v. Olano*, 113 S. Ct. 1770, 1781 (1993) ("' [It is] the almost invariable assumption of the law that jurors follow their instructions.'") (quoting *Richardson v. Marsh*, 481 U.S. 200, 206 (1987)).  Mr. McCoskey pointed out, as well, that "read literally" the nullification instruction told jurors that they should answer the future dangerousness special issue affirmatively "if they believed that…. Appellant deserved a life sentence."  *Id.,* at 17.  Turning to the verdict returned by the jury, Mr. McCoskey explained that "the jury could well have believed that they were giving effect to Appellant's mitigating evidence," and recommending a life sentence, "by returning and affirmative answer to the future dangerousness issue."   He also specifically complained that by answering the first special issue in the affirmative, "mistakenly and unconstitutionally" gave an answer, which, under Texas Rule of Criminal Procedure, Article 37.071, "placed the defendant in a "narrowed" class of capital defendants subject the death penalty."  App. I, *Appellant's Brief,* at 19.

Relatedly, Mr. McCoskey argued that the nullification instruction prevented jurors from properly answering the special issues in a manner that would allow them to express a preference for a life sentence in the manner that the Texas legislature intended when it passed Article 37.071.  *Id.,* at 16.  As Mr. McCoskey stressed, the law, properly stated, required jurors to answer the first special issue *negatively* in order to express their finding that a life sentence was warranted because Mr. McCoskey would not be a future danger to society. *Id.*  However, the

nullification charge prevented jurors from answering, No, to the first special issue in precisely the situation where it the legislature intended for the death penalty **not** to be imposed, namely, where there was evidence showing that the defendant would not be a future danger to society. *Id.,* at 17, 19. Indeed, jurors who determined that Mr. McCoskey would not be a future danger would be compelled by the nullification instruction to answer it a manner that, under article 37.071, reflected the exact opposite intention.

TCCA's acknowledged that the nullification instruction was "completely erroneous." *McCoskey*, no. 71, 629, at 30. However, without bothering to explain why, the Texas court swept aside Mr. McCoskey's contention that that the verdict, read in light of the charge, showed that jurors intended to answer the first special issue in a manner that required the imposition of a life sentence. The TCCA simply dismissively ruled that "obviously, an affirmative answer to the first special issue does not reflect a finding that life is more appropriate." *Id.*, at 30.

Having disposed of Mr. McCoskey's interpretation of the charge and punishment phase verdict form, the TCCA disposed of his complaint that the trial court's instructions did not permit the jury to give full effect to mitigating evidence pursuant to a harmless error evaluation. Upon "analyzing the situation," *id.*, the TCCA explained its determination as follows:

> we note that, had the jury completely disregarded the instruction, then no harm would have resulted because the jury would have been ignoring exactly what appellant says caused him harm. On the other hand, *had the jury followed the court's instruction to the letter,* then two possibilities could have occurred. Had the jury wanted to recommend a life sentence as opposed to death it would have responded in the affirmative to both of the special issues, thus yielding appellant's desired result of a life sentence. But, if the jury had expressly wanted to recommend a death sentence, then under the court's instruction, it would have answered both of the questions "no," thus also resulting, to appellant's benefit, albeit contrary to the jury's intention, in a life sentence. Hence, appellant would have suffered no harm.

> *Id. (italics in the original).*

**A.    MR. MCCOSKEY'S DEATH SENTENCE VIOLATES DUE PROCESS AND THE EIGHTH AMENDMENT BECAUSE THE SENTENCING JURY ANSWERED THE SPECIAL ISSUES UNDER THE INSTRUCTIONS GIVEN TO THEM IN A MANNER REQUIRING IMPOSITION OF A LIFE SENTENCE INSTEAD.**

In *Hicks v. Oklahoma*, the Supreme Court held that where a State has provided for the imposition of criminal punishment in the discretion of the trial jury, it is not correct to say that the defendant's interest in the exercise of that discretion is merely a matter of state procedural law. 447 U.S. 343, 346 (1980); Instead, "[t]he defendant in such a case has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion."  *Id.; and see, Marzano v. Kincheloe*, 915 F.2d 549, 552 (9th Cir. 1990) (A sentence unauthorized by law is unconstitutional.).  While the judge, under Texas capital punishment scheme, imposes the sentence, the imposition is dictated by the jury's answers to the special issues. TEX. CODE CRIM. P. § 37.071.  As a result, *Hicks* applies squarely to Mr. McCoskey's case.  As he pointed out on direct appeal, upon stressing that jurors, in answering the first special issue affirmatively, "could have believed that they were "giving effect" to Appellant's mitigating evidence and, thereby, determining that a life sentence was warranted," sentencing not only violated Article 37.071, it "also violated the Eighth and Fourteenth Amendments to the United States Constitution." *App. I, Appellant's Brief* at 18; *id.,* at 20 (citing *Eddings v. Olahoma*, 455 U.S. 104, 117-18)(O'Connor, J., concurring)("Because death sentences are 'qualitatively different'… from life sentences, this Court has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded a process that will guarantee, as much as humanly possible, that he sentence will not be imposed out of whim, passion, prejudice or *mistake*))(emphasis in the Appellant's Brief).

The Supreme Court has also consistently followed the rule that the jury's verdict must be set aside if it could be supported on one ground but not on another, and the reviewing court was uncertain which of the two grounds was relied upon by the jury in reaching the verdict. S*ee, e.g., Yates v. United States*, 354 U.S. 298, 312 (1957); *Stromberg v. California*, 283 U.S. 359, 367-368 (1931).  It goes without saying that if, as here, the verdict read in light of the charge expresses the jury's determination that a more lenient sentence is warranted, a reviewing court cannot set it aside and impose a harsher punishment, let alone death, based on uncertain grounds. As the Supreme Court emphasized in *Mills v. Maryland*, 486 U.S. 367, 376-377 (1988), "[i]n reviewing death sentences, the Court has demanded even greater certainty that the jury's conclusions rested on proper grounds." *Citing, e.g*, *Lockett v. Ohio*, 438 U.S., at 605 ("[T]he risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty ... is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments"); *Andres v. United States*, 333 U.S. 740, 752 (1948) ("That reasonable men might derive a meaning from the instructions given other than the proper meaning of § 567 is probable. In death cases doubts such as those presented here should be resolved in favor of the accused"); *accord, Zant v. Stephens*, 462 U.S. 862, 884-885, 1 (1983).  Even if  there is some way to construe the jury instructions and verdict form to require imposition of the death sentence, if a reviewing court "cannot conclude with any degree of certainty that the jury did not adopt petitioner's interpretation of the jury instruction," *Mills,* 486 U.S., at 377-378*,*  it must order a new punishment phase.

Mr. McCoskey's appellate contention that the verdict, read in light of the charge, expressed the jury's determination that a life sentence should be imposed is not only plausible, it is, as he argued, based on the well established principle that jurors follow their instructions. App.

'I', *Appellant's Brief,* at 18 (citing, *Richardson v. Marsh*, 481 U.S. 200, 211(1987); *Parker v. Randolph*, 442 U.S. 62, 73 (1979) (opinion of REHNQUIST, J.) ("A crucial assumption underlying that system [of trial by jury] is that juries will follow the instructions given them by the trial judge.")).[4]  The charge explicitly instructed jurors to consider each special issue, starting with future dangerousness, in light of "all mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the State or the defendant." *McCoskey*, no. 71, 629, at 29 (quoting the trial court's charge).  The charge also explicitly instructed the jury that "a affirmative finding should be given to that special issue under consideration" if "when giving effect to the mitigating evidence,"  the jury determines that a "a life sentence, as reflected by a [sic] affirmative finding to the issue under consideration, rather than a death sentence, is an appropriate response to the personal moral culpability of the defendant." *Id.*  It ineluctably follows that the affirmative answer to the first special issue must be taken as expressing the jury's finding that Mr. McCoskey would not be a future danger.  This special issue, furthermore, required the imposition of a life sentence no matter how the jury answered the second special issue.  *See,* TEX. CODE CRIM. P. § 37.071(b)

---

[4] The Texas Court of Criminal Appeals' contention that "obviously, an affirmative answer to the first special issue does not reflect a finding that live is more appropriate," *id.*, at 30, rests squarely on the assumption that jurors ignored the trial court's nullification instruction.  Supreme Court authority, however, emphatically prohibits lower courts from making this assumption when considering a charge to the jury, particularly when the obvious purpose, as here, is to find a way to uphold a death sentence.  *See, Francis v. Franklin*, 471 U.S. 307, 322 n.9 (1985) (criticizing the abandonment of the presumption when to do so would favor upholding the verdict).  Consequently, the Texas court's disposition of Mr. McCoskey's claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *See,* 28 U.S.C. § 2254(d)(1). Furthermore, the prominent placement of the nullification instruction before the special issues leaves no room for speculation that the jurors initially answered the issues in disregard of it and then refused to change their answers.  In this situation, where the most reasonable interpretation of the charge and verdict is that jurors' answer to the special issues expressed their determination that a life sentence was warranted habeas relief is, in turn, warranted.

**B.      THE JURY CHARGE PREVENTED THE JURY FROM GIVING EFFECT TO SUBSTANTIAL MITIGATING EVIDENCE.**

**1.      Even as interpreted by the TCCA, the nullification instruction clearly prevented jurors from giving effect to evidence mitigating against future dangerousness.**

According to the TCCA,

> [H]ad the jury followed the court's instruction to the letter, then two possibilities could have occurred. **Had the jury wanted to recommend a life sentence as opposed to death it would have responded in the affirmative to both of the special issues**, thus yielding appellant's desired result of a life sentence. But, if the jury had expressly wanted to recommend a death sentence, then under the court's instruction, it would have answered both of the questions "no," thus also resulting, to appellant's benefit, albeit contrary to the jury's intention, in a life sentence.

