IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JAMIE BRUCE MCCOSKEY, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | No. 4:10-cv-00123 |
| | § | DEATH PENALTY CASE |
| RICK THALER, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Correctional | § | |
| Institutions Division, | § | |
| Respondent. | § | |

## RESPONDENT THALER'S ANSWER WITH BRIEF IN SUPPORT

Petitioner Jamie Bruce McCoskey[1] was convicted and sentenced to death

for the brutal capital murder of Michael Keith Dwyer.  Having spent several

years pursuing his claims in state court, McCoskey now challenges the validity

of his conviction and sentence in this Court pursuant to 28 U.S.C. § 2254.  But

McCoskey fails to demonstrate that he is entitled to relief.  He does not show

that the state courts unreasonably applied clearly established federal law; nor

does he overcome the state court's factual findings with clear and convincing

evidence.  For these reasons, McCoskey's bid for federal habeas relief should be

denied.[2]

---

[1]    Respondent Rick Thaler will be referred to as "the Director."

[2]    The Director further denies all allegations of fact made by McCoskey
except those supported by the record and those specifically admitted herein.

## MCCOSKEY'S ALLEGATIONS

The Director understands McCoskey to allege that:

(1)    (a)    McCoskey's death sentence deprives him of due process and violates the Sixth, Eighth, and Fourteenth Amendments because the sentencing jury answered the special issues in a manner requiring imposition of a life sentence;

        (b)    the trial court's punishment-phase charge prevented jurors from giving effect to mitigating evidence, depriving McCoskey of due process and violating his rights under the Eighth Amendment;

        (c)    the jury instructions injected arbitrariness and capriciousness into the capital-sentencing proceeding, depriving McCoskey of due process and violating his rights under the Eighth and Fourteenth Amendments;

(2)    the trial court denied for-cause strikes of jurors who purportedly stated they would not consider life in the case of felony murders, depriving McCoskey of due process and his rights under the Sixth and Eighth Amendments;

(3)    the trial court failed to conduct a competency hearing, in violation of McCoskey's procedural due-process rights;

(4)    McCoskey was tried while incompetent in violation of his substantive due-process rights;

(5)    the State withheld evidence that would have impeached the State's serological and DNA testimony, thereby violating McCoskey's due-process rights;

(6)    McCoskey was deprived of his Sixth-Amendment right to the effective assistance of counsel because his attorneys purportedly failed to:

(a)    object to the "nullification instruction" during the punishment phase of trial;

(2)    introduce and argue psychological and psychiatric records and information; and

(3)    interview a witness who indicated McCoskey, Dwyers, and Collins were socializing before the kidnapping;

(7)    the trial court erroneously admitted extraneous evidence of the sexual assault of one of McCoskey's victims, thereby depriving McCoskey of due process;

(8)    the State deprived McCoskey of his medication during trial, preventing him from effectively communicating with counsel and causing him to involuntarily incriminate himself by throwing a chair at prosecutors;

(9)    the trial court erroneously excused a juror that both sides had accepted;[3]

(10)    the State withheld exculpatory evidence, in violation McCoskey's due-process rights;

(11)    McCoskey is actually innocent of capital murder and of the death penalty; hence, his incarceration and sentence violates his rights under the Due Process Clause and the Eighth Amendment; and

(12)    McCoskey is ineligible for the death penalty under *Atkins v. Virginia,* 536 U.S. 304 (2002), because he is mentally retarded.

---

[3]    McCoskey mis-labels this as "Claim Ten," and his final three claims as "Eleven," "Twelve," and "Thirteen."

## STATEMENT OF THE CASE

A two-paragraph indictment charged McCoskey with intentionally killing Michael Keith Dwyer during the course of committing or attempting to commit the robbery or kidnapping of Dwyer. 1 CR[4] 6. A jury in the 185th Judicial District Court of Harris County, Texas, convicted and sentenced McCoskey to death. 2 CR 358, 375-76. The Texas Court of Criminal Appeals affirmed McCoskey's conviction and sentence on direct appeal. *McCoskey v. State,* No. 71,629 (Tex. Crim. App. 1996). The Supreme Court denied certiorari review of this decision. *McCoskey v. State,* 519 U.S. 1060 (1997).

McCoskey sought state habeas review of his conviction, filing his initial habeas application on May 17, 1997. SHCR-01 2-5. While that application was pending, McCoskey filed a subsequent application on June 17, 2003, presenting two claims for relief under *Atkins.* SHCR-02 2-30; *Ex Parte McCoskey,* No. 56,820-01, slip op. at 2 (Tex. Crim. App. Jun. 6, 2007) (unpublished). The first

---

[4]      The Director has submitted McCoskey's state court records under separate cover. "CR" refers to the Clerk's Record of pleadings and documents filed during McCoskey's trial. "RR" refers to the Reporter's Record of transcribed state trial proceedings. "SHCR-01, -02" refer to the respective Clerk's Records of pleadings and documents filed during McCoskey's state habeas reviews. (Note: McCoskey's state habeas applications were decided out-of-order. For the sake of clarity, the Director refers to them chronologically. Thus, the "A" writ, decided in *Ex parte McCoskey*, No. 56,820-02, is referred to as SHCR-01. The "B" writ, decided in *Ex parte McCoskey*, No. 56,820-01, is referred to as SHCR-02.) All references are preceded by volume number and followed by page number where applicable. "DE" refers to entries on this Court's PACER docket sheet, followed by entry number.

claim, alleging his execution was prohibited by the Eighth Amendment because he is mentally retarded, was remanded to the trial court for consideration. *Ex Parte McCoskey,* No. 56,820-01, slip op. at 2. The trial court did not hold an evidentiary hearing, but did receive evidence from both parties, after which it recommended that relief be denied. *Id.* The Court of Criminal Appeals adopted the trial court's findings and conclusions, and denied relief. *Id.* The Court of Criminal Appeals subsequently denied McCoskey's original application for state habeas relief as well. *Ex Parte McCoskey,* No. 56,820-02 (Tex. Crim. App. Mar. 11, 2009) (unpublished).

The instant appeal was timely filed on January 7, 2010. *McCoskey v. Quarterman*, No. 4:09-mc-00416 (DE 6, 13); *McCoskey v. Thaler*, No. 4:09-cv-00123 (DE 1).

## STATEMENT OF FACTS

### I.  Facts of the Crime

The Court of Criminal Appeals accurately set forth the facts of the crime in its opinion on direct appeal:

> The evidence[5] in this case reveals that between approximately 6:00 and 6:30 p.m. on November 13, 1991, an engaged couple returned to their apartment complex from a brief shopping trip. They went upstairs to their apartment and the decedent unlocked

---

[5]     Much of the evidence comes from the decedent's girlfriend who survived the abduction and testified at trial. [footnote in original]

the door, leaving the keys in the lock until they could get the groceries inside.  As he turned to remove the keys from the door, the decedent encountered [McCoskey] standing in the doorway. [McCoskey] unzipped his jacket to reveal a hunting knife in a scabbard in the waist of his pants.  When asked what he wanted, [McCoskey] responded that he wanted a ride and they were going to take him where he needed to go.  The decedent stated that he did not have any gas in the car or any money with which to put some in, but [McCoskey] told him that did not matter.  The decedent eventually agreed to take [McCoskey] where he wanted to go on the condition that his fiancé be allowed to stay behind, but [McCoskey] insisted that she come along.

The three originally got into the car with the couple in the front seat and [McCoskey] in the back. [McCoskey] instructed the man to go to a gas station and put gas in the car, which he did.  Two or three blocks away from the station, [McCoskey] decided that he wanted to ride up front in the passenger seat so he could get out quickly in case a police officer pulled them over.  After [McCoskey] and the woman changed positions, [McCoskey] instructed the driver to get onto the highway I-10 eastbound.  While they were on the highway, [McCoskey] apparently made several contradictory statements, including: (1) he was going to kill the couple; (2) he just needed a ride and he knew no one would volunteer; (3) he knew how to kill people using martial arts techniques; and (4) he was doing this for someone else who wanted him to steal the car.

Eventually [McCoskey] instructed the driver to exit I-10 and directed him (somewhat indirectly) to an embankment in the middle of an empty field.  Apparently [McCoskey] was looking for an isolated place.  After the car was stopped, [McCoskey] took the keys and proceeded to a Suburban parked nearby to tell its occupants that the land was private property and they needed to leave.  After a brief conversation with [McCoskey], the occupants of the Suburban left. [McCoskey] returned "kind of … jumpy," grabbed the decedent around the neck, pulled him down, and put the knife to his

throat. [McCoskey] then ordered the woman to handcuff[6] the decedent's hands behind him. [McCoskey] then moved the coats that were in the trunk to the back seat and placed the man in the trunk. [McCoskey] then got into the driver's seat and figured out how to drive the car.[7]  He ordered the woman to take off her shorts because he did not want her to "jump out of the car and run."

[McCoskey] left the embankment, but could not find his way out of the surrounding neighborhood.  After asking some construction workers for directions, [McCoskey] got back onto the highway.  During the ensuing period, [McCoskey] started fondling the woman's genitals.  When she started crying, he turned up the radio so "she would not get embarrassed and so her boyfriend could not hear." [McCoskey] then unzipped his pants and tried to force the woman to engage in oral sex with him by pushing her head down, but when she started gagging, he discontinued the assault.  As [McCoskey] drove in the direction of the couple's apartment, the decedent attempted to tell him that the woman was pregnant and asked him not to hurt her. [McCoskey's] response was that he better shut up and not make him mad.

[McCoskey] then told them that he was going to leave the decedent with some friends and then drop the woman off at the apartment, and after leaving the apartment he would call his friends to release the man; this way he could ensure that the two would be too scared to call the police.  However, as they neared the apartments, [McCoskey] turned away and eventually came to an empty house close to the freeway. [McCoskey] took the woman into the house at knifepoint and proceeded to sexually assault her.  He then returned her to the car and took the man into the house.  The next sound the woman heard was something like "if somebody hit you in the stomach and you get the breath knocked out of you" and recognized the sound was coming from her fiancé.

---

[6]     The record revealed that the handcuffs were already in the car due to the decedent's part-time job related to law enforcement.  [footnote in original]

[7]     The car had manual transmission with which [McCoskey] was not familiar.  [footnote in original]

The woman then jumped from the car and fled across a gravel road and through a field to a nearby home.  The occupant of the house would not allow her to enter, but then [McCoskey] appeared with a knife in hand, shaking his head.  The occupant let the woman in and locked the door, whereupon she then called 911. [McCoskey] fled in the couple's vehicle.  When the police arrived on the scene, they found the man's body inside the empty house; he had been stabbed approximately two dozen times.

The police eventually located [McCoskey].  Upon his arrest, they noticed knife scabbards strapped to both his belt and his right leg.  The knife used in the stabbing was located a few feet away from him on the floor.

*McCoskey v. State*, slip op. at 3-5.

In addition, the State introduced evidence that the day following the commission of the crime McCoskey asked a friend to pick up some money that had been wired to him and some dye for his hair.  26 RR 425-27.  McCoskey was arrested about one-half hour after this conversation.  *Id.* at 430.

McCoskey presented an insanity defense.   In support, several lay witnesses testified as to McCoskey's strange behavior.  For example, McCoskey slept little at night and was often hyper.  He would pick up cigarette butts off the ground one at a time or lift weights at night.  27 RR 340, 345, 368, 372.  McCoskey's mother also testified that McCoskey had suffered extreme abuse as a child and had been placed in a number of different facilities to help him deal with his behavioral problems.  *Id.* at 45-129.

Dr. Melissa Ferguson, a psychiatrist, saw McCoskey the same day that McCoskey committed the instant offense and provisionally diagnosed McCoskey as suffering from bipolar disorder. *Id.* at 213. She prescribed lithium for McCoskey. *Id.* at 249. However, after Dr. Ferguson reviewed McCoskey's medical records, she concluded that he did not suffer bipolar disorder or any other major mental illness. *Id.* at 311-16, 322. Instead, she diagnosed McCoskey as having an antisocial personality disorder. *Id.* at 317-18. She also concluded that McCoskey knew right from wrong when he committed the capital murder. 27 RR 339.

James Ray Hays, Ph.D., a psychologist, testified that McCoskey suffered from bipolar disorder when he committed the crime, which prevented him from understanding the wrongfulness of his conduct, *i.e.*, McCoskey was insane at the time he committed the crime. 28 RR 426, 438, 447-48. Dr. Hays also testified that it is possible that McCoskey also suffers from intermittent explosive disorder. *Id.* at 426.

In rebuttal, the state called Jerome Brown, Ph.D., a psychologist, who examined McCoskey on December 3, 1991, and concluded that McCoskey was not suffering from any significant mental disease or defect and knew right from wrong at the time he committed the offense. *Id.* at 128. Dr. Brown diagnosed McCoskey as having an antisocial personality disorder. *Id.* at 149.

## II.    Evidence Relating to Punishment

At the punishment phase, the State offered additional evidence of McCoskey's prior bad acts and convictions, which was accurately summarized by the Court of Criminal Appeals as follows:

- [A] 1981 juvenile commitment to the custody of the Texas Youth Council for an unnamed, but apparently serious, offense;

- [A] 1983 conviction for kidnapping for which [McCoskey] received shock probation.  The probation was revoked later that year after [McCoskey] committed an assault;

- [W]hile in the penitentiary, [McCoskey] committed several rules violations, including five fights and four incidents of striking or threatening an officer;

- 1987 convictions for misdemeanor assault and possession of marijuana; [and]

- [A] 1992 incident of striking another inmate in the Harris County jail with a chisel, cracking his skull.