Clearly, under the TCCA's own interpretation of the charge, the nullification instruction made the second special issue determinative of the first.  Because of the nullification instruction, the jury could find (as opposed to inadvertently recommend) that life should be imposed instead of a death sentence *only if* it answered the second special issue dealing with mitigating evidence in the affirmative.  However, interpreting the charge in the manner that the Texas Court of Appeals maintains that it must be does not cure the serious constitutional violation that the charge caused. Instead, the TCCA's interpretation of how the nullification "negates" the purpose of the future dangerousness issue, which is exactly as Mr. McCoskey complained on direct appeal:

> The trial court's instruction thus told jurors exactly the opposite of what the law says and entirely negated the purpose of the first special issue, which the Legislature believed was necessary in addition to the statutory "Penry" special issue.

App. I, Appellant's Brief, at 17.

As Mr. McCoskey also pointed out the nullification instruction, by negating the purpose of (i.e., by automatically determining the answer to) the future dangerousness issue did not

simply violate Texas law, by "negating" the first special issue the charge unconstitutionally prevented the jury from giving effect to evidence that indicated Mr. McCoskey would not commit future acts of violence. *Id.*   In *Penry I*, the Supreme Court stressed that mitigating evidence is a two edged sword. *Penry,* 492 U.S., at 324.  Evidence that may lessen a defendant's moral culpability may at the same time support a finding that the defendant will be dangerous in the future.  Similarly, evidence that shows a defendant will *not* be a future danger, may not lessen his or her personal moral culpability for the offense. Evidence that shows a defendant is docile when confined, isolated or medicated in the prison system may reasonably lead to the conclusion that the defendant lacks the capacity for self-reflection and self-control that are the hallmarks of moral deliberation and conduct, and must be physically or medically restrained in order to prevent him or her from realizing his true, violent nature.[5]  However, the nullification instruction that Mr. McCoskey's jury was told to follow to "decide how much weight" any mitigating circumstances "deserve … in assessing the defendant's personal moral culpability at the time you answer the special issue," and it the charge defined mitigating circumstances as "evidence that a juror might regard as reducing the defendant's moral blameworthiness." *See, McCoseky,* no. 71, 629, at 29-31 (quoting jury instructions).

The evidence that Mr. McCoskey sponsored to show that he not a future danger to society clearly had the double edged quality that concerned the Supreme Court in *Penry I* (and the Texas legislature in passing Article 37.071), in that it was not related to his personal moral culpability for the crime or else could be viewed as indicating a moral weakness.  Mr. McCoskey introduced

---

[5] The Texas legislature's inclusion of the future dangerousness issue, in addition to the mitigation instruction, is in recognition of the fact that jury's may face evidence may mitigate against future dangerousness enough to warrant a life sentence, even though that evidence may not diminish "personal moral culpability" enough to warrant life instead of death. That is precisely why Article 37.071 requires the trial court to impose a life sentence if the jury answers one **or** the other special issue in favor of the defendant.

substantial evidence that he would not be a future danger within an institution where he would be isolated and treated for his psychological problems.  His adoptive mother testified about Mr. McCoskey's history of institutionalization and the benefits he derived while undergoing extended psychological treatment. *Tr. Transc. vol*. 28, at 80-82, 84-85. Records from the youth homes and treatment centers indicated that Mr. McCoskey responded to treatment and therapy. *Id.,* at 75, *Def. Exh*. 11; *id.,* at 88, *Def. Exh.* 12.  His defense expert also testified that Mr. McCoskey would respond to Lithium treatment and opined that, at the time of the crime, Mr. McCoskey was undergoing a manic episode of his underlying bipolar disorder because he had failed to take his medication for several months. *Id.,* at 444-445.  Trial counsel therefore focused in his closing argument at the end of the punishment phase on evidence that demonstrated that within the prison system, Mr. McCoskey would not be likely to commit acts of violence:

> Members of the jury, you can confine Jamie McCoskey for the rest of his life and you know by his experience that he will be given medication in prison to treat his condition. You know that by the history of his time in prison. You know that therefore, society, if our government chose to do its job right, chose to confine him properly, administratively segregate him so that he's not a harm to himself or others and medicate him properly, you know that society is safe from Jamie McCoskey, because he's going to be in prison for life.
>
> Now if that's what you want to do, to protect society, you can do so by confining him for the rest of his life, and that's what you should do. And you also know that, in his case, while confined, he did get medical treatment, and you know that because he's gotten it before, that when he has problems, when it becomes explosive, they could medicate him, they can treat him.

*Tr. Transc., vol* 32, at 132-133.

However, the nullification instruction in the charge, as interpreted by the TCCA, prevented jurors from giving effect to considerable evidence that Mr. McCoskey would not be a future

danger precisely because it did not concern, or tend to diminish, his moral culpability for the offense.

Indeed, if the verdict alone is looked to, and a sentence mechanically imposed based on Article's 37.07's statutory requirement that an affirmative answer to the first special issue and a negative answer to the second special issue necessitates a death sentence, then the charge negated the "future dangerousness" issue in an even more fundamental sense. In short, it did not permit jurors to answer, "No," to the first special issue even if they found that Mr. McCoskey's mitigation defense warranted this response. Instead, as appellate counsel pointed out, jurors following the instruction had to answer the first special issue affirmatively, *App. I, Appellant's Brief*, at 17, whether or not they found that Mr. McCoskey's punishment phase defense mitigated against future dangerousness. Mr. McCoskey's appellate contention that the charge, in violation of due process, did not provide a vehicle through which he could "give effect" to evidence mitigating against future dangerousness is, therefore, unquestionably correct.

On direct appeal, Mr. McCoskey cited Supreme Court decisions ruling that evidence that a capital defendant will not be a future danger "is itself a species of constitutionally relevant mitigating evidence, apart from any other type of mitigating factor." *Id.* (citing *Skipper v. South Carolina*, 476 U.S. 1 (1986) and *Franklin v. Lynaugh*, 487 U.S. 164 (1988)). In *Franklin*, both the concurrence and the dissent stressed that 'the right to have the sentencer consider and weigh relevant mitigating evidence would be meaningless unless the sentencer was also permitted to give effect to its consideration' in imposing sentence. *Id.,* 487 U.S., at 185 (O'Connor, J., concurring in judgment); *id.*, at 199 (Stevens, J., dissenting)). Interpreted in the manner of the TCCA, the charge made it impossible for the jury to give effect to evidence mitigating against the State's contention that Mr. McCoskey would commit acts of violence in the future. The

TCCA's decision was, therefore, contrary to, or an unreasonable application of, clearly established Supreme Court law to which Mr. McCoskey explicitly drew the TCCA's attention. *App. I, Appellant's Brief,* at 19.  Habeas relief is necessary under either prong of 28 U.S.C. § 2254(d)(1).

> **2.    Alternatively, the nullification instruction, by destroying the special issues independence from each other, compelled the jury to consider all mitigating evidence through the prism of the future dangerousness issue in violation of *Penry I*.**

The structure of charge indicated that the issue jurors were to address first was the future dangerousness special issue.  As the TCCA recognized, the nullification instructions required jurors to consider mitigating evidence in connection with the future dangerousness special issue, as follows:

> If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any, and thereafter, give effect and consideration to them in assessing the defendant's personal moral culpability at the time you answer the special lSSUE.

*McCoskey*, no. 71, 629, at 31 (quoting the charge to the jury). The charge therefore shackled the mitigation evidence to the future dangerousness issues.  As a result, in assessing the defendant's personal moral worth, jurors had to consider foremost whether the mitigating evidence that the defense sponsored in support of a life sentence had a bearing on whether Mr. McCoskey was likely to commit acts of violence in the future.

Importantly, jurors deliberating under the impression that mitigating evidence had to be evidence that militated against future dangerousness would be able to answer "Yes" to the first special issue and "No" to special issue number two without violating their oath to follow the Court's charge.   If the mitigating evidence did not change the jurors' belief that Mr. McCoskey would commit criminal acts of violence in the future, then it would follow automatically that the

mitigating evidence did not militate against the death penalty.  This, of course, underscores the *Penry I* violation flowing from the erroneous charge.  Furthermore, the prosecutor primed jurors to treat mental health evidence as mitigating only if it indicated that the defendant would not be dangerous by the prosecution during *voir dire*.  Over Mr. McCoskey's objection the trial court permitted the State to tell the jury that mental illness and the experience an abusive childhood could be considering aggravating factors. *See, McCoskey, 71,629,* at 8 (quoting *voir dire*).

By restricting mitigating evidence to evidence that had an impact on future dangerousness, the nullification instruction prevented the jury from giving effect to McCoskey's history of mental problems and childhood abuse.  One mitigation defense was that McCoskey's violent tendencies were not a willful expression, but caused by mental deficits, and mental illness exacerbated by the pain, suffering and abandonment he experiences in early childhood. Tr. Transc., vol. 28, at 365-451, 487-498.  Specifically, defense counsel brought out at trial that "[a]mong the various diagnoses that applied to Jamie McCoskey [in the past were]… cyclothymic disorder, intermittent explosive disorder, explosive personality disorder, bipolar disorder, and schizophrenia, paranoid type." *Id.,* at 415.  Defense expert, Dr. Hayes, testified that Mr. McCoskey suffered from bipolar disorder, but did not rule out intermittent explosive disorder. *Id.,* at 427.  As Dr. Hayes explained the condition, Mr. McCoskey was subject to manic episodes in which he engaged in goal directed violent behavior the wrongfulness of which he not perceive or desist from carrying out. *Id.,* at 435-440.  However, with a nullification charge constraining the jury to consider whether the evidence impacted the first special issue regarding future danger, evidence about the particular mental illness that Mr. McCoskey suffered from obviously worked at cross purposes with a mitigation defense.