Evidence was also presented that after [McCoskey] had been found guilty, but prior to the punishment stage, when the jury was out of the courtroom, [McCoskey] picked up a chair and threw it at the prosecutors, accusing them of lying at trial.

*McCoskey v. State,* slip op. at 6.

## BRIEF IN SUPPORT

### I.  Standard of Review

This petition is subject to review under the amendments to the federal habeas corpus statutes embodied in AEDPA.  *Williams v. Cain*, 125 F.3d 269, 274 (5th Cir. 1997).  Under AEDPA, "[t]his Court may not issue a writ of habeas corpus for a defendant convicted under a state judgment unless the adjudication of the claim by the state court '(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.'" *Riddle v. Cockrell*, 288 F.3d 713, 716 (5th Cir. 2002) (quoting 28 U.S.C. § 2254(d)(1)-(2) (West 2002)).

The Supreme Court has explained that a state court decision is "contrary" to established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Court's] cases," or confronts facts that are "materially indistinguishable" from a relevant Supreme Court precedent, yet reaches an opposite result.  *(Terry) Williams v. Taylor*, 529 U.S. 362, 405-06 (2000); *Hernandez v. Johnson*, 248 F.3d 344, 346 (5th Cir. 2001).  Alternatively, a state court "unreasonably applies" clearly established federal law if it correctly

identifies the governing precedent from the Supreme Court's precedents but unreasonably applies it to the facts of a particular case. *Williams,* 529 U.S. at 407-09; *Hernandez*, 248 F.3d at 346.

A federal habeas court's inquiry into unreasonableness should be objective rather than subjective, and a court should not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. *Williams*, 529 U.S. at 409-11; *Tucker v. Johnson*, 242 F.3d 617, 620-21 (5th Cir. 2001). Rather, federal habeas relief is only merited where the state court decision is both incorrect and objectively unreasonable. *Williams*, 529 U.S. at 411; *Martin v. Cain*, 246 F.3d 471, 476 (5th Cir. 2001). In other words, habeas relief is inappropriate when a state court, at a minimum, reaches a "satisfactory conclusion." *Williams,* 529 U.S. at 410-11 (citing *Wright v. West*, 505 U.S. 277, 287 (1992)).

Further, the Fifth Circuit has held that it is the state court's "ultimate decision" that is to be tested for unreasonableness, "not every jot of its reasoning." *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001); *see Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (holding that a federal court's "focus on the 'unreasonable application' test under [§] 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether

the state court considered and discussed every angle of the evidence"); *Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002) (applying AEDPA deferential standard of review where state habeas writ was denied without explanation). Indeed, state courts are presumed to know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). And, even where the state court fails to cite to applicable Supreme Court precedent or is unaware of such precedent, the AEDPA deferential standard of review nevertheless applies "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]." *Early v. Packer*, 537 U.S. 3, 8 (2002).

Moreover, pre-AEDPA precedent forecloses habeas relief if a claim: (1) is procedurally barred as a consequence of a failure to comply with state procedural rules, *Coleman v. Thompson*, 501 U.S. 722 (1991); (2) seeks retroactive application of a new rule of law to a conviction that was final before the rule was announced, *Teague v. Lane*, 489 U.S. 288 (1989); or (3) asserts trial error that, although of constitutional magnitude, did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation omitted).

## II.   The Jury Charge Was Constitutionally Sound.  (Petitioner's Claim 1)

McCoskey argues that his death sentence is constitutionally unsound because: (1) the sentencing jury answered the special issues in a manner

requiring imposition of a life sentence; (2) the trial court's punishment-phase charge prevented jurors from giving effect to McCoskey's mitigating evidence; and (3) the jury instructions injected "arbitrariness and capriciousness" into the capital-sentencing proceeding. Amended Petition at 8-28. While McCoskey was tried under the modern special issues, it appears that the trial court accidentally included the *Penry II*[8] nullification instruction when it charged the jury. The charge at issue read as follows:

> You are instructed that when you deliberate on the questions posed in the special issues, you are to consider all relevant mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the State or the defendant. A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character, background, record, emotional instability, intelligence or circumstances of the crime which you believe could make a death sentence in appropriate in this case. If you find that there are any mitigating circumstances in this case, you must decide how much weight they deserve, if any, and thereafter, give effect and consideration to them in assessing the defendant's personal moral culpability at the time you answer the special issue. If you determine, when giving effect to the mitigating evidence, if any, *that a life sentence, as reflected by a* [sic] *affirmative finding to the issue under consideration*, rather than a death sentence, is an appropriate response to the personal moral culpability of the defendant, *a* [sic] *affirmative finding should be*

---

[8]      In *Penry II*, the Supreme Court noted that the jury must be able to consider and give full effect to a defendant's mitigating evidence in imposing a sentence. *Penry v. Johnson*, 532 U.S. 782, 797 (2001) (*Penry II*). The Supreme Court found that the jury could not give effect to Penry's mitigating evidence because there was no question concerning mitigation. *Id.* at 788-89 (describing the special issues put before the jury). Instead, jurors were given a nullification instruction which directed them to answer a question falsely, in violation of their oaths, if they wished to assess a life sentence. *Id.* at 797-800. This was found unconstitutional.

-14-

*given to that special issue under consideration.*

2 CR 371 (emphasis added).  The special issues read as follows:

<u>SPECIAL ISSUE NO. 1</u>

Is there a probability that the defendant, Jamie Bruce McCoskey, would commit criminal acts of violence that would constitute a continuing threat to society?

\* \* \*

<u>SPECIAL ISSUE NO. 2</u>

Taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, do you find that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

You are instructed that the term "mitigating evidence" or mitigating circumstance means evidence that a juror might regard as reducing the defendant's moral blameworthiness.

2 CR 375-765.

Despite the deficiency in the jury charge the state court rejected McCoskey's claim for relief—instead finding that McCoskey did not suffer any harm from the nullification instruction's inclusion.  As shown below, this was not an unreasonable application of Supreme-Court precedent, nor was it an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d)(1)-(2).  Accordingly, relief should be denied on McCoskey's jury-charge claims.

### A.   The state court reasonably concluded that the sentencing jury did not answer the special issues in a manner requiring imposition of a life sentence as construed under the instructions given to them.

McCoskey raised this issue on direct appeal. Appellant's Brief at 16-20. The Court of Criminal Appeals agreed that the instruction requiring an affirmative answer to both special issues if the jury sought to impose a life sentence was "completely erroneous" as it pertains to the future-dangerousness special issue. *McCoskey v. State,* slip op. at 30.  However, the court observed that McCoskey failed to object to this faulty instruction, as required by Texas Code of Criminal Procedure Article 36.14. *Id.* Therefore, the court held that in order to reverse the sentence it would have to find that "the error [was] so egregious and [had] created such harm that [McCoskey] was denied a fair and impartial trial." *Id.* (citing *Almanza v. State,* 686 S.W.2d 157, 171 (Tex. Crim. App. 1984)).  But instead, the Court of Criminal Appeals concluded that McCoskey did not suffer *any* harm from inclusion of the erroneous instruction, much less egregious harm. *Id.* at 32.

The court reasoned that, had the jury ignored the instruction, they would have ignored the harm-causing element.  *Id.* at 31.  Conversely, if the jury followed the instruction to the letter, the jury would have answered "yes" to both special issues.  And because a "yes" to the second issue would have precluded imposition of the death penalty, the jury's answers would have yielded a life

-16-

sentence, regardless of their intent to recommend life or death. *Id.* Thus, McCoskey suffered no harm no matter how the jury reacted to the erroneous instruction. *Id.* But because the jury unanimously answered the second "mitigation" special issue "no", the court found that the jury fully intended to recommend that McCoskey receive the death penalty. *Id.* 31-32.

In his federal petition, McCoskey argues that the jury may have been following the nullification instruction when it answered the first special issue affirmatively, believing there was sufficient mitigating evidence to warrant a life sentence. Amended Petition at 12-14. However, as noted by the Court of Criminal Appeals, this argument is not plausible in light of the jury's negative answer to the second special issue, which specifically asked whether such mitigating evidence existed and the answer to would not have been affected by the nullification instruction. Thus, the Court of Criminal Appeals did not act unreasonably when it denied relief on harmless-error grounds. *Brecht*, 507 U.S. at 637 (relief not available for trial error that, although of constitutional magnitude, did not have a "substantial and injurious effect or influence in determining the jury's verdict"); *Mitchell v. Esparza*, 540 U.S. 12, 16-17 (2003) (harmless-error analysis available in a capital-sentencing proceeding).

B.    **The punishment-phase charge did not prevent jurors from giving effect to McCoskey's mitigating evidence.**

McCoskey claims that the trial court's punishment-phase charge prevented jurors from giving effect to his mitigating evidence, depriving McCoskey of due process and violating his rights under the Eighth Amendment.[9] Amended Petition at 15-22. McCoskey presented this claim on state habeas (although he did not bother to brief it). 2 SHCR-01 223. The state court rejected this claim, finding:

> 36. Because [McCoskey] fails to present argument or support for his habeas allegation that the punishment special issue prevented his jury from giving full consideration [to] the mitigating evidence at trial and fails to specify what evidence, if any, that the jury was not able to consider, [McCoskey] fails to plead and prove facts, which [if] true, would entitle him to relief. *Ex parte Maldonado*, 688 S.W.2d 114, 116 9Tex. Crim. App. 1985); *see also Ex parte Barber*, 879 S.W.2d 889 (Tex. Crim. App. 1994) (applicant must show that the complained[-]of error affected the fact or length of confinement in order to be cognizable on habeas).
>
> 37. In the alternative, the future dangerousness special issue and the mitigation special issue allowed the jury to fully consider evidence of [McCoskey]'s background, physical abuse, and mental

---

[9]    The Director observes that McCoskey's argument in this respect is not entirely clear. While his state habeas application and federal petition both refer to the *Penry* (*Penry v. Lynaugh*, 492 U.S. 302 (1989) ("*Penry I*")) line of cases, at times McCoskey also seems to argue that the nullification instruction precluded the jury from answering "no" to the future dangerousness special issue because it believed there were sufficient mitigating factors to warrant a life sentence.   To the extent this is McCoskey's argument, it is unexhausted and procedurally defaulted by his failure to present this claim to the state court. *See* Section II(C), *infra*.  Moreover, even if this argument was not unexhausted and procedurally defaulted, it is easily rebutted by the jury's "no" answer to the mitigation special issue.

illness. *See Curry v. State*, 910 S.W.2d 490 (Tex. Crim. App. 1995) (holding that amended art. 37.071 was patterned after language in *Penry* and provides for jury to consider all mitigating evidence); *see also Cockrell v. State*, 933 S.W.2d 73, 92-93 (Tex. Crim. App. 1996) (holding that even with addition of mitigation issue, enacted after Supreme Court's decision in *Penry I*, "'Texas'[s] death penalty scheme continues to narrow the class of 'death-eligible' defendants while also providing a jury with more discretion than it had under Texas'[s] prior statutory scheme to impose the death penalty.'").

3 SHCR-01 531-32.

Indeed, a review of the instruction given clearly shows that McCoskey's capital-sentencing jury was not denied a vehicle for expressing its reasoned moral response to his mitigating evidence. As noted above, the trial court instructed the jury on the mitigation issue, Issue No. 2, as follows:

> Taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, do you find that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

> You are instructed that the term "mitigating evidence" or mitigating circumstance means evidence that a juror might regard as reducing the defendant's moral blameworthiness.

2 CR 869 375-76.

The Fifth Circuit has repeatedly held that "Texas'[s] definition 'encompasses 'virtually any mitigating evidence.'" *Roach v. Quarterman*, 220 Fed. App'x 270, 277 (5th Cir. 2007) (quoting *Beazley v. Johnson*, 242 F.3d 248, 260 (5th Cir. 2001)). Furthermore, the Supreme Court has specifically

commended the current Texas capital-sentencing scheme, calling the new statute "[a] clearly drafted catchall instruction on mitigating evidence" and a model of "brevity and clarity." *Penry II*, 532 U.S. at 802-803.

Moreover, for the purposes of the case-at-bar, the jury's answer to this issue would not have been affected by the erroneous nullification instruction. If the jury had disregarded the instruction and believed that McCoskey had shown sufficient mitigating factors to warrant a life sentence, the jury would have answered the question affirmatively. Likewise, if it had not disregarded the instruction, it would have still been required—under the terms of the instruction—to answer affirmatively if it believed that believed that McCoskey had shown sufficient mitigating factors to warrant a life sentence.

Thus, McCoskey has not shown that the state court proceedings with respect to this claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or that the state court's decision was based on an unreasonable determination of the facts in light of the evidence. Accordingly, this claim should be denied.

### C. The jury instructions did not inject "arbitrariness and capriciousness" into the capital-sentencing proceeding.

McCoskey further claims that the jury instructions injected "arbitrariness and capriciousness" into the capital-sentencing proceeding, depriving McCoskey

of due process and violating his rights under the Eighth and Fourteenth Amendments. Amended Petition at 22-25. But relief is not warranted on this claim because McCoskey never presented it to the state court, rendering it unexhausted and procedurally defaulted. Alternatively, the claim fails on the merits.