The prosecution, moreover, exploited the connection that the nullification charge forced jurors to make between mitigation and future danger. Explaining the significance of Mr. McCoskey's criminal record, the prosecutor flatly stated that the evidence of a continuing tendency towards violent conduct, despite intervention by the mental health system, meant that "there is no mitigating evidence." *Id.,* at 166.   Singling out Mr. McCoskey's assault on the prosecution team by hurling a chair, the lead prosecutor, Lambright, asks, "What does he do that shows there's mitigating evidence in this case?" *Id.,* at 166.   He then answers his question in a manner that urged jurors to consider the defense's mental health evidence in light of the issue of future dangerousness, and which emphasized that there was "nothing mitigating with regard to [Mr. McCoskey's] mental illness" in light of the cycle of violence that the prosecutor maintained the jury has "got to stop":

> What does he do? He tries his level best to hurt me and to hurt Denise Nassar, by picking up that chair by hurling it through the air at me and hurling it through the air at her.  Now, folks, if that's mitigating evidence, I just don't know what to say to you.  How many people have to be hurt? How many people have to be kidnapped? How many people have to be sexually assaulted?   How many people have to be stabbed? When does it stop?  It's got to stop, folks. There's absolutely nothing mitigating about this man.  Absolutely nothing mitigating with regard to his mental illness.

*Id.,* at 166-167.

The charge to the jury, therefore, clearly violated well established Due Process and Eighth Amendment rights that require that the jury be allowed to give full effect to mitigating evidence, *see, Jurek v. Texas*, 428 U.S. 262 (1976); *Penry I,* such as the evidence of mental illness and childhood abuse in this case.  The nullification instruction in this case obviously did not resolve, but rather it transgressed constitutional principles that the Supreme Court has declared are long-standing and well established.  *See, Penry v. Johnson*, 532 U.S. 782, 797 (2001) (Penry II); *and see, Smith v. Texas*, 543 U.S. 37, 46 (2004) (per curiam).  Consequently,

21

the TCCA's decision affirming the death penalty was objectively unreasonable. *See, Penry II,* at 803-804.  This Court should grant relief and order a new punishment phase.

D.    **THE INSTRUCTIONS GIVEN TO MR. MCCOSKEY'S CAPITAL SENTENCING JURY INJECTED ARBITRARINESS AND CAPRICIOUSNESS INTO THE PROCEEDING, IN VIOLATION OF DUE PROCESS AND THE EIGHTH AND FOURTEENTH AMENDMENTS.**

1.    **The Eighth and Fourteenth Amendments Prohibit Arbitrary and Capricious Government Action.**

The nullification instruction given to Mr. McCoskey's capital sentencing jury injected capriciousness into the proceeding, in violation of Eighth and Fourteenth Amendment principles requiring that death sentences not be imposed in an arbitrary and capricious manner and due process under law.  *See Smith II,* 550 U.S., at 301-02 ("*Penry II* and *Smith I* recognized the ethical dilemma, the confusion, and the capriciousness introduced into jury deliberations by directing the jury to distort the meaning of an instruction and a verdict form."); *Penry II*, 532 U.S., at 800 ("The mechanism created by the supplemental instruction thus inserted 'an element of capriciousness' into the sentencing decision, 'making the jurors' power to avoid the death penalty dependent on their willingness' to elevate the supplemental instruction over the verdict form instructions."); *Furman v. Georgia*, 408 U.S. 238 (1972); *Jurek v. State*, 522 S.W.2d 934, 940 (Tex. Crim. App. 1975) (*Furman* not satisfied if discretion in the assessment of punishment capricious).

"*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."  *Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (opinion of Stewart, J.).  *See, also, Sawyer v. Whitley*, 505 U.S. 333, 341 (1992) ("Since our decision in *Furman v. Georgia*,

our Eighth Amendment jurisprudence has required those States imposing capital punishment to adopt procedural safeguards protecting against arbitrary and capricious impositions of the death sentence") (internal citations omitted).   Thus, an arbitrary or capricious capital sentencing proceeding violates the Eighth Amendment.

In *Furman*, Justice Douglas identified as the factor causing death sentences to be arbitrary and capricious that "[j]uries … have practically untrammeled discretion to let an accused live or insist that he die."  *Furman*, 408 U.S., at 248 (Douglas, J., concurring).  Further, "The high service rendered by the 'cruel and unusual' punishment clause of the Eighth Amendment is to require legislatures to write penal laws that are evenhanded, nonselective, and nonarbitrary, and to require judges to see to it that general laws are not applied sparsely, selectively, and spottily to unpopular groups."  *Id.*, at 256.   Justice Douglas believed discretionary capital statutes to be "unconstitutional in their operation" because "[t]hey are pregnant with discrimination and discrimination is an ingredient not compatible with the idea of equal protection of the laws that is implicit in the ban on 'cruel and unusual' punishments."  *Id.*, at 256-57.  Justice Stewart analogized arbitrary death sentences to being "struck by lightning." *Furman*, 408 U.S., at 309 (Stewart, J., concurring).  He believed a death sentence is "cruel and unusual" when the recipient of the sentence was "capriciously selected."

Additionally, the Fourteenth Amendment itself directly prescribes arbitrary and capricious government action.  The Fourteenth Amendment's due process clause "was intended to secure the individual from the arbitrary exercise of the powers of government."  *Daniels v. Williams*, 474 U.S. 327, 331 (1986).  *See also Wolff v. McDonnell*, 418 U.S. 539, 558 (1974) ("The touchstone of due process is protection of the individual against arbitrary action of government."); *Lehman v. City of Shaker Heights*, 418 U.S. 298, 303 (1974) (opinion of

Blackmun, J.) (because state action existed, even policies and practices merely governing access to transit system's advertising space could not be arbitrary or capricious); *Nebbia v. People of New York*, 291 U.S. 502, 525 (1934) ("the guaranty of due process … demands … that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the objective sought to be attained").  "It is not without significance that most of the provisions of the Bill of Rights are procedural.  It is procedure that spells much of the difference between rule by law and rule by whim or caprice.  Steadfast adherence to strict procedural safeguards is our main assurance that there will be equal justice under law." *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 179 (1951) (Douglas, J., concurring).

### 2.    The    Nullification    Instruction    Injected    Arbitrariness    and Capriciousness into Mr. McCoskey's Capital Sentencing Proceeding.

The Supreme Court has held that a nullification instruction materially identical to the one given jurors during Mr. McCoskey's capital sentencing proceeding injects capriciousness into the proceeding.  The nullification instruction, which informs the jury that it can change one or more truthful "yes" answers to an untruthful "no" answer in order to avoid a death sentence, "ma[kes] the jury charge as a whole internally contradictory[] and place[s] law-abiding jurors in an impossible situation." *Penry II*, 532 U.S., at 798.  It makes following the entirety of the instructions in the sentencing scheme "both logically and ethically impossible for a juror." *Id.*, at 799.

When a defendant's mitigating evidence does not fit within the scope of the special issues, then "answering those issues in the manner prescribed on the verdict form necessarily mean[s] ignoring the command of the [nullification] instruction" and "answering the special issues in the mode prescribed by the [nullification] instruction necessarily mean[s] ignoring the verdict form instructions." *Id.*, at 800.  Jurors who sought to comply with the nullification

24

instruction and give effect to a defendant's mitigating evidence "would have had to violate their oath[s] to render a true verdict." *Id*. (internal quotation marks omitted). The *Penry II* Court accordingly found that the nullification instruction's presence "insert[s] an element of capriciousness into the sentencing decision, making the jurors' power to avoid the death penalty dependent on their willingness to elevate the [nullification] instruction over the verdict form instructions." *Id*.

In *Smith II*, 550 U.S. 297 (2007), the Supreme Court reiterated this aspect of its *Penry II* holding, finding that nullification instructions present "problems distinct from *Penry* error and may be grounds for reversal as an independent matter…); 550 U.S., at 302; *see also id*. ("… the ethical and logical quandary caused by the jury nullification charge may give rise to distinct error…").

A capricious sentencing proceeding violates the Eighth Amendment cruel and unusual punishment clause as well as the Fourteenth Amendment's due process clause. The nullification instruction's presence injected capriciousness into Mr. McCoskey's sentencing proceeding and its presence requires granting the writ of habeas corpus and a new sentencing proceeding free of such arbitrariness.

### E.   PROPER HARMLESS ERROR ANALYSIS CLEARLY REQUIRES HABEAS RELIEF; IN THE ALTERNATIVE, IT IS NOT NECESSARY OR APPROPRIATE IN ORDER TO GRANT RELIEF.