### A.   This claim is unexhausted and procedurally defaulted.

McCoskey never presented his "arbitrary and capricious" claim to the state court. Therefore, this claim is unexhausted and procedurally defaulted and, as such, must be denied. The exhaustion doctrine codified in 28 U.S.C. § 2254(b)(1) reflects a policy of comity consistently adhered to by the Supreme Court and the Fifth Circuit. *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 8-10 (1992); *Picard v. Connor*, 404 U.S. 270, 275, 277-78 (1971); *Dowthitt v. Johnson*, 230 F.3d 733, 745-46 (5th Cir. 2000). Thus, before a federal court will entertain the alleged errors, a petitioner must have first provided the state's highest court with a fair opportunity to apply (1) the controlling federal constitutional principles to (2) the same factual allegations. *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995); *Rose v. Lundy*, 455 U.S. 509, 522 (1982); *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Thomas v. Collins*, 919 F.2d 333, 334 (5th Cir. 1990). This requirement is designed to give state courts the initial opportunity to pass upon and, if necessary, correct errors of federal law in a state prisoner's conviction. *Picard*,

404 U.S. at 275-76.

Where a petitioner "advances in federal court an argument based on a legal theory distinct from that relied on in the state court, he fails to satisfy the exhaustion requirement." *Nobles v. Johnson*, 127 F.3d at 420 (citing *Vela v. Estelle*, 708 F.2d 954, 958 n. 5 (5th Cir. 1983)).  Moreover, state court remedies are not exhausted when "material additional evidentiary support [is presented] to the federal court that was not presented to the state court," even if the evidence "came into existence after the state habeas relief had been denied." *Dowthitt*, 230 F.3d at 745-46 (quoting *Graham v. Johnson*, 94 F.3d 958, 968 (5th Cir. 1996), and *Joyner v. King*, 786 F.2d 1317, 1320 (5th Cir. 1986)).

In order to satisfy exhaustion, all of the grounds raised in a federal application for writ of habeas corpus must have been "fairly presented" to the state courts prior to being presented to the federal courts. *Dowthitt*, 230 F.3d at 745-46; *see also Nobles*, 127 F.3d at 420.  The Supreme Court has reasoned that the purpose of exhaustion "is not to create a procedural hurdle on the path to federal habeas court, but to channel claims into an appropriate forum, where meritorious claims may be vindicated and unfounded litigation obviated before resort to federal court." *Keeney*, 504 U.S. at 10.  "Comity concerns dictate that the requirement of exhaustion is not satisfied by the mere statement of a federal claim in state court." *Id.*

As McCoskey did not raise his claim either on direct appeal or in state collateral review, he has clearly failed to exhaust state court remedies. It is well-settled that habeas relief "shall not be granted" under any circumstances unless it appears that "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1) (West 2009). It is equally clear, however, that McCoskey would be barred from raising this claim in a successive state habeas application under Texas Code of Criminal Procedure Article 11.071, Section 5(a).[10] "Because [the exhaustion] requirement refers only to remedies still available at the time of the federal petition, it is satisfied if it is clear that the habeas petitioner's claims are now procedurally barred under state law." *Gray v. Netherland*, 518 U.S. 152, 161 (1996) (internal citations omitted); *see also Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982); *Castille v. Peoples*, 489 U.S. 346, 351 (1989); *Graham v. Johnson*, 94 F.3d at 969 ("exhaustion is not required if it would plainly be futile").

Nonetheless, such an unexhausted claim is subject to denial in federal court as procedurally defaulted. Further "[a]lthough AEDPA authorizes a district court to *deny* relief on an unexhausted claim, it does *not* authorize a

---

[10]     Article 11.071, Section 5(a) provides that a state court may not consider the merits of or grant relief on claims presented in a successive state habeas application absent facts giving rise to a statutory exception. McCoskey has made no showing that one of the Article 11.071 exceptions would apply to allow review of these claims in state court.

district court to *grant* relief on an unexhausted claim, 'unless the State, through counsel, expressly waives the requirement'." *Alexander v. Johnson,* 163 F.3d 906, 908 (5th Cir. 1998) (emphasis added).

Although under *Harris v. Reed*, 489 U.S. 255, 265 (1989), federal review of a habeas claim is procedurally barred only if the last state court to consider the claim expressly and unambiguously based its denial of relief on a state procedural default,

> [t]his rule does not apply if the petitioner failed to exhaust state remedies and the court to which petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.  In such a case there is a procedural default for purposes of federal habeas regardless of the decision of the last state court to which the petitioner actually presented his claims.

*Coleman*, 501 U.S. at 735.  In the instant case, just as in *Gray*, "the procedural bar which gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default," or that the federal court's failure to consider the claim will result in a miscarriage of justice.  *Gray*, 518 U.S. at 162 (barring claim on basis that claim would be barred in state court if it were presented there); *Coleman*, 501 U.S. at 750; *Nichols v. Scott*, 69 F.3d 1255, 1280 (5th Cir. 1995).

The Fifth Circuit has held that where a petitioner raises claims in federal court that have not previously been presented to the state courts, and Article 11.071, Section 5(a) would foreclose review of those claims if presented in a successive state habeas application, such is an adequate state procedural bar foreclosing federal habeas review of the claims. *Nobles*, 127 F.3d at 422; *Muniz v. Johnson*, 132 F.3d 214, 221 (5th Cir. 1998). McCoskey does not attempt to distinguish his case from *Nobles* and *Muniz*; nor does he attempt to demonstrate cause and prejudice for his failure to raise the claims in state court. Finally, McCoskey does not show that he qualifies for the miscarriage of justice exception.[11] Thus, circuit precedent compels the denial this claim as procedurally defaulted.

---

[11] A petitioner may come within the "fundamental miscarriage of justice" exception, (1) if, as a consequence of the identified constitutional error in the guilt-innocence phase and in light of new evidence, "it is more likely than not that no reasonable juror would have convicted him," *Schlup v. Delo*, 513 U.S. 298, 329 (1995), or (2) if he establishes "by clear and convincing evidence that, but for the constitutional error at his sentencing hearing, no reasonable juror would have found him eligible for the death penalty" under state law. *Sawyer v. Whitley*, 505 U.S. 333, 350 (1992). As shown in the preceding sections, McCoskey has not presented clear and convincing evidence that no reasonable juror would have found him eligible for the death penalty if this instruction had not been given.

## B.   Alternatively, this claim is meritless.[12]

McCoskey is correct that Supreme-Court precedent holds that death sentences may not be arbitrarily imposed. *See, e.g., Zant v. Stephens*, 462 U.S. 862 (1983); *Gregg v. Georgia*, 428 U.S. 153 (1976); *Furman v. Georgia*, 408 U.S. 238 (1972). Nevertheless, this requirement generally refers to the Supreme Court's holdings that for a state capital-sentencing statute to be considered constitutional it must narrow the class of murderers eligible for the death penalty. The Supreme Court upheld a version of the Texas death-penalty statute in *Jurek v. Texas*, 428 U.S. 262 (1976), which, like the version of the statute under which McCoskey was tried and sentenced, narrowed the class of offenders who were subject to a death sentence to a specific subset of murder defendants. Thus, the Supreme Court has specifically ruled that the manner in which Texas narrows the class of murderers eligible for the death penalty passes constitutional muster by eliminating arbitrariness in the determination of who is eligible to received the death penalty.

What McCoskey means when he argues that the death penalty in his case is "arbitrary" and "capricious" is simply that he thinks that the jury may have

---

[12]   As noted in the preceeding section, although a federal court cannot grant habeas corpus relief on an unexhausted claim, it is permissible to deny relief on an unexhausted claim. 28 U.S.C. § 2254(b)(2).

made a mistake when it sentenced him to death.[13]  Amended Petition at 23-24.

However, as clearly set forth by the Court of Criminal Appeals, that is  not the

case.  By answering "no" to the second special issue, the jury plainly understood

that it was sentencing McCoskey to death.  Indeed, the Director finds it worth

noting that McCoskey has not submitted any affidavits from jurors indicating

that they believed that they answered the special issues in such a way that

would have sentenced McCoskey to life imprisonment.  After all, one assumes

that one of them would have been willing to make mention of the fact once they

had seen that McCoskey had been sentenced to death.

McCoskey's version of events strains credulity, and his claim for relief

should be denied.

## III.  The Trial Court Did Not Err in Denying McCoskey's Strikes for Cause of Jurors Hoesel and Savant. (Petitioner's Claim 2)

In his second claim for relief, McCoskey argues that the trial court

deprived him of his rights under the Due Process Clause and the Sixth and

Eighth Amendments by denying for-cause strikes of two jurors who purportedly

stated they would not consider life in case of felony murders.  Amended Petition

at 28-30.  McCoskey raised these claims on direct appeal.  Appellant's Brief at

77-81.  However, the Court of Criminal Appeals rejected McCoskey's claims,

---

[13]     The Director has adequately addressed McCoskey's argument based on *Penry II* (Amended Petition at 24-25) in the preceding section.

finding that the trial court had not abused its discretion in denying the strikes. *McCoskey v. State,* slip op. at 8-11.   As shown below, this decision was reasonable under Supreme Court precedent and, therefore, federal habeas relief on this claim must also be denied.

"The right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Virgil v. Dretke*, 446 F.3d 598 (5th Cir. 2006) (citing *Irvin v. Dowd*, 366 U.S. 717, 722 (1961)).   The proper standard for determining when a prospective juror should be excluded for cause because of his view on capital punishment is whether those views prevent or substantially impair the performance of his duties as a juror. *Witherspoon v. Illinois*, 391 U.S. 510 (1968) (holding that a prospective juror who would automatically vote to impose a life sentence is properly excluded for the jury); *see also Wainwright v. Witt*, 469 U.S. 412, 424 (1985); *Soria v. Johnson*, 207 F.3d 232, 242 (5th Cir. 2000).   The Supreme Court has emphasized the need to defer to the trial court's broad discretion in making implicit factual findings regarding a potential juror's "substantial impairment." *See Uttecht v. Brown*, 551 U.S. 1 (2007); *Patton v. Yount*, 467 U.S. 1025, 1036-37 & n.1 (1984) (recognizing that, even in the pre-AEDPA context, while the question of a veniremember's disqualification is a mixed question of law and fact, a trial judge's determination regarding a veniremember's bias is essentially a factual determination entitled to deference

on collateral review); *Beazley*, 242 F.3d at 262 (recognizing a trial judge's finding of bias during voir dire is a determination of fact subject to a presumption of correctness on collateral review).

Regarding juror Savant, the Court of Criminal Appeals rejected McCoskey's suggestion that the court must remove for a cause all venirepersons who are biased in favor of the death penalty, holding that *Morgan v. Illinois,* 504 U.S. 719, 736 (1992), requires removal only if the venireperson would *automatically* vote for the death penalty in *every* case. *McCoskey v. State*, slip op. at 9. Since Savant admitted there were circumstances in which he did not think the death penalty was appropriate, or that mitigated against imposing the death sentence; and there is no indication that Savant would not follow the law or would have disregarded the trial court's instructions, the trial court did not abuse its discretion by refusing to strike him. *McCoskey v. State*, slip op. at 9; *see generally* 8 RR 106-187.

Regarding juror Hoesel, the court found that while Hoesel "consistently expressed his *belief* that the death penalty was always warranted in the commission of certain crime, he just as consistently returned to the idea that, ultimately, the sentence would depend on the circumstances involved, regardless of the crime." *McCoskey v. State*, slip op. at 11. Since Hoesel did not indicate he would violate the law or his oath when answering the special issues in order

-29-

to obtain a certain result, and given the totality of his voir dire, the Court of Criminal Appeals could not say that the trial court had abused its discretion in denying the challenge for cause.   .   *McCoskey v. State*, slip op. at 11; *see generally* 12 RR 102-77.

In his federal petition, McCoskey provides no new evidence or precedent. Rather, he simply reiterates his *Morgan* argument from direct appeal.   Amended Petition at 28-30.   But it is clear that the state trial court's holding that Savant and Hoesel did not have a disqualifying bias was a reasonable determination of the facts, and the Court of Criminal Appeals correctly found that the trial court did not abuse its discretion by refusing to strike them for cause.   Because McCoskey has not rebutted the presumption of correctness owed to the state court's findings with clear and convincing evidence, relief on this claim should be denied.

## IV.   The Trial Court Did Not Err in Denying McCoskey's Request for a Competency Hearing.   (Petitioner's Claim 3)

In his third claim for relief, McCoskey argues that the trial court violated his due-process rights by failing to conduct a competency hearing.   Amended Petition at 30-37.   McCoskey raised this claim on direct appeal and on state habeas review.   Appellant's Brief at 34-41;   SHCR-01 194.   The Court of Criminal Appeals rejected relief in both instances, finding that the procedure utilized by the trial court met due-process standards.   *McCoskey v. State,* slip

op. at 19-22; 3 SHCR-01 504-06.  As set forth below, this determination was clearly reasonable in light of the Supreme Court's jurisprudence on the matter.

The Supreme Court has "repeatedly and consistently recognized that the criminal trial of an incompetent defendant violates due process." *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996); *see also Medina v. California*, 505 U.S. 437, 453 (1992); *Drope v. Missouri*, 420 U.S. 162, 171-72 (1975); *Pate v. Robinson*, 383 U.S. 375, 378 (1966).  Competency provides a foundation upon which other constitutional rights depend:

> Competency to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of counsel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so.