It is well established that the imposition of a sentence greater than the law permits is fundamental error that seriously undermines the judicial system. *See, United States v. Williamson*, 183 F.3d 458, 464 (5th Cir. 1999) ("Leaving [the defendant] incarcerated for 30 years when he should have been sentenced to no more than 15 under existing precedent ... seriously would affect the fairness, integrity and public reputation of judicial proceedings by

undermining the rule of law."); *United States v. Aderholt,* 87 F.3d 740, 744 (5th Cir. 1996) (finding plain sentencing calculation errors seriously affected the fairness and integrity of the judicial proceeding); *United States v. Franks*, 46 F.3d 402, 405 (5th Cir. 1995) (finding "substantially longer sentence" of 63 months longer than defendant should have received "seriously affected" the fairness and integrity of judicial proceedings); *United States v. Cabral-Castillo*, 35 F.3d 182, 189 (5th Cir. 1994) (finding, in fairness, that district court should correct plain sentencing errors on remand); *United States v. Ford*, 88 F.3d 1350, 1356 (4th Cir. 1996) ("If we do not correct this error, [the defendant] will serve a term of imprisonment three years longer than required by the sentencing guidelines.") (emphasis added). As the Supreme Court has stated, "the penalty of death is different in kind from any other punishment imposed under our system of criminal justice." *Gregg v. Georgia*, 428 U.S. 153, 188 (1976); *Eddings, supra*. Hence, the erroneous imposition of a death sentence, when the verdict required an imposition of life, obviously the type of fundamental error that violates due process. Furthermore, since the charge, in violation of *Penry I*, prevented the jury from giving effect to evidence mitigating against a finding that Mr. McCoskey would be a future danger, harmless error analysis is simply inappropriate. *See, Nelson v. Quarterman*, 472 F.3d 287, 287 (5th Cir. 2006).

**F.     28 U.S.C. § 2254(d)   DOES NOT PRECLUDE RELIEF.**

Title 28 U.S.C. § 2254(d) provides that relief on a habeas corpus claim may not be granted on a claim adjudicated on the merits in state court unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The CCA did not adjudicate the merits of Mr. McCoskey's claim that his death sentence violated his Eighth and Fourteenth Amendment rights in view of the jury instructions and verdict rendered.  While the CCA addressed the claim, it is entirely unclear whether the CCA was addressing the federal constitutional errors that Appellate counsel raised.  See Appellant's Brief at 18 ("The trial court's erroneous instruction was not simply a violation of the clear requirements of TEX. CODE CRIM. PRO. Art. 37.071 (Vernon 1994).  It also violated the Eighth and Fourteenth Amendments to the United States Constitution.").  The state court did not cite to the federal constitution or any federal case in disposing of the claim.  Consequently, Mr. McCoskey's federal claim was not adjudicated on the merits by the state court.  Federal review is therefore not circumscribed by 28 U.S.C. § 2254(d), because an adjudication on the merits by the state court is a precondition to application of the limitation.  *See, Salazar v. Dretke*, 419 F.3d 384, 396 n.19 (5th Cir. 2005) ("…if the federal claim was not adjudicated on the merits in the state courts, we would review the claim de novo rather than under the deferential standard set forth in § 2254(d)(1)"); *Solis v. Cockrell*, 342 F.3d 392, 394 (5th Cir. 2003) (claim reviewed *de novo* when state court failed to adjudicate its merits after erroneously applying procedural rule to dispose of it); *Miller v. Johnson*, 200 F.3d 274, 281, n.4 (5th Cir. 2000) ("Review is de novo when there has been no clear adjudication on the merits."); *Nobles v. Johnson*, 127 F.3d 409, 416 (5th Cir. 1997).

Alternatively, within the meaning of 28 U.S.C. § 2254(d)(1), the Texas court's disposition of Mr. McCoskey's claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" because the TCCA's decision (a) ignored reasonable, natural interpretations of the verdict in light of the charge that showed that jurors found a life sentence

was warranted, (b) rested on an assumption that jurors ignored their instructions, and (c) contradicted Supreme Court decisions that are meant to ensure that jurors have the ability to give effect to all evidence mitigating against the death penalty.

## CLAIM TWO

**IN VIOLATION OF DUE PROCESS, THE SIXTH AND THE EIGHTH AMENDMENT THE COURT DENIED STRIKES FOR CAUSE OF JURORS WHO STATED THEY WOULD NOT CONSIDER LIFE IN THE CASE OF FELONY MURDERS.**

**A.      Juror Housel should have been removed for cause.**

As the TCCA recognized, juror Hoesel expressed a "very strong" preference to invoke the death penalty in certain circumstances.  In fact, the circumstances that Hoesel expressed his belief that death "automatically be imposed" were "intentional kill[ings] while… committing another crime." *McCoskey, no. 71 629,* at 9.  The very colloquies that the TCCA ruled showed that Hoesel was qualified to serve on the jury indicate that he would not consider life in case of felony murders. *Id.,* at 9-10.

> THE COURT: So now my question to you, having been given both kinds of views towards the death penalty, as you sit there now, do you believe that you could be fair and impartial to both sides?
>
> [HOESEL] , Well, yes, as far as the death penalty.  I mean, either way, which I'd have to hear the circumstances and everything.
>
> ***
>
> THE COURT: You've got to reconsider and apply the law as I give it to you, to this. Do you understand that?
>
> [HOESEL]: Yes Sir.
>
> THE COURT: Can you do that?
>
> [HOESEL] : Yes, sir,
>
> * * *

[THE STATE: ]  Let me get you to talk to us and tell us what you think about the death penalty

[HOESEL: ] I think - - I don't think that it's used as much as it should be. I think there's too many people on death row for too long; that if it's given as a sentence, that it should be carried out timely.

* * *

But, I don't think all cases warrant it, that there's certain cases where the death sentence shouldn't be used, but there are certain cases where it's no question that it should be.

* * *

[APPELLANT:] You think people that intentionally cause other people's deaths, murder them, should pay with their own lives?

[HOESEL:] If it's out of malice, yes.

* * *

[APPELLANT: ]  and I think you said that you think someone that kills a police officer
should forfeit their lives?

[HOESEL:  I believe so. In most cases it should, you know, they're serving a purpose.

* * *

[APPELLANT: And is it always true that **if** someone either intentionally kills a police officer in the performance of his duty or intentionally kills somebody that's not a police officer, but does that while committing another crime like a robbery or a burglary or a kidnapping or whatever, that you would believe that those persons should, **if** they're going to do that kind of crime, should pay with their lives?

[HOESEL:] Yes, because I think they went in knowing that something like that would happen if they're armed and if they're planning to do that.

* * *

It would matter on the circumstances, I guess, also. But, I think if they go and rob and have weapons with them knowing that there's a possibility that they could be interrupted during that crime, that they have the intent to harm the person or whoever they may run into.

The TCCA's ruling therefore violated Title 28 U.S.C. § 2254(d)(1-2), in that it was an unreasonable application of, or else was contrary to, constitutional law that was clearly established by Supreme Court precedents.  Supreme Court law does not allow a court to seat a juror who is set to vote for death even before the State has started his case in chief.  In this case, after the reading of the indictment death was the automatic choice for juror Hoesel absent acquittal. *See, Morgan v. Illinois*, 504 U.S. 719, 736 (1992).  *Voir dire* made it painfully obvious that Hoesel could not consider life in the case of any killings intentionally carried out in the course of another crime, and specifically could not consider life for defendants who killed someone they had kidnapped.

**B.     The trial court should have struck juror Savant for cause.**

Juror Savant expressed a clear preference for death.  While he indicated that his decision on punishment would depend on the circumstances, the circumstances that might inspire reflection rather than an automatic election of death meant Savant could not consider life for a broad category of cases in which Mr. McCoskey's fell.  As had Hoesel, Savant "even prior to the State's case in chief, had predetermined the terminating issue of his trial, that being whether to impose the death penalty." *See, Morgan* 504 U.S., at 736.

<u>**CLAIM THREE**</u>

**IN VIOLAION OF MR. MCCOSKEY'S PROCEDURAL DUE PROCESS RIGHTS, THE TRIAL COURT FAILED TO CONVENE A COMPETENCY HEARING.**

*Pate v. Robinson,* 383 U.S. 375 (1966), requires the trial court to conduct an inquiry into the defendant's mental capacity if the evidence raises a bona fide doubt as to competency.  The quantum of evidence implied by "bona fide doubt" describes the same constitutional standard as "sufficient doubt" and "reasonable doubt."  *See Chavez v. United States*, 656 F.2d 512, 516 n. 1

(9th Cir. 1981) (collecting cases).  If the trial court receives evidence, viewed objectively, that should raise a reasonable doubt as to competency, yet fails to make further inquiry, this constitutes a denial of a fair trial. *Lokos v. Capps*, 625 F.2d 1258, 1261-62 (5th Cir. 1980).

In determining whether *Pate* and *Dusky* were violated the question is whether, viewed objectively, the "aggregate of [] indicia" before the trial court raise a bona fide doubt as to the defendant's competency.  *See Drope*, 420 U.S at 180; *Pedrero v. Wainwright*, 590 F.2d 1383, 1387 (5th Cir. 1979).  "There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed." However, the following have been recognized as relevant factors: "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial." *Id.*  "Under appropriate circumstances, the existence of any one factor … could be sufficient to trigger a *Pate* inquiry." *Lokos,* 625 F.2d, at 1262.

### A.    Mr. McCoskey raised a threshold doubt as to his competency.

The TCCA's rendition of the facts demonstrates that the threshold showing for a *Pate* hearing was clearly reached in this case.  According to the TCCA,

> The record reveals the following series of events. Appellant was arrested November 15, 1991. On confinement, he was placed on prescribed medication, including psychotropic drugs and lithium, for his mental illness. In September of 1992, administration of the medication allegedly ceased. In October of 1992. appellant's counsel filed a motion to require the Harris County Sheriff's Department to resume its dispensing of medication to appellant, which motion was granted by the trial court. Despite this motion, appellant contends that he was continually denied his medication for a two month period. On November 12, 1992, after appellant had been adjudicated guilty of capital murder, but prior to sentencing, appellant entered the courtroom, picked up a chair and threw it at the prosecutors screaming, "That's for lying in court."