*Cooper*, 517 U.S. at 354 (quotation omitted).  A two-part inquiry scrutinizes a defendant's competency.  An inmate is only competent to stand trial when: (1) "he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and (2) "he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (internal quotation marks omitted); *see also Indiana v. Edwards*, 554 U.S. 164 (2008); *Godinez v. Moran*, 509 U.S. 289, 396 (1993); *Drope*, 420 U.S. at 171-72.  Texas has adopted by statute a functionally identical standard for competence.   *See* Tex. Code Crim. Proc. Ann. art. 46B.003

(formerly Tex. Code Crim. Proc. art 46.02); *see also White v. Estelle*, 459 U.S. 1118, 1122 n. 2 (1983) (Marshall, J., dissenting from denial of certiorari) (recognizing that "[t] he State of Texas has adopted essentially the same standard").   Competency to stand trial is defined in Texas as (1) sufficient present ability to consult with counsel with a reasonable degree of rational understanding, or (2) the ability to understand, both rationally and factually, the criminal proceedings.   Tex. Code Crim. Proc. Ann. art. 46B.003.

Incompetency claims in habeas corpus proceedings arise in two distinct circumstances: a procedural context (a claim that the trial court should have held a competency hearing) or a substantive context (a claim that the petitioner was actually incompetent at the time of trial).   *United States v. Williams*, 819 F.2d 605, 607-09 (5th Cir. 1987); *Enriquez v. Procunier*, 752 F.2d 111, 113-14 (5th Cir. 1984); *Lokos v. Capps*, 625 F.2d 1258, 1261 (5th Cir. 1980).   In the instant petition, McCoskey has raised both a procedural and substantive violation.   In conformity with McCoskey's arrangement of his claims, the Director addresses only the procedural violation here and will address the substantive violation in the following section.

To show a procedural violation, the accused must point to evidence before the trial court that raised a bona fide doubt about competency at the time of trial.   *Holmes v. King*, 709 F.2d 965, 967 (5th Cir. 1983).   The test is an objective

one based on what was known to the trial court at the time of trial. *Mathis v. Dretke*, 124 Fed. Appx. 865, 875 (5th Cir. 2005) (citing *Lokos*, 625 F.2d at 1261). Once such a doubt is known by the trial court, it must conduct an adequate inquiry into the defendant's mental capacity. *Holmes*, 709 F.2d at 967 (citing *Pate*, 383 U.S. at 385). The fact-finding process must rest on procedures and evidence "sufficient to permit a trier of fact reasonably to assess an accused's competency against prevailing medical and legal standards." *Holmes*, 709 F.2d at 967 ((citing *Fulford v. Maggio*, 692 F.2d 354, 361 (5th Cir. 1982), rev'd on other grounds, 462 U.S. 111 (1983)). The adequacy of the procedures varies according to the "fact matrix." *Id.* (citing *Curry v. Estelle*, 531 F.2d 766, 768 (5th Cir. 1976)). However, the Fifth Circuit has "never suggested that a state court must conduct 'a full-blown competency hearing every time there is the slimmest evidence of incompetency.' " *Id.* (citing *United States v. Horovitz,* 584 F.2d 682, 683 n.3 (5th Cir. 1978). Rather, all that is required is "an inquiry into a defendant's mental capacity." *Lokos*, 625 F.2d at 1261.

On direct appeal, the Court of Criminal Appeals set forth the three-step process by which the trial court was required to evaluate McCoskey's competence under state law. *McCoskey v. State,* slip op. at 19-20 (citing Tex. Code. Crim. Proc. art. 46.02, §§ 2(b) and 4(a)). As stated by the court, "[f]irst, the issue of incompetency must be raised by the evidence from any source. Second, once the

evidence is raised, the trial court must conduct a hearing outside the presence of the jury to determine if there is sufficient evidence of incompetency to impanel a separate jury to determine the question . . . Finally, if the evidence presented to the trial court "from any source" raises the issue of incompetency, a separate jury determination is required." *Id.*

In the case-at-bar, the Court of Criminal Appeals held that the trial court correctly found that issue was raised by the evidence.  Specifically, "[a]fter the chair-throwing incident[], [McCoskey's] counsel raised the issue of incompetence and moved for a mistrial." *McCoskey v. State,* slip op. at 20.  The court described the evidence (in addition to the chair-throwing incident) then presented to the trial court regarding McCoskey's competence:

> In arguing in support of the motion for mistrial, [McCoskey's] counsel stated that [McCoskey] was deprived of necessary medication pending trial, thus [McCoskey] became unable to maintain control of himself.  Counsel stated that [McCoskey] also became unable to assist counsel and had reached the level that he no longer had sufficient present ability to consult with his attorney with a rational degree of understanding.
>
> The State then pointed out that [McCoskey] had been found competent to stand trial prior to trial, that [McCoskey] acted in a rational manner through the four weeks of voir dire and throughout trial, and that it was only after he had been found guilty of the offense of capital murder that he acted up which actions were consistent with throwing a temper tantrum.
>
> Continuing the proceedings outside the presence of the jury, [McCoskey's] counsel then had himself and his co-counsel sworn as

witnesses in order to place their respective opinions of their client's status on the record.  Counsel then testified that:

> I have observed on many occasions irrational conduct, irrational thought processes and irrational behavior.  I have, however, on occasions also observed the ability to have some rational conduct and behavior.  He has, at times in the past, been able to be of some assistance to me in representing him, although in many instances, the information of his conduct in my dealings with him showed that he was, in fact, not rational.

> Co-counsel then testified under oath that he "wholeheartedly" agreed with his colleague's assessment of their client's behavior, adding that, on several occasions, he had to keep [McCoskey] busy doing things that would not disrupt the courtroom and that, at times, [McCoskey] did not seem focused on courtroom activities and would want to talk about other issues and topics that had nothing to do with the trial.  The State was then allowed to ask counsel questions at which time it elicited that counsel was able to get [McCoskey] to sign and apparently understand an evidentiary stipulation _after_ the chair-throwing incident.  The trial court then asked both sides if they had anything further to which they both replied in the negative.

_McCoskey v. State_, slip op. at 21.

In direct appeal and now in his federal petition, McCoskey argues that this was not a legitimate hearing under Supreme Court precedent.  However, the Court of Criminal Appeals held that this presentation of evidence constituted a "hearing," as anticipated under Article 46.02, Section 2(b).  _Id._ at 21-22.  The court noted that: (1) McCoskey's trial counsel had stated that the presentation constituted "a hearing;" (2) it conformed to the legal dictionary definition of a hearing; and (3) witnesses were called and heard.  _Id._ at 22.  The court also

observed that there is no indication that the trial court would have refused to allow McCoskey to present other evidence or testimony. *Id.* The court also observed that McCoskey did not complain that he was not allowed to present additional evidence. *Id.* Clearly, in the instant case, the procedures and evidence were sufficient to permit the trier of fact to reasonably assess McCoskey's competency. *Holmes*, 709 F.2d at 967.

Regarding the last step in the process—whether more than "a scintilla of evidence" was presented thus requiring the trial court to impanel a separate jury under Article 46.02, Section 4(a) to determine the issue of McCoskey's competence to stand trial—the Court of Criminal Appeals held that the trial court did not err in finding no evidence was presented to require the court to impanel a separate jury. *Id.* at 22. The court noted that the evidence presented at the hearing was nothing more than the "bare assertions" of McCoskey's attorneys regarding his state of mind, which "primarily amounted to statements regarding [McCoskey's] unruly courtroom behavior, his unsubstantiated lack of medication, and his occasional failure to communicate with his attorneys or to focus on the present courtroom proceedings." *Id.* Without more, the Court of Criminal Appeals found trial counsel's allegations of incompetency to be just as consistent with poor behavioral skills, and could not say that the trial court erred in refusing to impanel a separate jury. *Id.*

McCoskey has failed to demonstrate that the state court's decision was contrary to or involved an unreasonable application of clearly established federal law as determined by the United States Supreme Court, or that the decision constitutes an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Accordingly, this claim should be denied.

## V.   McCoskey Failed to Demonstrate He Was Incompetent to Stand Trial. (Petitioner's Claim 4)

In his fourth claim for relief, McCoskey makes the related substantive due-process claim that he was tried while incompetent. Amended Petition at 38. McCoskey raised his substantive due-process claim in his state habeas application. 2 SHCR-01 194-200. But the state habeas court rejected it, finding that McCoskey was competent at the time of trial. 3 SHCR-01 504-506.

To obtain a federal habeas corpus relief on a substantive claim, the petitioner must offer sufficient "evidence to raise a threshold doubt about competency." *Carter v. Johnson*, 131 F.3d 452, 460 (5th Cir. 1997) (quoting *Lokos*, 625 F.2d at 1261). In order to raise such doubt, he must present facts sufficient to "positively, unequivocally and clearly generate a real, substantial and legitimate doubt as to his mental competency at the time of trial." *Id.* (citing *Williams*, 819 F.2d at 609); *Goynes v. Dretke*, 139 Fed. Appx. 616, 619 (5th Cir. 2005) (citing *Dunn v. Johnson*, 162 F.3d 452, 460 (5th Cir. 1997) and *Carter*,

-37-

*supra*).  This threshold burden is "extremely heavy."  *Id.* at n.11 (quoting *Johnson v. Estelle*, 704 F.2d 232, 238 (5th Cir. 1983)).  In the absence of such a showing, a habeas court has no duty to investigate the constitutional challenge further.  *Washington v. Johnson*, 90 F.3d 945, 950 (1996).

As noted above, McCoskey raised this claim again on state habeas review, proffering a subsequent evaluation by clinical psychologist Dr. Patrick Lawrence in support.  2 SHCR-01 194-200.  After restating the direct-appeal findings, *see* 3 SHCR-01 504-05, the state habeas court found unpersuasive Dr. Lawrence's opinion that McCoskey was incompetent to stand trial, in light of "the pretrial determination of [McCoskey's] competency, [McCoskey's] actions during and after the offense, the lack of a scintilla of evidence of incompetency during trial, and the passage of five years after trial before Lawrence's examination of [McCoskey]."  *Id.* at 505.  The court also found unpersuasive Dr. Lawrence's opinion that McCoskey was incompetent without medication, citing instead to the testimony of two trial experts that medication was given to McCoskey to curb his aggressive outbursts—a state which was not necessarily relevant to his competency to stand trial.[14]  *Id.* at 506.  Finally, the court found that the act of

---

[14]     The state habeas court's credibility determination is entitled to deference by this Court.  *Kitchens v. Johnson*, 190 F.3d 698, 700-01 (5th Cir. 1999) (under AEDPA, a state's factual findings are presumed correct unless rebutted by the petitioner with clear and convincing evidence).

throwing a chair in the courtroom was consistent with Dr. Jerome Brown's finding that McCoskey, while competent to stand trial, suffered from an antisocial personality disorder, characterized by symptoms such as initiating fights, aggressive behavior, and disregarding the safety of others. *Id.* Also, the court found that this act demonstrates that McCoskey comprehended the jury's verdict and was angered by the State's jury argument and presentation of evidence. *Id.* These findings are entitled to a presumption of correctness unless the petitioner can rebut the presumption with clear and convincing evidence to the contrary. *Valdez v. Cockrell*, 274 F.3d 941, 947 (5th Cir. 2001). McCoskey has not provided such clear and convincing evidence.

Given the "extremely heavy" burden of proof necessary to justify federal habeas corpus relief on grounds of mental incompetency, McCoskey cannot succeed on his claim that he was incompetent at the time of his 1992 trial. McCoskey has failed to present facts sufficient to "positively, unequivocally and clearly generate a real, substantial and legitimate doubt" concerning his mental capacity. Thus, in the absence of this threshold showing, the Court has no duty to investigate the constitutional challenge further.

## VI.   The State Did Not Withhold Material Evidence That Would Have Impeached the State's Serological and DNA Testimony. (Petitioner's Claim 5)

In his fifth claim for relief, McCoskey argues that the State withheld evidence that would have impeached the State's serological and DNA testimony. Amended Petition at 39-41. As background, the State's case against McCoskey included DNA evidence developed by the HPD Crime Lab. Since McCoskey's conviction, flaws in the laboratory's handling of DNA evidence have come to light. Now McCoskey maintains that defense counsel should have been given the opportunity to impeach the individuals from the crime lab who testified at his trial.

McCoskey never presented this claim to the state court[15], although he did present a related ineffective-assistance of counsel claim.[16]  2 SHCR-01 196-200. Nevertheless, the claim fails on the merits, as McCoskey has abjectly failed to show that the evidence in question was favorable, known to and suppressed by

---

[15]   McCoskey correctly observes that this claim was not available at the time he filed his initial state habeas application. Consequently, the Director does not assert that this claim is procedurally defaulted despite the fact that McCoskey never presented it to the state court. *Ex parte Campbell*, 226 S.W.3d 418 (Tex. Crim. App. 2007) (finding HPD Crime Lab claim factually and legally unavailable at time of 1997 and 2003 writ filings). The claim remains unexhausted, however.

[16]   Again, although a federal court cannot grant habeas corpus relief on an unexhausted claim, it is permissible to deny relief on an unexhausted claim. 28 U.S.C. § 2254(b)(2).

the prosecutors at the time, or was in any way material.  28 U.S.C. § 2254(b)(2)

("An application for a writ of habeas corpus may be denied on the merits,

notwithstanding the failure of the applicant to exhaust the remedies available

in the court of the State.").