> Following this incident, appellant's counsel claimed that appellant *was* not. competent as a result of the denial of his medication. Counsel stated that appellant did not have a rational understanding of the events and was no

> longer able to assist in his defense or consult with counsel. Both of appellant's counsel subsequently testified under oath that appellant was not competent to proceed with the punishment phase of trial. The trial court ordered the trial to continue and the chair-throwing incident was introduced into evidence over objection at the punishment phase.

Clearly, multiple factors came directly to the trial court's attention, each recognized by the Supreme Court in *Pate* and *Drope* as being sufficient to raise the requisite threshold doubt regarding competence to stand trial. These *indicia* including Mr. McCoskey's history of mental illness, aberrant behavior in the courtroom, deprivation of medication needed to modulate Mr. McCoskey's psychiatric condition, and the testimony of both defense attorneys that their client could not assist them with his defense or comprehend the facts of the case or the proceedings against him with a reasonable degree of rational understanding.

The record shows that the TCCA's rendering of the evidence was incomplete.   Trial counsel impressed upon the Court that,

> right now in the holdover cell, he is continuing to exhibit signs of a heightened agitated state, rapid pacing, he is crying, he is extremely distraught, acting in an irrational manner, all of which is consistent with the mental illness that he suffers from.
> Tr. Transc., vol. 30, at 19.

Trial counsel did not use the chair throwing incident as a fortuitous excuse to complain about Mr. McCoskey's competency.   On several occasions, trial counsel had brought to the trial court's attention that Harris County had taken Mr. McClosky of his medication and he had repeatedly expressed doubts about his client's competency to stand trial.   *Id.,* at 12.   The testimony that each defense attorney, far from conclusory, provided the court with substantial details of their clients irrational conduct, and inability to communicate about the trial. *Id.,* at 35-37.   After affirming lead counsel's testimony that Mr. McCoskey was unable rationally understand the proceedings or consult with counsel, co-chair, Mr. Easterling, stated:

> Specifically, throughout the week that we've been in trial, Monday Tuesday, Wednesday, Thursday, and now Friday, I have sat next to our client, Jamie McCoskey, with Mr. Peacock to my right, and between us and the State's attorneys. I have done everything I can, Your Honor, during the trial, to keep the client calm, to keep him, basically busy or distracted in doing things that would not disrupt the courtroom. At times, he would assist us in the representation and other times he would be totally incoherent and not be understanding what was going on during the trial. We have consulted with him many times in the holdover cell on breaks, lunch, before and after the trial, and at those times, he did not seem focused on the activities that was (*sic.*) happening in the courtroom. He would want to talk about other issues and other things that had nothing to do with this trial, and certainly, at those points, did not have any present ability to consult with us with a reasonable degree of rational understanding.

*Id.,* at __.

As in *Pate*, it was therefore incumbent upon the court to take steps consonant with due process to ensure that Mr. McCoskey was competent to stand trial.  This was not done, resulting in a violation of Mr. McCoskey's procedural due process rights.  *See, Pate*, *supra.*

**B.    The TCCA determination of Mr. McCoskey's *Pate* claim on direct appeal violated 28 US.C. § 2254(d).**

In order to justify denying relief, the TCCA manipulated that fact that Texas' competency statute arguably codifies a tripartite process.  According to the TCCA, counsel raises the issue of competency at the first stage.  At the second stage, the court makes an inquiry to determine whether there is sufficient evidence.  If the court decides affirmatively, the third stage is a competency hearing in front of a jury especially gathered for that purpose.  The TCCA maintained that the trial court proceeded to stage two when it heard the sworn testimony of the defense attorneys.  It then considered only (but not all of) the evidence that the attorneys put on and condemned important portions of it as conclusory, particularly counsel's statement that Mr. McCoskey was not medicated.

For numerous reasons, the TCCA's determination that the trial court's inquiry satisfied due process was clearly unreasonable, or contrary to, the Supreme Court's seminal rulings for purposes of 28 U.S.C. § 2254(d).  **First**, *Drope* makes clear that the trial court must consider evidence from all sources.  **Second**, as *Pate* established, even if a source contains evidence of competency, the trial court in making the threshold decision to convene a competency hearing, must consider indicial of incompetency presented by that source. In this case, the court heard from lay witnesses who testified about Mr. McCoskey's history of weird irrational behavior.  It also had before it testimony from a psychological expert that Mr. McCoskey was mentally ill and suffering from a disorder that rendered him irrational particularly if untreated.  Trial counsel had also introduced extensive records documenting Mr. McCoskey's history of mental illness. **Third**, *Pate* emphasized that the trial court, in determining whether to convene a hearing, has an independent obligation to consider the evidence of incompetency that comes before.  Here, trial counsel, reminded the court of the evidence already before it, and, from the perspective of the privileged relationship with their client that only the defense attorneys have, each attorney provided the court with uncontested testimony that Mr. McCoskey had been taken off his medication, and unambiguous testimony that he was acting too irrational and disturbed due to his mental illness to satisfy either of *Dusky*'s prongs.

The TCCA's implication that the trial court was only obligated to consider evidence that Mr. McCoskey's lawyers presented at the alleged "second" stage of Texas competency proceedings contradicts *Pate's* unmistakable holding that trial courts have an independent responsibility to consider evidence of incompetency that comes before it.  The TCCA's dismissal of trial counsel's assertion that Mr. McCoskey had been taken off of his medication conflicts

with *Pate's* instruction that the trial court must consider uncontradicted evidence of incompetency.

The TCCA's contention that some sort of intermediary hearing took place is based on the fact that the defense counsel took the stand and testified under oath, as opposed to making a record standing at the bar.  However, that fact that the attorneys took the stand did **not** absolve the trial court of its independent obligation to consider all evidence of incompetency from any source, nor did taking the stand convert a preliminary inquiry into a competency hearing that comports with due process.  Clearly, trial counsel's testimony simply *triggered the need for a hearing* in which, *inter alia*, the testimony of a mental health professional ordered by the court to contemporaneously examine Mr. McCoskey could be heard and considered.  Indeed, far from satisfying constitutional desiderata for a competency hearing, simply hearing from the attorneys, who both attested to their client's incapacity, fell short of requirements for a preliminary inquiry. The trial court, contrary to the Supreme Court's unmistakable instructions in *Drope*, did not take the minimal step of engaging, or attempting to engage, Mr. McCoskey in a colloquy.

When the TCCA considered the evidence, as opposed to the process, the TCCA  found that that the trial court was adequately solicitous of Mr. McCoskey's rights by focusing on (i) the State's testimony that Mr. McCoskey had been found competent pursuant to a pretrial psychological exam and had not acted out before he was convicted, focusing on (ii) co-counsel's testimony that Mr. McCoskey could sometimes understand him, and noting (iii) that co-counsel testified that after the chair-throwing incident Mr. McCoskey was able to comprehend and sign an evidentiary stipulation.   However, the TCCA's consideration of the evidence simply compounded the violations of Supreme Court law.

The gravamen of an inquiry into competency is whether the defendant has a *present* ability to assist counsel with his defense and comprehend facts of the case and proceedings against him, *Dusky, supra,* but the TCCA relies on (a) the results of a competency examination administered 11 months before trial, and (b) defense counsel's reference to past conferences in which his client "sometimes" understood him. Finally, the "evidentiary stipulation" that Mr. McCoskey signed was a stipulation that certain jail records pertained to Mr. McCoskey's. *Tr. Transc. vol.*30, at 38; *id., vol.,* 31, at 95 (referring to *State'sExhibit No.* 64 "A Stipulation of Evidence, wherein it is stipulated that the defendant, Jamie Bruce McCoskey, is the same Jamie Bruce McCoskey whose name is mentioned in State's Exhibit 62, 61, 60, 65 and 59").   That required no more of than that the defendant recognize his name.   Counsel furthermore indicated that McCoskey did not sign the stipulation understanding that he was giving up a right (i.e., the "right" to cross examine a custodian of records) for the sake of expediency, but because he incorrectly believed that by stipulating to the evidence he could avoid having to come to court. *Id.*, *vol.* 30, at 39.

### C.   The convicting court's re-visitation of the procedural due process issue in state habeas proceedings in 2008 simply repeated errors made by the TCCA on direct appeal.

Once the TCCA rules on an issue on direct appeal, the same claim cannot be raised in collateral proceedings.   The TCCA applies this bar regularly and consistently.   Hence, Judge Suzan Brown's (who was not the judge at trial) findings and facts regarding this issue do not represent a redetermination by the TCCA of this issue.

Furthermore, Judge Brown's proposed findings of fact and conclusions of law ("PFFACL"), paragraphs 40-52, repeat the violations of Supreme Court law seen in the decision on direct appeal. Indeed, the convicting courts recommendation in 2008 of how to dispose of the

procedural due process issue by and large incorporates the TCCA's erroneous 1995 opinion. *See, PFFACL*, ¶¶ 45-48.  The convicting court relies again on contrary allegations by the State. *PFFACL*, ¶41, 43.  It relies again on the 11 month old competency exam.  *Id.,* at 50.  It also discounts evidence of incompetency on the ground that it is "just as consistent with competency," thereby repeating verbatim the TCCA's mistake application standards governing substantive competency issues to the procedural due process issue at hand.