Few constitutional principles are more firmly established by Supreme-

Court precedent than the rule that "'the suppression by the prosecution of

evidence favorable to an accused upon request violates due process where the

evidence is material either to guilt or to punishment, irrespective of the good

faith or bad faith of the prosecution.'"  *Banks v. Dretke*, 540 U.S. 668, 691 (2004);

*Brady v. Maryland*, 373 U.S. 83, 87 (1963).  The Supreme Court has consistently

held the prosecution's duty to disclose evidence material to either guilt or

punishment applies even when there has been no request by the accused.

*Banks*, 540 U.S. at 690; *Strickler*, 527 U.S. at 280; *United States v. Agurs*, 427

U.S. 97, 107 (1976).  This duty also applies to impeachment evidence.  *Strickler*,

527 U.S. at 280; *United States v. Bagley*, 473 U.S. 667, 676 (1985).  The rule in

*Brady* encompasses evidence known not only to police investigators and not just

that evidence personally known by the prosecutor.  *Strickler*, 527 U.S. at 280-81;

*Kyles v. Whitley*, 514 U.S. 419, 438 (1995).  "[T]he individual prosecutor has a

duty to learn of any favorable evidence known to the others acting on the

government's behalf in this case, including the police." *Strickler*, 527 U.S. at 281; *Kyles*, 514 U.S. at 437.

As noted above, under clearly established Supreme-Court precedent, there are three elements to a *Brady* claim: (1) the evidence must be favorable to the accused either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be "material," *i.e.*, prejudice must have ensued from its non-disclosure. *Banks*, 540 U.S. at 691; *Strickler*, 527 U.S. at 281-82. Evidence is "material" under *Brady* where there exists a "reasonable probability" that had the evidence been disclosed the result at trial would have been different. *Banks*, 540 U.S. at 698-99. The Supreme Court has emphasized four aspects of the *Brady* materiality inquiry. First, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted in the defendant's acquittal. *Bagley*, 473 U.S. at 682 (expressly adopting the "prejudice"-prong analysis of ineffective-assistance claims as the appropriate standard for determining "materiality" under *Brady*). Second, the materiality standard is not a sufficiency of the evidence test. *Kyles*, 514 U.S. at 434-35. Third, once materiality is established, harmless-error analysis has no application. *Id.* at 435-36. Finally, materiality must be assessed collectively, not item by item. *Id.* at 436-37.

-42-

Applying *Brady* to the facts of the instant case, McCoskey fails to demonstrate that the anyone working for the State suppressed evidence regarding the credibility of the HPD Crime Lab's work. McCoskey was tried and convicted in 1992. McCoskey does not indicate that the problems with the Crime Lab became apparent to anyone at the time of his trial. Indeed, McCoskey himself suggests that the problems did not become apparent until 1999 at the earliest. Amended Petition at 40. A petitioner's speculation about the suppression of exculpatory evidence is insufficient basis to support a *Brady* claim. *Hughes v. Johnson*, 191 F.3d 607, 630 (5th Cir. 1999).

Furthermore, McCoskey has failed to show that the evidence in question is material. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Agurs,* 427 U.S. at 109-10. Instead, the evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Bagley,* 473 U.S. at 682. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. *Id.* In assessing the materiality of undisclosed impeachment evidence, a court "must consider the nature of the impeachment evidence improperly withheld and the additional evidence of the defendant's guilt independent of the disputed

-43-

testimony." *United States v. Weintraub*, 871 F.2d 1257, 1262 (5th Cir. 1989).

McCoskey argues that had he been able to impeach the HPD Crime Lab's reputation at the time of trial, then the jury would have discounted the evidence that he raped Collins. *Id.* But McCoskey ignores that independent testing has confirmed the HPD Crime Lab's conclusions in McCoskey's case. The State submitted a report from Orchid Cellmark dated April 24, 2004, confirming that McCoskey's DNA matched DNA obtained from swabs taken from Collins after she was raped. McCoskey's claim is plainly meritless and should be summarily dismissed.

## VII. McCoskey Received Constitutionally Effective Assistance of Counsel. (Petitioner's Claim 6)

In his sixth claim for relief, McCoskey argues that he was deprived of his Sixth Amendment right to the effective assistance of counsel by his attorney's failure to: (1) object to the "nullification instruction" during the punishment phase of trial; (2) introduce and argue psychological and psychiatric records and information; and (3) to interview a witness who indicated McCoskey, Dwyers, and Collins were socializing before the criminal episode. Amended Petition at 41-45. On state habeas review, McCoskey raised raised claim three and asserted claims one and two (but did not brief them). 2 SHCR-01 214,217-18. The state court found that McCoskey's claims were without merit. As shown below, McCoskey has not shown that this decision was an unreasonable

application of the law to the facts or contrary to clearly established Supreme Court precedent. Accordingly, McCoskey's ineffective-assistance-of-counsel claim should be denied.

### A.    Standard of Review

The familiar two-prong standard by which a claim of ineffective assistance of counsel is weighed is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). That is, to establish that counsel performed ineffectively, McCoskey must show both that his attorney's performance was deficient and the deficient performance prejudiced his defense. 466 U.S. at 687. Furthermore, because a convicted defendant must satisfy both prongs of the *Strickland* test, a failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong. *Id.* at 697.

In order to establish that counsel's performance was constitutionally deficient, a convicted defendant must show that trial counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* at 687. In so doing, a convicted defendant must overcome a strong presumption that trial counsel's conduct fell within a wide range of reasonable professional assistance, and every effort must be made to eliminate the "distorting effect of hindsight." *Id.* at 689.

Furthermore, "any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Strickland,* 466 U.S. at 692.  In order to establish that he has sustained prejudice, McCoskey "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Id.* at 694.  A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *Id.*  A mere allegation of prejudice is not sufficient to satisfy the prejudice prong of *Strickland*; rather, McCoskey must "affirmatively prove" prejudice.  *Id.* at 693.  Where counsel is alleged to have been ineffective at the punishment phase, the inquiry is whether the "additional mitigating evidence [is] so compelling that there is a reasonable probability at least one juror could have reasonably determined that, because of [Petitioner's] reduced moral culpability, death was not an appropriate sentence." *Neal*, 286 F.3d at 241.

Moreover, when a petitioner seeks a writ of habeas corpus based on ineffective assistance:

> [i]t bears repeating that the test for federal habeas purposes is not whether [petitioner] made that showing.  Instead, the test is whether the state court's decision—that [petitioner] did not make the *Strickland* showing—was contrary to, or an unreasonable application of, the standards, provided by the clearly established federal law (*Strickland*), for succeeding on his IAC claim.

-46-

*Schaetzle v. Cockrell*, 343 F.3d 440, 444 (5th Cir. 2003). Accordingly, to succeed in this Court on an ineffective-assistance-of-counsel claim, McCoskey must at a minimum show that the state habeas court's decision was contrary to, or an unreasonable application of, the standards provided by the clearly-established federal law (*i.e.*, *Strickland*).

### B. Counsel's failure to object to the "nullification instruction" during the punishment phase of trial was not prejudicial.

McCoskey raised this claim during state habeas, but the state court concluded that this claim was "essentially raised and rejected on direct appeal" when the Court of Criminal Appeals held that the instruction was not harmful. 3 SHCR-01 529. Alternatively, the court held that McCoskey failed to make a *Strickland* showing because he cannot demonstrate harm/prejudice. *Id.; see also* 3 SHCR-01 515-16.

As explained in Section II, *supra*, the Court of Criminal Appeals held that the error in the charge was harmless. *McCoskey v. State*, slip op. at 29-32. In his petition, McCoskey now attempts to argue that he was prejudiced under the Supreme Court's holdings in *Penry I*, *Penry II*, and *Abdul-Kabir*[17]. However, McCoskey's reliance on these cases is sorely misplaced. To begin, McCoskey did not receive the instructions in those cases. Instead, he received the *Penry II*

---

[17]      *Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007).

nullification instruction in conjunction with the modern special issues. Moreover, those cases did not involve *Strickland* error, but rather simple jury-instruction error.  With respect to counsel's errors at the sentencing phase of a death penalty trial, the relevant inquiry is "whether there is a reasonable probability that, absent the errors, the sentencer [] would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695; *see also Riley v. Cockrell*, 339 F.3d 308, 315 (5th Cir. 2003) ("If the petitioner brings a claim of ineffective assistance with regard to the sentencing phase, he has the difficult burden of showing a reasonable probability that the jury would not have imposed the death sentence in the absence of errors by counsel." (internal quotation marks omitted)).

As noted above, the Court of Criminal Appeals addressed McCoskey's underlying claim on the merits.  While the court addressed McCoskey's claim under a more difficult standard than if counsel had objected, the court nonetheless concluded that McCoskey did not suffer *any* harm from inclusion of the erroneous instruction.  *McCoskey v. State*, slip op. at 32.  With no harm accruing from counsel's actions, McCoskey could not possibly have been prejudiced under *Strickland*.

Consequently, even if this Court finds deficient performance, McCoskey is not entitled to relief on this claim.  *Ramirez v. Dretke*, 398 F.3d 691, 697 (5th

Cir. 2005) (reiterating that both prongs of the *Strickland* test must be satisfied in order to be entitled to relief).

### C. McCoskey's attorneys were not ineffective for not introducing psychological and psychiatric records and information.

Despite his failure to adequately brief this claim in the state court, that court nonetheless concluded that McCoskey's attorneys were not ineffective for failing to present sufficient medical records regarding mental health testing in light of the of the extensive testimony from Dr. Hayes at trial concerning his diagnosis and testing of McCoskey, and his review of McCoskey's medical records. 3 SHCR-01 508, 523 (citing case law suggesting that this was a strategic decision and that additional evidence would have been cumulative). Specifically, the state court found that:

> 54. The Court finds that, although trial counsel presented argument and examples of alleged incompetency during the hearing, the prior finding of competency, [McCoskey]'s actions during the offense, his statement to police, and his ability to stipulate to identity immediately after throwing the chair showed that there was not more than a scintilla of evidence that would require the trial court to impanel a separate jury under [Tex. Code Crim. Procedure Article 46.02], § 4(a).  *See* Finding No. 46 []; [*McCoskey v. State*], slip op. at 20-[24].

> [. . .]

> 59. The Court finds that, during [McCoskey]'s trial, extensive testimony was presented concerning the various medications taken by [McCoskey] prior to and after the offense.  [27 RR 78-79, 85, 103, 115, 186-89, 249-54, 278-80, 308-09, 324-24, 415, 444-46; 28 RR 238.]

      60.  The Court finds that trial counsel presented the extensive testimony of Dr. James Ray Hays concerning his diagnosis and testing of [McCoskey] and his review of [McCoskey]'s medical records[.]  [27 RR 369-450; see Finding Nos. 21-22.]

3 SHCR-01 507-08.

McCoskey basically asks the Court to find counsel ineffective for failing to present cumulative testimony.  A reviewing court must be also wary of "argument[s] [that] essentially come[] down to a matter of degrees.  Did counsel investigate enough?  Did counsel present enough mitigating evidence?  Those questions are even less susceptible to judicial second-guessing." *Kitchens*, 190 F.3d at 703; *see also Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992) ("The defense of a criminal case is not an undertaking in which everything not prohibited is required.  Nor does it contemplate the employment of wholly unlimited time and resources.").  Moreover, the Supreme Court has admonished that judicial scrutiny of counsel's performance "must be highly deferential," with every effort made to avoid "the distorting effects of hindsight." *Strickland*, 466 U.S. at 689-90; *Rector v. Johnson,* 120 F.3d 551, 563 (5th Cir. 1997); *Belyeu v. Scott*, 67 F.3d 535, 538, 540 (5th Cir. 1995).  In light of Dr. Hayes's exhaustive testimony, counsel made a reasonable strategic decision to not present additional, cumulative evidence.  Likewise, since this evidence was cumulative to Dr. Hayes's testimony, McCoskey could not possibly have been prejudiced under *Strickland*.

### D.   Counsel was not ineffective for not calling Stuart Chapple[18] to testify.

McCoskey claims that counsel should have called Stuart Chapple to testify.   Amended Petition at 44-45.   However, "[c]omplaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what a witness would have testified are largely speculative." *Sayre v. Anderson*, 238 F.3d 631, 635-36 (5th Cir. 2001) (quoting *Lockhart v. McCotter*, 782 F.2d 1275, 1282 (5th Cir. 1986)).   Allegations that counsel failed to investigate and develop useful evidence are not sufficient to warrant a hearing or relief absent an "affirmative showing of what the missing evidence or testimony would have been" and an explanation "why it would have been likely to make any difference in his trial or sentencing." *Anderson v. Collins*, 18 F.3d 1208, 1220 (5th Cir. 1994).   "A prisoner's bald conclusory assertion that supposed . . . witnesses were not called does not serve to 'overcome the strong presumption that his counsel's actions were reasonable.'" *Sayre*, 238 F.3d at 635 (quoting *Marler v. Blackburn*, 777 F.2d 1007, 1010 (5th Cir. 1985)).   Furthermore, the presentation of witness testimony is essentially strategy and, thus, within trial

---

[18]     McCoskey refers to this individual as "Stuart Chappel" in his federal petition and "Stuart Chappelle" in his state habeas petition.   Amended Petition at 44; 1 SHCR-01 22.   According to the transcript submitted with McCoskey's state habeas application, it appears that this individual's correct name is actually "Stuart Chapple." 1 SHCR-01 124.

counsel's domain. *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985). A petitioner must overcome a strong presumption that his counsel's decision in not calling a particular witness was a strategic one. *Murray v. Maggio, Jr.*, 736 F.2d 279, 282 (5th Cir. 1984).