In addition, Judge Walker, before whom Mr. McCoskey was tried, passed away before state habeas proceedings commenced.  Judge Brown, who took his place on the bench, did not have first-hand knowledge of Mr. McCoskey's demeanor or behavior, nor, of course, a record of a colloquy between Mr. McCoskey and trial court, since no such colloquy took place.  Her allegation about Mr. McCoskey's competency at trial making a retrospective hearing unnecessary, *id.*, at ¶ 52, is therefore conclusory and contrary to the approach mandated by the Supreme Court.  Under *Pate* and progeny, convicting courts must determine whether evidence raising a threshold doubt as to competency came before the trial court.  The next step is to determine whether a competency hearing is feasible.  Here, Judge Brown erroneously reasoned that because Mr. McCoskey did not prove his substantive competency claim, the court did not have to assess the feasibility of, or convene, a hearing.

## CLAIM FOUR

**MR. McCOSKEY WAS TRIED WHILE ACTUALLY INCOMPETENT IN VIOLAITON OF HIS FOURTEENTH AMENDMENT DUE PROCESS RIGHTS.**

The evidence of incompetency in CLAIM THREE above is incorporated by reference as if fully set forth herein.

Because the trial court did not convene a competency hearing and the convicting court did not convene a retrospective hearing, Mr. McCoskey emphasizes that his due process rights were denied. He maintains that convening a hearing now is not feasible and relief must be granted on procedural grounds.

In addition, during State habeas proceedings, Mr. McCoskey presented that affidavit testimony of trial counsel and of mental health expert, Dr. Patrick Lawrence, extensively supporting the conclusion that Mr. McCoskey was incompetent to stand trial. *See,* PFFACL, p. 10, ¶¶ 48 and 49 (referring to Dr. Lawrence's report). He also provided extensive medical records, including Harris County Jail records made contemporaneous with trial showing that he Mr. McCoskey was confused, depressed and off his medication. The State does not appear to have presented evidence besides the allegations that it made at trial. See PFFACL, p. 25, ¶4. The convicting court relied entirely on the trial transcripts for evidence from which it concluded that Mr. McCoskey was competent. *Id.* Remarkably, the evidence that the Court cited was testimony of Mr. McCoskey's mother, whose last known communication with her son was around the time of the murder, and approximately one year before trial. *Id.* (citing *Tr. Transc.*, vol. 28, 125-163).

In light of clear and convincing evidence that Mr. McCoskey was incompetent to stand trial this Court should order habeas relief.

## CLAIM FIVE

**IN VIOLATION OF DUE PROCESS THE STATE WITHHELD EVIDENCE IMPEACHING SEROLOGICAL AND DNA TESTIMONY.**

The State sponsored the testimony of C. Kim, B. Sharma, and H. Hammond regarding the collection, transmittal, analysis and results of DNA testing.  At the time of trial, Kim was employed by HPD as a chemist. *Tr. Transc*. vol. 27, at 107.  Kim received Collins' rape test kit. *Id.,* at 108, 114 and *State's Exhs.* 35-38.  Kim also recovered from the HPD property room items of Collin's clothing, and the knives taken off of Mr. McCoskey. *Id.,* at 116, 120 and *State's Exh*. 41 and 31-32.  Kim received DNA evidence from a Dr. Sharma, *id.,* at 131, including the results of DNA testing of Mr. McCoskey's blood and Collins' and Dwyer's blood. She also obtained the results of DNA testing performed on clothing in the case from a Ms. Hollie Hammond. *Id.* and *State's Exh.* 55.

Baldev Sharma testified that he had a PhD and had completed post doctoral work at the University of Michigan.  At the time of trial, Sharma was working with a laboratory that he said was "associated with the Baylor College of Medicine." *Id.,* at 138.  Sharma, however, did the work in this case at the HPD Crime Lab, *id.*, at 205, where he performed the DNA analysis on body fluid samples taken from the evidence that Kim gave to him.  *Id.*, at 140 *et seq.*  Hollie Hammond provided DNA testimony based  that linked Mr. McCoskey to the rape of Collins and murder of Dwyer.  *Id.,* at 211, 214.

In 2002, the Houston Crime Lab suspended DNA testing because of shoddy work of employees, including Kim.  In 2003, Kim was fired for her shoddy work in the wrongful rape conviction of Josiah Sutton.  Investigation by the Houston Chronicle revealed that she had been subject to disciplinary actions related to her work. *Houston  Chronicle,* Jan  8,  2006

(http://www.chron.com/disp/story.mpl/special/crimelab/3572618.html).  Kim's mishandling and misinterpretation of evidence extend far back.  Kim's shoddy work resulted in the wrongful conviction in 1987 of Gary Alvin Richards. *Houston Chronicle*, April 29, 2009.

Baldev Sharma, former DNA section supervisor and current head of quality control, has master's and Ph.D.-equivalent degrees in chemistry.  However, "an internal HPD memo said he had failed proficiency tests and therefore did not qualify for his position as quality-control supervisor." *Sept. 7, 2003, Houston Chronicle, DNA lab analysts unqualified Review finds education, training lacking Houston Chronicle, by Lise Olsen and Roma Khanna*.

Hammond's work also came in for substantial criticism in the June 13, 2007, *Final Report of the Independent Investigator for the Houston Police Department Crime Laboratory and Property Room* (http://www.hpdlabinvestigation.org/reports/070613report.pdf).  Evaluation of her serological work in the *Luken* case revealed that  "overwhelming evidence … contradicting Ms. Hammond's enzyme testing results. *Id.,* at 93.  Noting the "widespread problems [] observed in the Crime Lab's electrophoresis testing," the June 13, 2007 Report concluded that there is reason to be skeptical about [Ms Hammonds] exclusion of Mr. Luken." *Id.,* at 94.

The systemic problems at the Houston Crime Lab, and the false and misleading results that Kim was presenting, were not discovered, or discoverable, until well after Mr. McCoskey filed his initial habeas petition in 1997.  The Sutton case that set the stage for an investigation that revealed the degree of scientific incompetence and dishonesty pervading the Houston Crime Lab did not break until 1999.  Up until that time, Crime Lab failed to disclose evidence impeaching its DNA and serological analysis.  Mr. McCoskey is therefore excused under *Murray*

*v. Carrie,* 477 US 478 (1986), and *Strickler v. Greene,* 527 U.S. 263 (1999)*,* from presenting this evidence the due process claim depending on it.

Had Mr. McCoskey's trial counsel been informed of Kim's and the HPD Crime Lab's mishandling of evidence, defense counsel would have been able to impeach the results of the rape test kit and further undermine the chain of custody of important physical evidence used to convict him at trial. The failure to disclose this evidence, must be imputed to the prosecution under *United States v. Agurs*, 427 U.S. 97 (1976).

**CLAIM SIX**

**MR. McCOSKEY WAS DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HIS SIXTH AMENDMENT RIGHTS**

**A.     STANDARDS**

*Strickland v. Washington*, 466 U.S. 668 (1984), set forth the legal principles that govern ineffective assistance of counsel claims. There are two components: a petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. *Id.,* at 687. To establish deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness." Id., at 688. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct." *Wiggins v. Smith,* 539 U.S. 510*,* 521 (2003). Instead, the Court has "emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Id.,* (quoting *Strickland*, 466 U.S., at 688). In order for counsel's inadequate performance to constitute a Sixth Amendment violation, petitioner must show that counsel's failures prejudiced his defense. *Strickland*, 466 U.S., at 692. To establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

41

proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*., at 694.

**B.    ARGUMENT**

     **1.    Counsel's Failure to Object to the "Nullification Instruction" Was Ineffective.**

       **a.    Deficiency**

The facts and argument alleged in CLAIM ONE, sections A, B, and C, above are incorporated by reference and re-alleged as if fully set forth herein.

Two years before Mr. McCoskey's trial, the Supreme Court delivered *Penry v. Lynaugh*, 492 U.S. 302 (1989), which held that the Texas death penalty statute violated the Eight and Fourteenth Amendment rights of Johnny Penry because his evidence in mitigation of punishment could not be properly considered by the jury within the scope of the statutory special issues included in the court's charge; that is, the jury did not have a means of expressing its "reasoned moral response" to Penry's mitigating evidence.   A careful review of Supreme Court jurisprudence in this area makes clear that well before our decision in *Penry* I, seminal cases" had firmly established that sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future." *See, Abdul-Kabir v. Quarterman*, 550 U.S. 233, 265-266 U.S (2007) (citing Woodson v. North Carolina, 428 U.S. 280 (1976), *Proffitt v. Florida*, 428 U.S. 242 (1976)).  In response to *Penry* I, the Seventy-Second Texas Legislature amended article 37.071 of the Code of Criminal Procedure to provide for instructions concerning mitigating evidence in capital cases. See TEX. CODE CRIM. PROC. ANN. art. 37.071 (Vernon Supp. 1992).

The trial court in Mr. McCoskey's case, gave the jury the mitigation issue that the Texas Legislature had hoped would render the State's punishment phase constitutional. However, the trial court also included a "nullification instruction" that unconstitutionally limited the jury's ability to consider mitigating evidence that did not affect the jury's determination of future dangerousness. Trial counsel's failure to object to the nullification instruction clearly was deficient. The TCCA acknowledged that instruction was given in error and noted that trial counsel had failed to object to this obviously incorrect charge.

### b.   Prejudice

Counsel's failure clearly prejudiced Mr. McCoskey. As detailed in the Statement of Facts, above, pp. 1-3, the record is replete with mitigating evidence of Mr. McCoskey's mental illness and abusive childhood. Clearly, it is reasonably probable that at least one juror would have answered the mitigating special issue in a manner so as to prevent the court from imposing the death penalty if the instructions had provided a vehicle to give that evidence effect.