McCoskey raised this claim on state habeas review. The state court rejected the claim, finding that the partial transcript of Stuart Chapple's video deposition from rape-victim Laurie Collins's civil suit against the apartment complex indicates that the victim Dwyer was at Chapple's apartment with a group of people when McCoskey arrived; Dwyer and McCoskey were in the apartment at the same time between fifteen and twenty minutes before Dwyer left with Collins, who came to the door of the apartment; that Dwyer and McCoskey spoke as "part of the room full of conversation;" and that Chapple later saw McCoskey walking up the stairs behind Dwyer and Collins, who were carrying groceries, and he saw McCoskey standing in the doorway of their apartment. 3 SHCR-01 511. The state court concluded that Chapple's deposition does not contradict Collins's trial testimony that she and Dwyer did not know McCoskey, and that Dwyer briefly being in a room with McCoskey or Collins's standing in the doorway of an apartment in which McCoskey was in does not establish that they knew him. *Id.* Further, "any knowledge or recognition" that the victims may have had of McCoskey does not obviate the

facts of the offense, or show that the victims willingly went with McCoskey, and any prior knowledge that McCoskey had a knife does not change the facts that he used the knife to force the victims to accompany him, that he raped Collins, and that he killed Dwyer.  *Id.* at 512.  The court concluded that Chapple's testimony would not have rebutted the facts of the instant offense or Collin's testimony, but would have reinforced Collins's assertion that McCoskey had a knife and appeared in their doorway as they returned from buying groceries. *Id.* Chapple's testimony would not have presented evidence supporting the lesser-included offense of kidnapping or murder.  *Id.*  For these reasons, the state court concluded that trial counsel was not ineffective for failing to present this witness, nor was McCoskey prejudiced as he would not have been entitled to lesser-included offense instructions.  *Id.* at 525-26.

### D.    Conclusion

McCoskey cannot show that the state court's decision to deny relief was an unreasonable application of the Supreme Court's precedent.  *See*, *e.g.*, *Bell v. Cone*, 535 U.S. 685, 699 (2002) (holding that the burden is on the petitioner to do more than just "convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly," but instead the petitioner "must show that the [state court] applied *Strickland* to the facts

of his case in an objectively unreasonable manner"). Therefore, McCoskey's ineffective-assistance-of-counsel claims should be denied.

## VIII. McCoskey's Claim That the Trial Court Erroneously Admitted Evidence of an Extraneous Sexual Assault on One of the Victims Is Unexhausted and Procedurally Defaulted. Alternatively, the Admission of the Sexual-Assault Evidence at the Guilt Phase of Trial Did Not Violate McCoskey's Due-Process Rights. (Petitioner's Claim 7).

In his seventh claim for relief, McCoskey argues that the trial court admitted extraneous evidence of a sexual assault on one of the victims, in violation of his due-process rights. Amended Petition at 45-46. However, McCoskey never raised this claim in the state court; therefore, it is unexhausted and procedurally defaulted. Alternatively, this claim fails on the merits.

### A.     This claim is unexhausted and procedurally defaulted.

McCoskey did not present this claim in either of his state habeas applications[19] or in his brief on direct appeal. *See generally* SHCR-01; SHCR-02; Appellant's Brief. As a consequence, this claim is unexhausted and procedurally defaulted. *See* 28 U.S.C. § 2254(b) (precluding federal habeas corpus relief when applicant has not exhausted state court remedies); *Nobles*, 127 F.3d at 422 (5th Cir. 1997) (holding that defaulted claims had yet to be presented to the state courts; determining the claims were unexhausted and procedurally defaulted

---

[19]     McCoskey did raise an ineffective-assistance-of-counsel claim for failing to object to the sexual-assault evidence. 3 SHCR-01 524-25. However, McCoskey never raised a free-standing claim of trial error.

and concluding that the standard for avoiding a state citation for abuse of the writ could not be satisfied).

### B.   Alternatively, this claim fails on the merits.[20]

The admission into evidence of an extraneous offense is constitutionally permissible if there is a strong showing that the defendant committed the offense and if the extraneous offense is rationally connected with the offense charged. *Enriquez v. Procunier*, 752 F.2d 111, 115 (5th Cir. 1984). To justify federal habeas relief, error in admitting extraneous offense evidence must be of a magnitude that will render the trial as a whole "fundamentally unfair." *Nelson v. Estelle*, 642 F.2d 903, 907 (5th Cir. 1981).  Error is fundamentally unfair only if it was "material in the sense of a crucial, critical, highly significant factor." *See id.* at 907-08.

Under Texas law, extraneous offenses may be admissible as "same transaction contextual evidence" when "several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction." *Prible v. State*, 175 S.W.3d 724, 731-32 (Tex. Crim. App. 2005) (quoting *Rogers v. State*, 853 S.W.2d 29, 33 (Tex. Crim. App.1993)).  This type of evidence is admissible when an extraneous matter is so intertwined with the

---

[20]     As mentioned before, although a federal court cannot grant habeas corpus relief on an unexhausted claim, it is permissible to deny relief on an unexhausted claim.  28 U.S.C. § 2254(b)(2).

State's proof of the charged crime that avoiding reference to it would make the State's case difficult to understand or incomplete. *Id.* at 732. Under these circumstances, "the jury is entitled to know all relevant surrounding facts and circumstances of the charged offense; an offense is not tried in a vacuum." *Moreno v. State*, 721 S.W.2d 295, 301 (Tex. Crim. App. 1986). Indeed, Texas courts have approved the introduction of such evidence in similar cases. *See, e.g., Rogers v. State*, 853 S.W.2d 29, 33 (Tex. Crim. App. 1993); *Tatum v. State*, 2002 WL 1810374 (Tex. App.—Dallas 2002) (evidence of defendant's sexual assault of robbery victim's wife admitted as same transaction contextual evidence).

A review of the record reveals that evidence of McCoskey's sexual assault on Collins was an integral part of the criminal transaction—the kidnapping of Collins and Dwyer and the murder of Dwyer. Thus, the evidence was permissible under the doctrine of res gestae. *See United States v. Navarro*, 169 F.3d 228, 233 (5th Cir. 1999) ("Evidence that is 'inextricably intertwined' with the evidence used to prove the crime charged . . . is admissible so the jury may evaluate all the circumstances under which the defendant acted."); *see also Neal v. Cain*, 141 F.3d 207, 214 (5th Cir. 1998). Furthermore, McCoskey has failed to show that but for the admission of this testimony the result in the trial would have been different. *Brecht*, 507 U.S. at 637 (1993). Accordingly, there is

nothing unreasonable in the state court's application of clearly established federal law or in the state court's determination of facts in light of the evidence.

## IX. McCoskey's Claim that the State Violated His Fifth- and Sixth-Amendment Rights by Allegedly Depriving Him of His Medication During Trial Is *Teague*-barred.  Alternatively, this Claim Fails on the Merits.  (Petitioner's Claim 8)

In his eighth claim for relief, McCoskey argues that: (1) the State deprived him of medication he needed to effectively communicate with counsel, depriving him of his due-process and Sixth; and (2) the State deprived McCoskey of his due process and Fifth Amendment rights when failing to provide him medication caused him to have an outburst in the courtroom.  Amended Petition at 46-48.  McCoskey raised these claims on direct appeal.  Appellant's Brief at 41-43.  The Court of Criminal Appeals found that they were meritless.  *McCoskey v. State*, slip op. at 22-23.  McCoskey raises this claim again in his federal petition, but this claim is barred by the non-retroactivity principle of *Teague*.

### A.   McCoskey's claim is *Teague*-barred.

In support of his claim, McCoskey cites to *Riggins v. Nevada*, 504 U.S. 127 (1992).  In *Riggins*, the Supreme Court held that held that the trial court had erred in ordering that the defendant be administered antipsychotic drugs during his trial over his objection without first making factual findings that (1) there were no less intrusive alternatives available, (2) that the medication administered by the state was medically appropriate, and (3) that the medication

was essential for the sake of defendant's safety or the safety of others.  504 U.S.

at 135-36.  But as noted by the Fifth Circuit in an unpublished case, *Taylor v.*

*Cain*:

> The Court in *Riggins*, however, "narrowly define[d]" the issue before
> it to be whether the "involuntary administration of [medication]
> denied" the defendant a full and fair trial.  Taylor cites no authority
> from the Supreme Court, nor are we aware of any, dictating relief
> in a situation such as the one now before us, *i.e.*, requiring a holding
> that a state's failure to administer medication to a defendant denies
> the defendant due process at trial.

1999 WL 642890 at *5 (5th Cir. 1999) (unpublished) (citations omitted).

AEDPA  permits habeas relief only on the basis of "clearly established"

federal law. 28 U.S.C. § 2254(d). "Clearly established federal law" refers to the

"holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the

time of the relevant state-court decision." *(Terry) Williams*, 529 U.S. 362, 412;

*Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004) ("We look for 'the governing

legal principle or principles set forth by the Supreme Court at the time the state

court renders its decision.' ").  McCoskey may not obtain relief based on rules of

constitutional law that have yet to be announced, or that were announced after

his conviction became final.  *Teague*, 489 U.S. at 310.

Under *Teague*, a new rule is one where the result was not "dictated by

precedent existing at the time the defendant's conviction became final."  *Id*. at

30; *see also Saffle v. Parks*, 494 U.S. 484, 488 (1990) (noting that the question

is "whether a state court considering [the defendant's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution"); *O'Dell v. Netherland*, 521 U.S. 151 (1997) (noting that rule under *Teague* is whether "the rule . . . [is], in light of this Court's precedent, 'susceptible to debate among reasonable minds.'") (quoting *Butler v. McKellar*, 494 U.S. 407 (1990)).  There are only two limited exceptions to *Teague*'s non-retroactivity principle.  The first exception is for rules that would place primary conduct beyond the government's power to proscribe or a class of persons beyond its power to punish in certain ways.  *Graham v. Collins*, 506 U.S. 461, 477 (1993).  The second *Teague* exception is reserved for bedrock rules of criminal procedure that are necessary to ensure a fundamentally fair trial.  *Id.*  McCoskey fails to demonstrate what status[21] or offense[22] would qualify him for the first exception.  Likewise, he fails to demonstrate that this case involves a bedrock rule of criminal procedure that necessary to ensure a fundamentally fair trial.  Accordingly, *Teague* and its progeny foreclose the grant of federal habeas relief on this claim.

---

[21]    *See e.g. Ford v. Wainwright*, 477 U.S. 399, 410 (1986) (insanity).

[22]    *See e.g. Coker v. Georgia*, 433 U.S. 584 (1977) (rape) (plurality).

### B.   Alternatively, this claim is meritless.

Furthermore, the Court of Criminals denied relief on McCoskey's medication-related claims because his assertion that he was denied medication by the State was not supported by the record. *McCoskey*, No. 71,629, slip op. at 24-25.   The court found that the trial court granted McCoskey's motion to dispense medication to him without charging his inmate trust fund. *Id.* The Court of Criminal Appeals noted that the motion did not indicate that the medication was being actually kept from McCoskey. *Id.* With respect to the chair-throwing, the court further noted that it had not been "shown any evidence that [McCoskey] was in any state of mind other than simply throwing a temper tantrum at the time that he threw the chair at the prosecutors." *Id.* On state habeas review, McCoskey made a related claim that trial counsel failed to present jail medication records of alleged noncompliance with the court order. *Id.* The court found McCoskey's allegations that he was denied his medication by the State conclusory and noted that McCoskey refused his medication on September 2, 1992. *Id.* Thus, the state court has repeatedly found that McCoskey had not adequately demonstrated that he was denied his medication by the agency of the State or, indeed, if he was ever actually denied his medication at all.

A state court's factual findings are entitled to deference on federal habeas corpus review and are presumed correct under Section 2254(e)(1) unless the petitioner rebuts those findings with "clear and convincing evidence." *Garcia v. Quarterman*, 454 F.3d 441, 444 (5th Cir. 2006) (citing *Hughes*, 412 F.3d at 589 and 28 U.S.C. § 2254(e)(1)).   The state court's rejection on the merits of McCoskey's claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, nor based on an unreasonable determination of the facts in light of the evidence presented in state court proceedings.   Accordingly, McCoskey is not entitled to federal habeas corpus relief on this claim.

## X.   The Trial Court Did Not Err In Excusing Veniremember Barfield As a Juror.  (Petitioner's Claim 10)

In his ninth claim for relief, McCoskey argues that the trial court erroneously excused a juror that both sides had accepted.  Amended Petition at 49-50.  McCoskey raised this claim on direct appeal, and the Court of Criminal Appeals concluded that the trial court did not err by excusing the juror. *McCoskey v. State*, slip op. at 15.