### c.   Error *per-se*

In order to grant relief on a *Penry* claim, a court "must determine (1) whether the mitigating evidence has met the 'low threshold for relevance' and, if so, (2) that the evidence was beyond the scope of the jury" in answering the special issues. *Bigby vs. Drekte,*, 402 F.3d 551, 564-65 (5th Cir. 2005) (quoting *Tennard v. Dretke*, 542 U.S. 274, 124 (2004) (internal quotations omitted). The fact that trial counsel did not object does not change the analysis. *See, e.g.*, *Abdul-Kabi, supra* (noting that *Penry* nullification error can be raised for the first time in a state habeas application). Appellate counsel and state habeas counsel each raised the error. Here the mitigating evidence at issue obviously meets the relatively "low threshold for relevance," and

the evidence was "beyond the scope of the jury."  This Court should therefore grant relief and order the State to retry the punishment phase.

### 2.    Trial counsel was ineffective for failing to introduce and argue psychological and psychiatric records and information.

#### a.    Deficiency

Trial counsel failed to provide his psychological expert, Dr. Hayes, with important psychiatric and medical records and failed to have him address the evidence at trial.  For example, Dr. Hayes did not address the August 1991 psychological report by Dr. George Santos.

#### b.    Prejudice

Failure to introduce and address psychiatric information that chronicled Mr. McCoskey's condition near the time of the crime was deficient.  The Axis I diagnosis of intermittent explosive disorder supported Mr. McCoskey's insanity defense and his defense against the death penalty.  Dr. Santos report of hyperthyroidism was also significant for the foregoing reasons, since, untreated, the condition may result in psychotic symptoms, and Mr. McCoskey was frequently not in compliance with his medical regimen.

### 3.    Trial counsel's failure to interview witness showing that Mr. McCoskey, Dwyer and Collins were socializing before the criminal episode was ineffective.

Stuart Chappel was available to testify, but was not contacted by trial counsel.  One month before Mr. McCoskey's suit, Chappel gave a video deposition in a suit that Laurie Collins brought against Las Rosas Apartments.  *See*, *e.g*, *Ex Parte McCoskey*, December 21, 1997, Application, at Bates No. 00124-165.  Chappel confirmed that Mr. McCoskey, Collins and Dwyer had been sitting around his apartment with several other guests.  They had even passed Mr. McCoskey's knife around.  According to Chappel, Collins and Dwyer left to get food at Kroger's and so did Mr. McCoskey.  He said Mr. McCoskey returned when the couple did,

followed them up the steps and asked for a ride.  Mr. Chappel testified that Mr. McCoskey had hung around the apartments before, and indicated that he did not have a reputation, that he was aware of, for being violent.  He also confirmed that Mr. McCoskey did not force the couple into their car.

Failure to sponsor Chappel's testimony was prejudicial.  Chappel's testimony indicates that Mr. McCoskey did not plan to kidnap the couple.  Chapple's testimony, instead, supports that conclusion that Mr. McCoskey acted impulsively and irrationally as his psychiatric symptoms worsened while driving, directionless, with the couple.  Chappel's testimony clearly would have supported Mr. McCoskey's insanity defense and his punishment phase defense.

## CLAIM SEVEN

### IN VIOLATION OF DUE PROCESS, THE COURT ADMITTED EXTRANEOUS OFFENSE EVIDENCE OF A SEXUAL ASSAULT.

The Fifth Circuit applies a two-pronged test to determine whether extraneous offense evidence violates due process.  First, the government must make a "strong showing that the defendant committed the offense" and, second, the government must demonstrate that the extraneous offense is "rationally connected with the offense charged." *Enriquez v. Procunier*, 752 F.2d 111, 115 (5th Cir. 1984), *cert. denied*, 471 U.S. 1126 (1985).

Trial counsel moved *in limine* to exclude extraneous offenses, including the aggravated sexual assault that the State alleged Mr. McCoskey committed against Laurie Collins.  *Tr. Transc*. vol. 26, at 19.  He renewed the motion right before trial began.  *Id.,* at 21-22.  However, during opening argument, the State emphasized the sexual assault, and had Collins testify at length about the rape.  The State also introduced the results of the rape kit test over defense

counsel's extensive objections.  *Id.,* at 227-230; *id.,* at 240 (objections overruled).  The State did not demonstrate that the extraneous offense was "rationally connected to the offense charged." Hence, the introduction of the rape violated due process.

## CLAIM EIGHT

**A.  IN VIOLATION OF DUE PROCESS AND THE SIXTH AMENDMENT, THE STATE DEPRIVED MR. McCOSKEY OF MEDICATION NEEDED IN ORDER FOR HIM TO EFFECTIVELY COMMUNICATE WITH COUNSEL.**

Mr. McCoskey was in custody in the Harris County Jail from November of 1991 until trial in November of 1992.  For the first 11 months, he was on Lithium, Thorazine, Tegratol, and other drugs which controlled his mental disorders.  His records indicate that he had two Axis I diagnoses.  One was a diagnosis of intermittent explosive disorder provided by a Dr. Santos six weeks before the murder that identified Mr. McCoskey's serious mental illness as intermittent explosive disorder, and stated that,

> "the patient has had severe episodes of significant loss of control with aggressiveness and assaultive behavior. These episodes of aggressiveness are clearly grossly out of proportion to any precipitating factors. There are no general signs of impulsiveness between episodes, certainly not to the degree to which is evident during his attacks on individuals."

*See*, *Ex Parte McCoskey* ('A'-Writ), Clerk's File, pp. 1425-30.

The other was a diagnosis of bipolar disorder given by Dr. Hayes.  *Tr.Trans.*, vol. 28, at 426. The proscribed drugs also served as tranquilizers that calmed him down and allowed him to sleep. *Id.,* at 282.

Off of medication, Mr. McCoskey had a history of being distracted, tangential and hyperactive.  *Id.,* at 58, Mr. McCoskey's medical records, along with testimony at trial, showed that unless medicated, he had trouble carrying on a conversation about daily affairs and became easily upset and irrational.

Harris County Jail records confirm Mr. McCoskey medical treatment was sporadic and he was frequently in remission. *See, e.g., Ex Parte McCoskey*, December 21, 1997, Application, at Bates No. 00088, 00093, 00099. Mr. McCoskey apparently stopped receiving medication prescribed for his mental illness as trial approached. *Id.,* at Bates No. 0018. Harris County personnel also denied that he had hyperthyroidism and discontinued treatment of this condition. *Id.,* at Bates No. 00068.  As a result, he was agitated confused and depressed leading up to his capital murder trial.  *Id.* ('A'-Writ), Clerk's File, p. 1429. By taking Mr. McCoskey off medication, the State seriously interfered with Mr. McCoskey's ability to communicate with counsel and assist in his defense.  Leading up to, and during trial, Mr. McCoskey as unable to communicate with counsel  effectively. Both of his attorneys testified that Mr. McCoskey could not stay on track, could not focus on the case or issue in the case that they needed to discuss, and instead went off on tangents leading to unrelated topics.  Counsel had to keep Mr. McCoskey occupied with tasks and games to try to ensure that his he would not disrupt proceedings.  They did not completely succeed.  At the end of guilt innocence, Mr. McCoskey because he was unmedicated experienced an explosive episode in which he threw a chair at the prosecutors.

It is clear from the Supreme Court's decision in *Riggins v. Nevada*, 504 U.S. 127, 136 (1992), that medical decisions by the state that needlessly "impair[] the constitutionally protected trial rights," such as the right to assist counsel and to display appropriate demeanor before the jury, *id.,* require habeas relief. Turning to the issue of prejudice, the Court in Riggins ruled that it was enough simply to demonstrate that "it was clearly possible that such side effects had an impact upon not just upon [the defendant's]outward appearance, but also the content of his testimony on direct or cross examination, his ability to follow the proceedings, or the substance of his communication with counsel." *Id.*  In Mr. McCoskey's case, the State's failure to provide

medication adversely affected the very trial rights the Riggins decision sought to protect.  Relief in the form of new trial is therefore necessary.

**B.     THE STATE DEPRIVED MR. McCOSKEY OF HIS DUE PROCESS AND FIFTH AMENDMENT RIGHTS BY FAILING TO PROVIDE HIM MEDICATION.**

Mr. McCoskey's outburst in the courtroom was the direct result of improper Medical treatment.  He Mr. McCoskey been provided medication as the trial judge ordered, Mr. McCoskey would not have thrown a chair at the two prosecutors.   In effect, the State mismanagement of his medication compelled Mr. McCoskey do disgorge evidence detrimental to his punishment phase defense. This violated his Fifth Amendment right not to provide evidence against himself and it violated due process by offending basic principles of decency. *See, e.g., Rochin v.California*, 312 U.S. 165 (1952).  The fact that the prosecution featured the chair throwing incident in its punishment phase case demonstrates the harm and compounds the due process violation.

## CLAIM TEN

## THE COURT ERRONEOUSLY EXCUSED A JUROR THAT BOTH SIDES HAD ACCEPTED

On November 2, 1992, Veniremember Barfield was questioned by both parties and accepted as a juror by both parties. The next day the juror returned after calling the court and indicating that she felt that she could not be a fair and impartial juror.

The following proceeding, inter alia, occurred:

> [APPELLANT:] Your Honor, I actually have to object to the proceedings in view of the fact that this juror vias actually accepted by both sides and approved by both sides, after over an hour of individual voir dire, not to mention the Court's own voir dire. Therefore, I object to the proceedings.