Under the Due Process Clause of the United States Constitution, McCoskey was entitled to an impartial jury that will conscientiously apply the law and find the facts. *Morgan*, 504 U.S. at 727; *Wainwright*, 469 U.S. at 423. In Texas, trial courts have broad discretion to excuse jurors for cause. *See, e.g.,*

*Clark v. State*, 881 S.W.2d 682, 688-89 (Tex. Crim. App. 1994).  Article 35.03 of the Texas Code of Criminal Procedure allows the trial court to discharge a juror if the court deems the excuse for not serving sufficient.  A federal reviewing court is required to accord a presumption of correctness under 28 U.S.C. § 2254(d) to the trial court's determination that a prospective capital sentencing juror should be excused for cause.  *Wainwright*, 469 U.S. at 429; *Milton v. Procunier*, 744 F.2d 1091, 1096 (5th Cir. 1984).  On November 2, 1992, veniremember Barfield was questioned by both parties and accepted as a juror by both parties.  The next day the juror returned after calling the court and indicated that she felt that she could not be a fair and impartial juror.  The following exchange occurred:

> [DEFENSE:]   Your Honor, I actually have to object to the proceedings in view of the fact that this juror vias actually accepted by both sides and approved by both sides, after over an hour of individual voir dire, not to mention the Court's own voir dire. Therefore, I object to the proceedings.
>
> [THE COURT:]  What do y'all suggest?
>
> [DEFENSE:]  I believe if there's any inquiry to be made, it has to be done by the Court and not by the attorneys.  I don't believe it would be appropriate for the attorneys to do anything further since we have already done our questioning in this regard.  I think if you have that information, it may be within your right.  I don't think we have any right to talk to this lady any further.
>
> [THE COURT:]  I'll adhere to that.  I was going to ask her to place on the record what she was telling me on the phone.  And if—I think you missed my question, my "If".  If you don't want to ask anything,

I'll allow the State to ask.  If you have any questions, I'll ask those.  I'll excuse her, consult with you all, and make a decision.

[THE COURT:]  Now whatever it is you want to tell me whatever it is you want to tell me, I just "want it on the record, whatever it is that caused you to change your mind, what you did since you had been chosen.

[JUROR:]  Well, I didn't get a lot of sleep last night, and I have been under a lot of pressure, and I saw the therapist this morning.  And considering my personal problems right now, I don't think I can give this young man a fair trial.  And I think this is a very serious case, and I think that I need to tell you that.

[THE COURT:]  When you say you don't think you can give him a fair trial, just delineate that a little bit for me.

[JUROR:]  I'm not in any state to make any kind or decision right now.  I mean, my final divorce will be next week, the 60 days.  And I'll probably have to go to court from that.  And I don't think I'm in any—I don't think I can make a fair decision in this matter.  And I only think it's it's the fair thing for me to do.  I can't go on and not tell you this.

[THE COURT:]  But when you say you don't you can make a decision; delineate what are you talking about when you say you think you can make a fair decision?  What don't . . .

[JUROR:]  I don't think I can decide, one way or the other.

[THE COURT:]  Okay.

[JUROR:]  And I don't know.  I wake up one day and I think one way and I wake up another and I think another way.  And right now the - - my mental state is not that good.  And I would have to work from the time I leave here, next week, until the time I finish.  And that puts more pressure on me.  And it's just not a good time for me right now.

[THE COURT:]  Let me ask you this.  This is one of my legal

questions.  Do you think the frame of mind that you're in now, is different from what you were in yesterday, when we chose you, right now?

[JUROR:]  Well, I'm pretty fragile, and probably so.

[THE COURT:]  Well, as you sit there now, do you feel, that based on your own thoughts, you know you better than I, that your feelings could prevent or substantially impair your ability

[JUROR:]  Right, to decide.

[THE COURT:]  Your duties to—let me finish—to perform as a juror

[JUROR:]  Yes, sir.

[THE COURT:]  Carry out, listen to the facts, and apply the law that I'm going to give you, pursuant to the oath that you took?

[JUROR:]  Yes, sir.

22 RR 285-294.

The Court of Criminal Appeals held that, under its precedent, the power to grant an excusal from jury service under Article 35.03 extended from the first assemblage of the array until the juror was seated.  *McCoskey v. State*, slip op. at 15.  The court also found that, "[t]he juror here was quite adamant that she could not be fair to the defendant as she previously thought.  Even from the cold record, we can perceive the distress the veniremember was experiencing as she spoke to the trial court.  From this, we cannot say that the trial court erred in excusing Barfield from jury service."  *Id*.

McCoskey has provided no legal argument or support for his claim that

this juror was erroneously dismissed.  Indeed, not even a single case.  Nor has McCoskey elaborated on how the trial court's dismissal of Barfield violated the Due Process Clause either generally or specifically or how he was harmed by Barfield's dismissal.  The state habeas court's conclusion that the trial court did not err in excusing Barfield was not contrary to or an unreasonable application of federal law.

## XI.  McCoskey's Claim that the State Withheld Exculpatory Evidence is Unexhausted and Procedurally Defaulted.  Alternatively, McCoskey's Claim Is Conclusory.  (Petitioner's Claim 11)

In his tenth claim for relief, McCoskey argues that the State withheld exculpatory evidence, in violation of due process.  Amended Petition at 51-52.  Specifically, he claims that Collins and Dwyer were impaired by drug use at the time of the offense.  *Id.*  He believes that toxicology reports from the medical examiner and lab reports from the hospital where Collins was treated after McCoskey raped her would confirm this.  *Id.*  But this claim is unexhausted and procedurally defaulted.  Alternatively, this claim is conclusory and should be summarily dismissed.

### A.  This claim is unexhausted and procedurally defaulted.

McCoskey did not present this claim in either of his state habeas applications or in his brief on direct appeal.  *See generally* SHCR-01; SHCR-02; Appellant's Brief.  As a consequence, this claim is unexhausted and procedurally

defaulted.  *See* 28 U.S.C. § 2254(b) (precluding federal habeas corpus relief when applicant has not exhausted state court remedies); *Nobles*, 127 F.3d at 422 (5th Cir. 1997) (holding that defaulted claims had yet to be presented to the state courts; determining the claims were unexhausted and procedurally defaulted and concluding that the standard for avoiding a state citation for abuse of the writ could not be satisfied).

### B   Alternatively, this claim is conclusory.

This claim must fail because McCoskey has not provided the labs reports—or, indeed any evidence beyond his own statements—that would indicate that Collins and Dwyer were intoxicated at the time McCoskey kidnapped them.  The Fifth Circuit has consistently held that a petitioner's conclusory, self-serving allegation will not form the basis for habeas relief. *Beazley*, 242 F.3d at 270 (conclusory allegations will not support federal habeas relief); *Fahle v. Cornyn*, 231 F.3d 193, 196-97 (5th Cir. 2000) (self-serving allegations do not merit relief); *McDonald v. Johnson*, 139 F.3d 1056, 1058-60 (5th Cir. 1998) (finding court did not abuse discretion in finding petitioner's claim lacked arguable basis in fact where court "observed the absence of supporting evidence other than the petitioner's own self-serving allegations" that his attorney did not explain his right to appeal); *Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990); *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)

(emphasizing that mere conclusory allegations do not raise constitutional issues in habeas proceedings). McCoskey's conclusory allegations are simply insufficient to articulate a *Brady* violation. *Hughes*, 191 F.3d at 629-30 (observing that allegations that are merely "conclusory" or based on pure speculation cannot support a *Brady* claim); *Murphy*, 205 F.3d at 814 ("Allegations that are merely 'conclusory' or are purely speculative cannot support a *Brady* claim.") (citations omitted). Given unsubstantiated nature of his allegation, McCoskey's claim for relief should be summarily denied.

## XII. McCoskey's Actual-innocence Claims Are Unexhausted and Procedurally Defaulted. Alternatively, this Claim Is Not Cognizable and Conclusory. (Petitioner's Claim 12)

In his twelfth claim for relief, McCoskey asserts that he is actually innocent of both capital murder and the death penalty; hence, his incarceration and sentence violate his rights under the Due Process Clause and the Eighth Amendment. Amended Petition at 51-52. Specifically, McCoskey claims that advances in medical technology demonstrate that McCoskey suffers from a host of mental disorders. *Id.* But this claim is unexhausted and procedurally defaulted. Alternatively, it is unsubstantiated and completely conclusory.

### A. McCoskey's actual-innocence claim is unexhausted and procedurally defaulted.

McCoskey did not present this claim in either of his state habeas applications or in his brief on direct appeal. *See generally* SHCR-01; SHCR-02;

Appellant's Brief.  As a consequence, this claim is unexhausted and procedurally defaulted.  *See* 28 U.S.C. § 2254(b) (precluding federal habeas corpus relief when applicant has not exhausted state court remedies); *Nobles*, 127 F.3d at 422 (5th Cir. 1997) (holding that defaulted claims had yet to be presented to the state courts; determining the claims were unexhausted and procedurally defaulted and concluding that the standard for avoiding a state citation for abuse of the writ could not be satisfied).   Moreover, McCoskey does not attempt to demonstrate cause and prejudice for his failure to raise the claims in state court. Finally, McCoskey does not show that he qualifies for the miscarriage of justice exception.   A petitioner may come within the "fundamental miscarriage of justice" exception, (1) if, as a consequence of the identified constitutional error in the guilt-innocence phase and in light of new evidence, "it is more likely than not that no reasonable juror would have convicted him," *Schlup*, 513 U.S. at 329, or (2) if he establishes "by clear and convincing evidence that, but for the constitutional error at his sentencing hearing, no reasonable juror would have found him eligible for the death penalty" under state law.  *Sawyer*, 505 U.S. at 350.  As shown in the following section, McCoskey has abjectly failed to show that it is more likely than not that no reasonable juror would have convicted him or present the clear and convincing evidence that no reasonable juror would have

found him eligible for the death penalty. Thus, circuit precedent compels the denial this claim as procedurally defaulted.

### B.   Alternatively, this claim is both not cognizable and conclusory.

McCoskey alleges that he actually innocent of his conviction and sentence. However, McCoskey fails to meet the extraordinarily high threshold of proof required to demonstrate actual innocence that would render his execution unconstitutional. *House v. Bell,* 547 U.S. 518, 554 (2006); *Herrera v. Collins,* 506 U.S. 390, 417 (1993). Claims of actual innocence are categorized as either *Herrera*-type claims or *Schlup*-type claims. *See Schlup*, 513 U.S. at 298; *Herrera*, 506 U.S. 390. A *Herrera*-type claim involves a substantive claim in which the applicant asserts his bare innocence based solely on newly discovered evidence. *Ex parte Franklin*, 72 S.W.3d 671, 675 (Tex. Crim. App. 2002). A *Schlup*-type claim is a procedural claim in which the applicant's claim of innocence does not provide a basis for relief, but is tied to a showing of constitutional error at trial. *Id.*

McCoskey is asserting a bare, or *Herrara*-type, actual innocence claim.[23]
It is well-established that actual innocence is no grounds for federal habeas relief
from a state-court conviction. *Herrera*, 506 U.S. at 400. Actual innocence is not
an independently cognizable federal habeas claim. *Foster v. Quarterman*, 466
F.3d 359, 367-68 (5th Cir. 2006); *see House*, 547 U.S. 518 (declining to resolve
whether stand-alone actual innocence claims are viable).

Moreover, in this Court, McCoskey merely claims that unidentified
medical advances would demonstrate that he suffers from "serious psychosis"
and "brain damage." Amended Petition at 53. This assertion is entirely
speculative and conclusory. *See Amos v. Scott*, 61 F.3d 333, 346 (5th Cir. 1995)
(holding the burden is on the petitioner to allege facts which, if proven, entitle
him to relief). Consequently, this claim should be denied.

---

[23]    Since McCoskey asserts his actual innocence of the underlying crime, he
must show "it is more likely than not that no reasonable juror would have convicted
him in light of the new evidence" presented in his habeas petition. *Sawyer*, 505 U.S.
at 327. With respect to a claim of actual innocence of the death penalty, this Court
must determine whether the record includes clear and convincing evidence establishing
that a reasonable jury could not have returned answers to McCoskey's capital-
sentencing special issues that mandated a death sentence. *Id.* at 346-48 (a showing
of "actual innocence" is made in the punishment phase of a capital trial when a
petitioner shows by clear and convincing evidence that, but for constitutional error, no
reasonable juror would have found petitioner eligible for the death penalty under
applicable state law).

## XIII. McCoskey's Death Sentence Does Not Violate *Atkins* or the Eighth Amendment.   (Petitioner's Claim 13)

McCoskey claims that he cannot be executed pursuant to the Supreme Court's holding in *Atkins* due to the fact that he is mentally retarded. Amended Petition at 54.   The *Atkins* Court held that "the Constitution places a substantive restriction on the State's power to take the life of a mentally retarded offender." *Atkins*, 536 U.S. at 321 (internal quotation omitted).   The Court noted that, "[t]o the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded." *Id.* at 317.   "Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Id.* Although the Supreme Court left "to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences," *id.,* it cited with approval the following definitions of mental retardation:

> The American Association of Mental Retardation (AAMR) defines mental retardation as follows: "*Mental retardation* refers to substantial limitations in present functioning.   It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety,

functional academics, leisure, and work.   Mental retardation
manifests before age 18."[24]

The American Psychiatric Association's definition is similar: "The
essential feature of Mental Retardation is significantly subaverage
general intellectual functioning (Criterion A) that is accompanied by
significant limitations in adaptive functioning in at least two of the
following skill areas: communication, self-care, home living,
social/interpersonal skills, use of community resources, self-
direction, functional academic skills, work, leisure, health, and
safety (Criterion B).   The onset must occur before age 18 years
(Criterion C).  Mental Retardation has many different etiologies and
may be seen as a final common pathway of various pathological
processes that affect the functioning of the central nervous system."
"Mild" mental retardation is typically used to describe people with
an IQ level of 50-55 to approximately 70.