> [THE COURT:] What do y'all suggest?

> [APPELLANT:]  I believe if there's any inquiry to be made, it has to be done by the Court and not by the attorneys. I don't believe it would be appropriate for the attorneys to do anything further since we have already done our questioning in this regard. I think if you have that information, it may be within your right. I don't think we have any right to talk to this lady any further.

> [THE COURT:] I'll adhere to that. I was going to ask her to place on the record what she was telling me on the phone. And if -- I think you missed my question, my "If".  If you don't want to ask anything, I'll allow the State to ask. If you have any questions, I'll ask those. I'll excuse her, consult with you all, and make a decision.

> [THE COURT:] Now whatever it is you want to tell me whatever it is you want to tell me, I just "want it on the record, whatever it is that caused you to change your mind, what you did since you had been chosen.

> [JUROR:] Well, I didn't get a lot of sleep last night, and I have been under a lot of pressure, and I saw the therapist this morning. And considering my personal problems right now, I don't think I can give this young man a fair trial. And I think this is a very serious case, and I think that I need to tell you that.

> [THE COURT:] When you say you don't think you can give him a fair trial, just delineate that a little bit for me.

[JUROR:] I'm not in any state to make any kind or decision right now. I mean, my final divorce "'Jill be next week, the 60 days. And I'll probably have to go to court from that. And I don't think I'm in any -- I don't think I can make a fair decision in this matter. And I only think it's it's the fair thing for me to do. I can't go on and not tell you this.

[THE COURT:] But when you say you don't you can make a decision; delineate what are you talking about when you say you think you can make a fair decision? What don't …

[JUROR:] I don't  think I can decide, one way or the other.

[THE COURT:] Okay.

[JUROR:] And I don't know. I wake up one day and I think one way and I wake up another and I think another way. And right now the - - my mental state is not that good. And I would have to work from the time I leave here, next week, until the time I finish. And that puts more pressure on me. And it's just not a good time for me right now.

[THE COURT:] Let me ask you this. This is one of my legal questions. Do you think the frame of mind that you're in now, is different from what you were in yesterday, when we chose you, right now?

[JUROR:] Well, I'm pretty fragile, and probably so.

[THE COURT:] Well, as you sit there now, do you feel, that based on your own thoughts, you know you better than I, that your feelings could prevent or substantially impair your ability

[JUROR:] Right, to decide.

[THE COURT:] Your duties to – let me finish -- to perform as a juror

[JUROR:] Yes, sir.

[THE COURT:] Carry out, listen to the facts, and apply the law that I'm going to give you, pursuant to the oath that you took?

[JUROR:] Yes, sir.

Pursuant to this colloquy the court excused the juror.  The decision violated Mr. McCoskey's due process and sixth amendment right to be tried by an impartial jury selected in a fair manner.

## CLAIM ELEVEN

## IN VIOLATION OF DUE PROCESS THE STATE WITHHELD EXCULPATORY EVIDENCE.

At several points in her testimony, Collins blamed her inability to recall what happened on the rapidity with which events were unfolding.  However, there was nothing frenetic about the pace.  The path Mr. McCoskey took from Fairview apartment to the abandoned home where the murder took place was meandering and confused.   In transit, Collins and Dwyer had several opportunities to escape. The first opportunity was at the Fairview apartments when they walked downstairs and crossed the parking lot to their car. Although McCoskey was armed, he was not holding the couple at knifepoint. Dwyer worked with a bail bonding company, so he was not helplessly naïve. He and Collins were young and did not have physical disabilities, and Collins pregnancy apparently was recent and uncomplicated.  On the other hand, Mr.McCoskey, known as Lurch, looked the part; he was gangly and uncoordinated.  The second, and best opportunity, was at the gas station, before the three hit the freeway, when McCoskey filled the tank and paid for the fuel, apparently, in cash which meant he had to go into the store. Collins and Dwyer remained in the car. Dwyer had the keys and was in the driver's seat, but did not take off.  The couple planned to leave Houston for Orange County,  Texas the next day so the explanation cannot be that they feared Mr. McCoskey might show up again at their Fairview Apartment, upset at being abandoned.   The third opportunity was at the embankment on I-10 when McCoskey took the keys, made statements that showed he was out of his head (namely, that he was going to tell two Suburban parked nearby to leave because they were on private property). Dwyers and Collins could have at least run for it, especially since the scene would have been witnessed by the drivers of the Suburban.  Finally, at the abandoned house on Drew Street,

Dwyer, although handcuffed, could have gotten out of the Ford Escort and gone for help while McCoskey was inside with Collins.

On information and belief, Collins and Dwyer were mentally impaired by drug use.. Neither had a known history of mental illness or retardation.  Dwyer worked for a bail bonding company so he obviously was not helplessly naïve.  Officers had to realize this, and they had to have obtained toxicology reports from the Medical Examiner's office, and lab reports from Hermann Hospital, where Collins was tested, that showed this.  However, on information and belief, the State did not disclose this evidence, which would have severely impeached its key eye-witness, namely, Collins; and the police did not disclose interviews with acquaintances of Collins and Dwyer, or other information, that detailed their drug habits.

## CLAIM TWELVE

**MR. McCoskey IS ACTUALLY INNOCENT OF CAPITAL MURDER AND OF THE DEATH PENALTY; HENCE, HIS INCARCATION AND SENTENCE VIOLATES DUE PROCESS AND THE EIGHTH AMENDMENT.**

Mr. McCoskey's medical records contains several Axis I diagnosis, among them schizophrenia and bipolar disorder and intermittent explosive disorder.  Other clinical information suggests that he did not suffer from an Axis I malady. Authors of these records surmise, instead, that Mr. McCoskey's history of child abuse and abandonment caused the aberrant behavior that so often lead to institutionalization, particularly as a youth.  Partly because, Mr. McCoskey's records to not reveal a unitary or consistent Axis I diagnosis, two experts at trial, Dr. Ferguson and Dr. Brown, maintained that Mr. McCoskey does not suffer from serious mental illness, but instead suffered from an affective disorder, personality disorder, or else was malingering (factitious disorder).

Since trial, and since Mr. McCoskey's initial filing in state habeas proceedings, advances have been made in the detection and differential diagnosis of schizophrenia and related mental illnesses.  These new developments in neuroscience and psychiatry may demonstrate that Mr. McCoskey suffers from serious psychosis and not from a personality or social disorder. Advances have also been made in the detection and differential diagnosis of bipolar disorder and intermittent explosive disorders.  The new science is remarkable in the field of childhood and juvenile psychiatry.   Many of these, advances have taken place since Mr. McCoskey's 1992 trial and his 1997 habeas filing. Had Mr. McCoskey been able to present this evidence at trial, he would have been able to impeach expert testimony as it related to guilt innocence and the punishment phase of his capital murder trial.  In fact, the experts would be compelled to retract their testimony refuting Mr. McCoskey's insanity defense at guilt innocence and his mitigation defense at the punishment phase.

Evidence regarding brain damage due to repetitive head injuries would also have been important to show the jury.  Mr. McCoskey frequently fought, and appears to have sustained numerous head injuries, beginning at an early age.  Jail records, for example, indicate he suffered a fractured jaw, necessitating surgical repair. *Ex Parte McCoskey, Application, at Bates No.* 00078.  Only recently, however, has the significance of repetitive head trauma begun to be understood.   The evidence showing brain damage, attendant loss of memory and confusion would have been important to show the jury and important for Mr. McCoskey's expert witnesses to address.  While not a known cause of mental illness, such as psychosis, confusion and disorientation caused by memory loss and headaches related to repetitive insults to the brain can exacerbate these underlying psychiatric disorders.

## CLAIM THIRTEEN

**THE DEATH SENTENCE VIOLATES THE SUPREME COURT'S EIGHT AMENDMENT JURISPRUDENCE SET FORTH IN ATKINS v. VIRGINIA, 536 U.S. 304 (2002).**

Based on the argument and evidence connected with Mr. McCoskey's 'B' Writ filed in the 185th Harris County District Court on June 17, 2003, which is incorporated by reference, as if fully set forth herein, Mr. McCoskey execution would violate the Eighth Amendment's prescription against putting mentally retarded defendants to death.

## PRAYER FOR RELIEF

WHEREFORE, Jamie Bruce McCoskey, requests that this Court:

1.      Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death.

2.      Grant him an evidentiary hearing at which he may present evidence in support of the foregoing claims, and allow him a reasonable period of time subsequent to any hearing this Court determines to conduct, in which to brief the issues of fact and of law raised by this petition or such hearing.

3.      Order a retrospective hearing to determine competency to stand trial.

4.      Grant such other relief as law and justice require.

\

Respectfully submitted,

HILDER & ASSOCIATES, P.C.
By:   /s/_*James G. Rytting*_____
Philip H. Hilder
State Bar No. 19620050
James Rytting
State Bar No. 24002883
819 Lovett Boulevard
Houston, Texas 77006
Telephone (713) 655-9111
Facsimile (713) 655-9112
ATTORNEYS FOR PETITIONER

## VERIFICATION

I, James Rytting, state that to the best of my knowledge, the facts alleged in support of the claims in this case are true and correct, under penalty of perjury, as proscribed by Title 18 U.S.C. § 1746; and  I hereby sign on behalf of Petitioner, Jamie Bruce McCoskey.

/s/_____
James Rytting

## CERTIFICATE OF SERVICE

On April 15, 2010, Respondent was served by ECF with this Amended Petition.

/s/_____
James Rytting

55