*Atkins*, 536 U. S. at 309 n. 3 (internal citations omitted);  *id.* at 317 n. 22.

Although an evidentiary hearing was not held, the trial judge entered

findings of facts and conclusions of law and determined that McCoskey was not

entitled to relief.   After its own review of the record, the Court of Criminal

Appeals adopted the trial court's findings and conclusions.  *Ex parte McCoskey,*

No. 56,820-02, slip op. at 1-2.  Thus, these findings are entitled to deference on

federal habeas review (28 U.S.C. §§ 2254(d)(2), (e)(1)), and McCoskey has not

presented the clear and convincing evidence necessary to rebut this presumption

---

[24]      Although the *Atkins* Court used the AAMR's 9th edition definition, the
10th edition, released in May 2002, contains a somewhat different definition: "Mental
retardation is a disability characterized by significant limitations both in intellectual
functioning and in adaptive behavior as expressed in conceptual, social, and practical
adaptive skills.   This disability originates before age 18."  American Association of
Mental Retardation, Mental Retardation:  Definition, Classification, and Systems of
Supports 1 (10th ed. 2002).

of correctness.  28 U.S.C. § 2254(e)(1).

Indeed, McCoskey's entire mental-retardation argument is one paragraph long and simply incorporates by reference his pleadings in the state court. Amended Petition at 55.  Although this argument is clearly inadequately briefed, the Director will briefly outline the evidence supporting the state court's decision for the convenience of the Court.

**A.**    **McCoskey has failed to show by clear and convincing evidence that he has significantly subaverage intellectual functioning.**

"Significantly subaverage intellectual functioning" is defined as "an IQ of about 70 or below" as obtained by assessment on a standardized, individually-administered intelligence test.  APA, Diagnostic and Statistical Manual of Mental Disorders IV-Text Revision 41 (4th ed. 2000) ("DSM-IV-TR").  After entering extensive findings, the state habeas court entered the following conclusions with respect to this prong:

> 1.  [McCoskey] fails to meet the first criterion for mental retardation; [McCoskey] fails to show by a preponderance of the evidence significantly subaverage general intellectual functioning, in light of [McCoskey]'s not attaining any IQ score below 70 during his developmental period, in light of [McCoskey] attaining IQ scores of 71, 77, 91, 88 , 88, 76, and 111, in light of [McCoskey]'s intelligence being understated by some of the reported scores, and in light of [McCoskey]'s IQ score of 88 being the best indicator of [McCoskey]'s intellectual functioning during his developmental period. [*Ex parte Briseño*, 135 S.W.3d 1, 12 (Tex. Crim. App. 2004)] (adopting the allocation of the burden to defendant and adopting preponderance of evidence standard when assessing mental retardation claims in habeas proceedings); [Tex. Health & Safety

Code] § 591.003.

2.   [McCoskey]'s 2006 score of 65 on the WAIS-III fails to establish significant subaverage intellectual functioning in light of [McCoskey] failing to exert sufficient effort during the WAIS-III, in light of [McCoskey]'s prior, documented attempt to fake serious mental disorders, and, in light of the score of 65 being an understatement of [McCoskey]'s mental ability especially when considered in conjunction with [McCoskey]'s prior IQ scores attained when [McCoskey] did not have a self-interest in appearing to be mentally retarded.  *See Ex parte Simpson,* 136 S.W.3d 660, 665-66 n.13 (Tex. Crim. App. 2004) (upholding trial court's finding that defendant [was] not mentally retarded where defendant's score of 59 at odds with prior tests; State's expert's opinion was that defendant was faking; his intelligence in borderline-to-low range; he submitted request forms in jail; and, he corresponded with others); *see also Hall v. State,* 160 S.W.3d 24, 39 (Tex. Crim. App. 2004) (holding that trial court's finding that defendant not mentally retarded was supported by the record where defendant supported claim of mental retardation with testimony of three psychologists, family, teachers, and fellow death row inmate and State controverted defendant's claim through testimony of psychologist, five prison guards, waitress, defendant's former work supervisor, defendant's former co-worker, and police detective, through cross-examination [regarding] school records indicating defendant not mentally retarded, through defendant's videotaped interview, through defendant's *pro se* motion, and through circumstances of crime itself).

3.   Based on [McCoskey]'s documented behavior problems and the resultant disruption of his schooling, any poor academic development of [McCoskey] is consistent with the dynamics of conduct-disordered youth and does not establish significantly subaverage general subaverage intellectual functioning. [McCoskey] fails to show by a preponderance of the evidence significantly subaverage general intellectual functioning; [McCoskey] fails to meet the first prong of the criteria necessary to establish a diagnosis of mental retardation, pursuant to [Tex. Health & Safety Code] § 591.003.

3 SHCR-02 518-519.

McCoskey's IQ scores are thus clearly inconsistent with a finding of mental retardation.  McCoskey's has seven IQ scores above the cut-off for mental retardation.  His only score below the mental-retardation threshold (a 65 on the WAIS III) was secured in 2006, and the State's expert opined that McCoskey was likely malingering.[25]  As a consequence, the state court correctly determined that McCoskey had failed to prove that he suffered from significantly subaverage intellectual functioning.[26]

### B.   McCoskey has failed to show by clear and convincing evidence that he has significant deficits in adaptive functioning.

Texas law describes adaptive behavior as "the effectiveness with or degree to which a person meets the standards of personal independence and social responsibility expected of the person's age and cultural group."  Tex. Health & Safety Code § 519.003(13).  The AAMR and APA also describe the factors in evaluating adaptive functioning.  *Atkins,* 536 U.S. at 309, n.3.  For example, the AAMR refers to "limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use,

---

[25]     Indeed, McCoskey's incentive to underperform on this test in 2006 is plain, as it may save his life.

[26]     It appears that McCoskey's own expert found that McCoskey had failed to meet either the requirements of the first or second prong and concluded that McCoskey was not mentally retarded.  4 SHCR-02 1029-1035.

self-direction, health and safety, functional academics, leisure, and work."[27]  *Id.*
The APA guidelines require "significant limitations in adaptive functioning" in
at least two of its list of similar skill areas.  *Id.*

The state habeas court evaluated McCoskey's adaptive functioning and
concluded:

> 4.  Based on [McCoskey]'s scores on the 2006 ABAS, based on
> the absence of assertion from [McCoskey]'s family and professionals
> during [McCoskey]'s developmental period that [McCoskey] was
> mentally retarded, based on [McCoskey]'s demonstrated abilities to
> care for himself, to carry out plans, to respond rationally and
> appropriately to external stimuli (albeit it in a socially unacceptable
> manner), to respond coherently, rationally, and onpoint to
> questions, to lead and manipulate others, to lie for his own interests,
> and to commit a capital murder that required forethought, planning,
> and purpose, [McCoskey] fails to show by a preponderance of the
> evidence that he has deficits in adaptive behavior.  *See* [Tex. Health
> & Safety Code] § 591.003; *see also Briseño,* 135 S.W.3d at 12; *Ex
> parte Modden,* 147 S.W.3d 293, 296 (Tex. Crim. App. 2004) (setting
> out *Briseño s* additional evidentiary factors to determine mental
> retardation).

3 SHCR-02 519-20.

In light of the foregoing, McCoskey has not shown by clear and convincing
evidence of significant deficits in adaptive functioning and, thus, cannot rebut
the presumption of correctness afforded to the state court's factual findings.

---

[27]     The AAMR 10th edition refers to "significant limitations . . . in adaptive
behavior as expressed in conceptual, social, and practical adaptive skills." American
Association of Mental Retardation, Mental Retardation: Definition, Classification, and
Systems of Supports 1 (10th ed. 2002).

**C.    McCoskey has failed to show by clear and convincing evidence of onset before the age of eighteen.**

Finally, McCoskey has presented no evidence of onset before the age of eighteen.  Specifically, the state habeas court found that:

> 68.  The Court finds, based on the credible affidavit of Dr. Denkowski and official records, that [McCoskey]'s Wechsler Verbal IQ increased gradually from a 70 to 74 range when [McCoskey] was aged seven to nine years to an 80 to 85 range when [McCoskey] was aged thirteen to fifteen years; and, that [McCoskey]'s slow but consistent progress is typical of a severely behavior-disordered youth whose chronic misbehavior impedes normal academic learning. [3 SHCR-02 523-62 (Denkowski Affidavit]

> 69.  The Court finds, based on the credible affidavit of Dr. Denkowski and official records, that [McCoskey]'s Wechsler Performance IQ, a testing that is largely independent of academic achievement, increased more rapidly from a score of 74 at age seven to a 96-score range by age thirteen.  [3 SHCR-02 523-62 (Denkowski Affidavit).]

> 70.  The Court finds, based on the credible affidavit of Dr. Denkowski, that [McCoskey]'s WAIS Full Scale Score of 88 appears to be the best indicator of [McCoskey]'s mental ability during his formative years.  [3 SHCR-02 523-62 (Denkowski Affidavit)]; *see also* Findings Nos. 58-59, supra.

> 71.  The Court finds, based on the credible affidavit of Dr. Denkowski, that the numerous intelligence tests that were given to [McCoskey] during his formative years when mental retardation was not an issue can be used to estimate [McCoskey]'s adult intelligence, and that it is expected that [McCoskey] would produce a WAIS-III Full Scale Score between 77 and 88 when [McCoskey] exerted optimal effort.  [3 SHCR-02 523-62 (Denkowski Affidavit).]

> 72.  The Court, based on [McCoskey]'s records, his prior IQ scores attained during his developmental period, and Dr. Denkowski's credible affidavit, finds that [McCoskey],

notwithstanding his current lack of sufficient effort on intelligence tests, fails to show significantly sub-average intellectual functioning, and that [McCoskey] fails to meet the first prong of the criteria necessary to establish a diagnosis of mental retardation.

[. . .]

120.   The Court finds, based on the credible affidavit of Dr. Denkowski, that [McCoskey]'s Wechsler intelligence scores from his childhood and adolescence are consistent with the score pattern of conduct-disordered youths; that the Wechsler intelligence scores that [McCoskey] produced last in adolescence are more accurate based on all forms of development being delayed among seriously behavior-problemed youths; that these scores indicate that [McCoskey]'s measured intelligence was around 88 Full Scale score when he was about fifteen and one-half years of age; and, that [McCoskey]'s general intellectual functioning was not significantly subaverage during his developmental period.  [3 SHCR-02 523-62 (Denkowski Affidavit).]

3 SHCR-02 500-01, 516.

Thus, the state habeas court concluded that:

5.  Because [McCoskey] fails to show either significantly subaverage general intellectual functioning or deficits in adaptive behavior before the age of 18, [McCoskey] fails to show by a preponderance of the evidence origination during the developmental period.  *See* Findings Nos. 69-73 and 120; *see also* [Tex. Health & Safety Code] § 591.003.

3 SHCR-02 500-01, 520.

Having  completely  failed  to  present  convincing  evidence  showing

significant limitations in intellectual ability or adaptive functioning manifested

at or before the age of eighteen, McCoskey fails to meet his burden on this final

prong as well.

### D.    Conclusion

The state habeas court correctly determined that McCoskey failed to prove all three prongs of the test for determining mental retardation.  McCoskey has not shown clear and convincing evidence necessary to rebut the presumption of correctness afforded these findings.  Therefore, the state court's determination does not conflict with clearly established federal law as determined by the Supreme Court.  28 U.S.C. § 2254(d).  Nor is it "based on an unreasonable determination of the facts in light of the evidence."  *Id.*  McCoskey's claim for relief should be denied.

## CONCLUSION

For the foregoing reasons, the Director respectfully requests that McCoskey's federal petition for writ of habeas corpus be denied and that no certificate of appealability issue with regard to any of the claims raised therein.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

ERIC J.R. NICHOLS
Deputy Attorney General
for Criminal Justice

-79-

EDWARD L. MARSHALL
Chief, Postconviction
Litigation Division


\* Attorney-in-charge

  /s/  Stephen M. Hoffman

\*STEPHEN M. HOFFMAN
Assistant Attorney General
Texas Bar No. 24048978
P. O. Box 12548, Capitol Station
Austin, Texas   78711
Tel:  (512) 936-1400
Fax: (512) 320-8132
Stephen.Hoffman@oag.state.tx.us

ATTORNEYS FOR RESPONDENT

-80-

## CERTIFICATE OF SERVICE

I do hereby certify that on October 5, 2010, I electronically filed the foregoing pleading with the Clerk of the Court for the U.S. District Court, Southhern District of Texas, using the electronic case-filing system of the Court. The electronic case-filing system sent a "Notice of Electronic Filing" to the following attorneys of record, who consented in writing to accept this Notice as service of this document by electronic means :

James Gregory Rytting
Hilder Associates PC
819 Lovett Blvd
Houston, TX 77006-3905
713-655-9111
Fax: 713-655-9112
Email: james@hilderlaw.com

and

Philip Harlan Hilder
Hilder & Associates P.C.
819 Lovett Blvd.
Houston, TX 77006-3905
713-655-9111
Fax: 713-655-9112
Email: philip@hilderlaw.com

       /s/  Stephen M. Hoffman
       STEPHEN HOFFMAN
       Assistant Attorney General