JAMIE BRUCE McCOSKEY, Appellant

No. 71,629                    v.              Appeal from HARRIS County

THE STATE OF TEXAS

### O P I N I O N

In November of 1992, appellant was convicted in the 185th District Court of Harris County of capital murder pursuant to V.T.C.A. Penal Code, § 19.03(a)(2), specifically murder during the course of kidnapping.  The indictment alleged that the offense occurred on or about November 13, 1991.  During the punishment phase the jury affirmatively answered the special issue set forth in Article 37.071, § 2(b)(1), V.A.C.C.P., and negatively answered the special issue set forth in Article 37.071, § 2(e), V.A.C.C.P., whereupon the trial court sentenced appellant to death.  Direct appeal is automatic.  Article 37.071, § 2(h), V.A.C.C.P.  On direct appeal, appellant raises thirty-six points of error.

Appellant does not challenge the sufficiency of the evidence at guilt/innocence.  However, he does challenge the sufficiency of the evidence to support the jury's answers to the special issues.  We will first address the sufficiency of the evidence on future dangerousness, i.e. whether there was a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society.

I.

### SUFFICIENCY OF THE EVIDENCE AT PUNISHMENT

In point of error eighteen, appellant alleges that the evidence is insufficient to support the jury's affirmative answer to the first special issue (future dangerousness).  In conjunction with this point, in point of error nineteen, appellant alleges that the trial court submitted an incomplete extra-statutory punishment charge on unadjudicated extraneous offenses which therefore, "requires reversal of appellant's death sentence because there is no way for this Court to meaningfully review the sufficiency of the evidence supporting the jury's answers to the special issues."

Appellant's entire argument under these two points seems to be to the effect that the jury should have been required to identify

which unadjudicated offenses it found appellant had committed.[1]
Because it did not, appellant contends, this Court is unable to
consider the unadjudicated offenses in its evaluation, thus barring
a review of the sufficiency of the evidence of the punishment
issues.[2] We disagree.

It is well-settled that in reviewing the sufficiency of the
evidence at the punishment stage, this Court views the evidence in
the light most favorable to the verdict to determine whether any
rational trier of fact could make the finding beyond a reasonable
doubt. Barnes v. State, 876 S.W.2d 316, 322 (Tex.Cr.App.), cert.
denied, ___ U.S. ___, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994). In
light of this, we look to the record in the present case and review
the evidence in the light most favorable to the verdict to
determine whether a rational jury could have found sufficient
evidence that appellant would probably be a danger in the future.
A jury is permitted to look at several factors in its review of
future dangerousness including, but not limited to:

> 1. the circumstances of the capital offense, including
> the defendant's state of mind and whether he was working
> alone or with other parties;

---

[1] Appellant does not here argue that the extraneous offenses
should not have been admitted. Nor does he argue that the charge
given was inappropriate, only that it was incomplete. The charge
given was as follows:

> You are further instructed that if there is
> any testimony before you in this case
> regarding the defendant's having committed
> offenses other than the offense alleged
> against him in the indictment, you cannot
> consider said testimony for any purpose unless
> you find and believe beyond a reasonable doubt
> that the defendant committed such other
> offenses, if any were committed, and even then
> you may only consider the same in determining
> the answers to the special issues.

See Harris v. State, 827 S.W.2d 949, 961-63 (Tex.Cr.App. 1992),
cert. denied, ___ U.S. ___, 113 S.Ct. 381, 121 L.Ed.2d 292 (1992).

[2] We note that the only argument appellant gives for both of
these points regards the particular contention that the jury should
have had to reveal which unadjudicated offenses it found appellant
to have committed. Appellant does not even enlighten us as to
which offenses he is referring. He also does not adequately relate
the standard for reviewing the sufficiency of the evidence at
punishment and cites no law for that specific point of error. In
fact, appellant totally omits reference to the number of other
factors the jury may consider concerning future dangerousness.
While this might normally be considered inadequately briefed under
Tex. R. App. Proc. 74(f), we will address it.

2.  the calculated nature of the defendant's acts;

3.  the forethought and deliberateness exhibited by the crime's execution;

4.  the existence of a prior criminal record, and the severity of the prior crimes;

5.  the defendant's age and personal circumstances at the time of the offense;

6.  whether the defendant was acting under duress or the domination of another at the time of the offense;

7.  psychiatric evidence; and

8.  character evidence.

Barnes, supra; Keeton v. State, 724 S.W.2d 58, 61 (Tex.Cr.App. 1987) ("Keeton I").  These factors are also helpful in this Court's evaluation of this question.

The evidence[3] in this case reveals that between approximately 6:00 and 6:30 p.m. on November 13, 1991, an engaged couple returned to their apartment complex from a brief shopping trip.  They went upstairs to their apartment and the decedent unlocked the door, leaving the keys in the lock until they could get the groceries inside.  As he turned to remove the keys from the door, the decedent encountered appellant standing in the doorway.  Appellant unzipped his jacket to reveal a hunting knife in a scabbard in the waist of his pants.  When asked what he wanted, appellant responded that he wanted a ride and they were going to take him where he needed to go.  The decedent stated that he did not have any gas in the car or any money with which to put some in, but appellant told him that did not matter.  The decedent eventually agreed to take appellant where he wanted to go on the condition that his fiancé be allowed to stay behind, but appellant insisted that she come along.

The three originally got into the car with the couple in the front seat and appellant in the back.  Appellant instructed the man to go to a gas station and put gas in the car, which he did.  Two or three blocks away from the station, appellant decided that he wanted to ride up front in the passenger seat so he could get out quickly in case a police officer pulled them over.  After appellant

---

[3]  Much of the evidence comes from the decedent's girlfriend who survived the abduction and testified at trial.

McCoskey - 4

and the woman changed positions, appellant instructed the driver to get onto highway I-10 eastbound. While they were on the highway, appellant apparently made several contradictory statements, including: (1) he was going to kill the couple; (2) he just needed a ride and he knew no one would volunteer; (3) he knew how to kill people using martial arts techniques; and (4) he was doing this for someone else who wanted him to steal the car.

Eventually appellant instructed the driver to exit I-10 and directed him (somewhat indirectly) to an embankment in the middle of an empty field. Apparently appellant was looking for an isolated place. After the car was stopped, appellant took the keys and proceeded to a Suburban parked nearby to tell its occupants that the land was private property and they needed to leave. After a brief conversation with appellant, the occupants of the Suburban left. Appellant returned "kind of . . . jumpy," grabbed the decedent around the neck, pulled him down, and put the knife to his throat. Appellant then ordered the woman to handcuff[4] the decedent's hands behind him. Appellant then moved the coats that were in the trunk to the back seat and placed the man in the trunk. Appellant then got into the driver's seat and figured out how to drive the car.[5] He ordered the woman to take off her shorts because he did not want her "to jump out of the car and run."

Appellant left the embankment, but could not find his way out of the surrounding neighborhood. After asking some construction workers for directions, appellant got back onto the highway. During the ensuing period, appellant started fondling the woman's genitals. When she started crying, he turned up the radio so "she would not get embarrassed and so her boyfriend could not hear." Appellant then unzipped his pants and tried to force the woman to engage in oral sex with him by pushing her head down, but when she started gagging, he discontinued the assault. As appellant drove in the direction of the couple's apartment, the decedent attempted

---

[4]  The record revealed that the handcuffs were already in the car due to the decedent's part-time job related to law enforcement.

[5]  The car had manual transmission with which appellant was not familiar.

to tell him that the woman was pregnant and asked him not to hurt her.  Appellant's response was that he had better shut up and not make him mad.

Appellant then told them that he was going to leave the decedent with some friends and then drop the woman off at the apartment, and after leaving the apartment he would call his friends to release the man; this way he could ensure that the two would be too scared to call the police.  However, as they neared the apartments, appellant turned away and eventually came to an empty house close to the freeway.  Appellant took the woman into the house at knifepoint and proceeded to sexually assault her.  He then returned her to the car and took the man into the house.  The next sound the woman heard was something like "if somebody hit you in the stomach and you get the breath knocked out of you" and recognized the sound as coming from her fiancé.

The woman then jumped from the car and fled across a gravel road and through a field to a nearby house.  The occupant of the house would not allow her to enter, but then appellant appeared with a knife in hand, shaking his head.  The occupant let the woman in and locked the door, whereupon she then called 911.  Appellant fled in the couple's vehicle.  When the police arrived on the scene, they found the man's body inside the empty house; he had been stabbed approximately two dozen times.

The police eventually located appellant.  Upon his arrest, they noticed knife scabbards strapped to both his belt and his right leg.  The knife used in the stabbing was located a few feet away from him on the floor.

At trial, a psychiatric resident testified that she had diagnosed appellant with antisocial personality disorder.  A clinical psychologist concurred with this diagnosis.  At the punishment hearing, the State introduced prior offenses consisting of:

    * a 1981 juvenile commitment to the custody of the Texas Youth
      Council for an unnamed, but apparently serious, offense;
    * a 1983 conviction for kidnapping for which appellant

McCoskey - 6

received shock probation.  The probation was revoked later
that year after appellant committed an assault;

* while in the penitentiary, appellant committed several rules
violations, including five fights and four incidents of
striking or threatening an officer;

* 1987 convictions for misdemeanor assault and possession of
marijuana;

* a 1992 incident of striking another inmate in the Harris
County Jail with a chisel, cracking his skull.

Evidence was also presented that after appellant had been found
guilty, but prior to the punishment stage, when the jury was out of
the courtroom, appellant picked up a chair and threw it at the
prosecutors, accusing them of lying at trial.

The facts of this offense are of a calculated and deliberate
nature.  These facts, combined with the violent prior adjudicated
offenses and the psychiatric/psychological testimony, lead us to
the conclusion that a rational trier of fact could have found
appellant to be a danger in the future.  Point of error eighteen is
overruled.

We note further that as to point nineteen, concerning
appellant's contention that the jury should have had a special
verdict form for the unadjudicated offenses, no request or
objection was made at trial.  See  Article 36.15, V.A.C.C.P.
Although appellant tries to characterize this point as one purely
affecting this Court's sufficiency review and not the proceedings
at trial, this is not persuasive.  His failure to request a special
verdict form at trial bars him from now complaining on appeal under
Almanza v. State, 686 S.W.2d 157 (Tex.Cr.App. 1984), since no
egregious harm to appellant has been shown.  Point of error
nineteen is overruled.

II.

JURY SELECTION

In point of error six, appellant contends that the trial
court's refusal to permit defense counsel to inform prospective
jurors about Texas parole law violated his rights under Article I,

§§ 10, 13, and 19 of the Texas Constitution. Appellant's entire argument on this point consists of two segments: first, he relies on the arguments he made to points of error four and five. However, these two points refer to giving the jury an <u>instruction</u> on parole law in the charge at <u>punishment</u>. Vastly different circumstances apply in that instance and the law is not necessarily applicable in the context of voir dire.

Secondly, appellant simply asserts that questions concerning parole are proper questions and thus should be allowed at voir dire. Appellant does not tell us exactly what questions he attempted or wanted to ask or how the questions were phrased. He does not point us to specific examples in the record or even to where he initially made his attempt and was stopped. To this end, we hold this point to be inadequately briefed under Rule 74(f) of the Texas Rules of Appellate Procedure. While certain questions are recognized as proper in the voir dire context[6], we refuse to speculate as to the specific questions about which appellant complains on appeal. Point of error six is overruled.

In his twentieth point of error, appellant complains that "the prosecution's repeated statements to [prospective] jurors that mental illness and child abuse evidence could properly be considered to be aggravating evidence violated the eighth and fourteenth amendments." Appellant begins his argument by stating that "during voir dire, the prosecution informed virtually every member of the venire, including the majority of jurors actually seated, that evidence . . . could properly be considered to be relevant *aggravating* evidence." He then refers to "<u>See</u>, *e.g.*" and lists eight record cites wherein we should expect to see illustrations of his complaint.[7]

We note, and appellant concedes, that in none of the cited incidents did he contemporaneously object, thus there is an error

---

[6] <u>See</u> <u>Jackson v. State</u>, 822 S.W.2d 18, 27 (Tex.Cr.App. 1990), <u>cert. denied</u>, ___, U.S. ___, 113 S.Ct. 3034, 125 L.Ed.2d 722 (1993); <u>Ellason v. State</u> 815 S.W.2d 656, 665-66 (Tex.Cr.App. 1991).

[7] Nowhere in his brief does he actually set out any of these examples, but simply makes conclusory statements about them.

preservation problem. <u>See</u>, <u>e.g.</u>, Tex.R.App.Pro. 52(a). Furthermore, in our reading of each of the examples noted, we find that the prosecutor's argument is better characterized as telling the prospective jurors that <u>they</u> would have to characterize the particular evidence as <u>they</u> see fit instead of having one of the parties label it for them as aggravating or mitigating. The following is a good illustration of this:

> [THE STATE:] Now, there's all types of evidence and you shouldn't automatically think if you hear evidence from me, it's automatically aggravating or if you hear evidence from them, the defense, it's automatically mitigating. For example, mental illness. It could be that someone suffers from mental illness and just because that is apparent, it doesn't necessarily mean that that's automatically mitigating evidence. For example, let's say it's the type of mental disease or defect that just causes people to be cruel. Would you agree with me that there's some people that just don't like other people? There's some people that don't like women, and there's some people that don't like kids. Even though that person, even though a doctor may say that person has got a mental defect, that may be the type of mental illness that in your opinion is aggravating, as opposed to mitigating. Likewise, evidence that someone was abused as a child, you may ask yourself, well, what is there that proves to me, number one, that that person was abused as a child, number two, is it the type of child abuse, in my opinion, that would be sufficient to mitigate under Special Issue Number Two? Some people may think that type of evidence is mitigating, other people may not.

Such "double-edged" evidence was precisely what led the United States Supreme Court in <u>Penry v. Lynaugh</u>, 492 U.S. 305, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), to require that the jury be provided a vehicle to give effect to such evidence. Appellant's contention that the State characterizes this evidence as aggravating is not supported by the record. Point of error twenty is overruled.

Appellant's points twenty-one through twenty-three all concern alleged error in denying his challenges for cause to three different veniremembers. In his twenty-first and twenty-second points of error, appellant complains that the trial court erred in failing to grant his challenges for cause to Veniremember Savant and Veniremember Hoesel because of their expressed bias in favor of imposing the death penalty.

Regarding the challenge to Savant, appellant in his argument relies solely on <u>Morgan v. Illinois</u>, 504 U.S. ___, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), for the proposition that "a trial court must remove for cause all . . . venirepersons in a capital venire who have a clear bias in favor of imposing the [death] penalty on those persons convicted of capital murder."  However, appellant's reliance is misplaced.  <u>Morgan</u> stands for the proposition that venirepersons must be removed for cause if they maintain that they would *automatically* vote for the death penalty in *every* case.  Such is not the case here.

While Savant did express a clear preference for imposing the death penalty, he also admitted that there were circumstances in which he did not think that death was appropriate and circumstances that would mitigate against imposing a death sentence.  Further, there was no indication that Savant could not have followed or would have disregarded the court's instructions or the law.  The grant or denial of a challenge for cause is within the discretion of the trial court, and this Court will not disturb the ruling absent an abuse of the trial court's discretion.  <u>Adanandus v. State</u>, 866 S.W.2d 210, 222 (Tex.Cr.App. 1993), <u>cert. denied</u>, ___ U.S. ___, 114 S.Ct. 1338, 127 L.Ed.2d 686 (1994).  If a veniremember ultimately indicates that he can follow the court's instructions and render a verdict according to the evidence, that veniremember is not challengeable for cause.  <u>Id</u>.  We find no abuse of discretion in this instance.  Point of error twenty-one is overruled.

In regard to the challenge of Hoesel, appellant avers that the veniremember stated a bias in favor of imposing the death penalty in that he expressed a belief "that anyone who 'intentionally kills somebody . . . while committing another crime . . . ' should automatically receive the death penalty."  To an even greater degree than with Savant, Hoesel expressed a "very strong" preference to invoke the death penalty in certain circumstances (as in the killing of a police officer which is not at issue here).  However, the following exchanges also occurred:

THE COURT:  So now my question to you, having
been given both kinds of views towards the
death penalty, as you sit there now, do you
believe that you could be fair and impartial
to both sides?

                    *   *   *

[HOESEL]:   Well, yes, as far as the death
penalty.  I mean, either way, which I'd have
to hear all the circumstances and everything.

                    *   *   *

THE COURT:  You've got to reconsider and apply
the law as I give it to you, to this.  Do you
understand that?

[HOESEL]:  Yes, sir.

THE COURT:  And you can do that?

[HOESEL]:  Yes, sir.

                    *   *   *

[THE STATE:]  [L]et me get you to talk to us
and tell us what you think about the death
penalty.

[HOESEL:]  I think -- I don't think that it's
used as much as it should be.  I think there's
too many people on death row for too long;
that if it's given as a sentence, that it
should be carried out timely.

                    *   *   *

But, I don't think all cases warrant it, that
there's certain cases where the death sentence
shouldn't be used, but there are certain cases
where it's no question that it should be.

                    *   *   *

[APPELLANT:]      You    think    people    that
intentionally cause other people's deaths,
murder them, should pay with their own lives?

[HOESEL:]  If it's out of malice, yes.

                    *   *   *

[APPELLANT:]  And I think you said that you
think someone that kills a police officer
should forfeit their lives?

[HOESEL:]  I believe so.  In most cases it
should, you know, they're serving a purpose.

                    *   *   *

[APPELLANT:]  And is it always true that if
someone either intentionally kills a police
officer in the performance of his duty or
intentionally kills somebody that's not a
police officer, but does that while committing
another crime like a robbery or a burglary or
a kidnapping or whatever, that you would
believe that those persons should, if they're

> going to do that kind of crime, should pay
> with their lives?
>
> [HOESEL:]  Yes, because I think they went in
> knowing that something like that would happen
> if they're armed and if they're planning to do
> that.
>
>        *   *   *
>
> It would matter on the circumstances, I guess,
> also.  But, I think if they go and rob and
> have weapons with them knowing that there's a
> possibility that they could be interrupted
> during that crime, that they have the intent
> to harm the person or whoever they may run
> into.

While the veniremember consistently expressed his *belief* that the death penalty was always warranted in the commission of certain crimes, he just as consistently returned to the idea that, ultimately, the sentence would depend on the circumstances involved, regardless of the crime.  Nowhere did Hoesel indicate that he would violate the law or his oath in answering the punishment questions in order to obtain a certain result.  Given the totality of his voir dire, we cannot say that the trial court abused its discretion in denying the challenge for cause.  Point of error twenty-two is overruled.

In point twenty-three, appellant alleges that the trial court erred in denying his challenge to Veniremember Sharrick due to his bias against the law of insanity.  <u>See</u> Article Art. 35.16(c)(2), V.A.C.C.P.  Without pointing us to specific examples of voir dire questioning to support his argument, appellant simply makes the conclusory statements that "Sharrick possessed a strong (and admitted) bias against the insanity defense" and "it is clear that he would not set aside that bias and follow the law, despite his claim to the prosecutor that he could do so."

Reviewing the entirety of Sharrick's voir dire, we note that he did, indeed, express a dislike and frustration with the law of insanity.  However, he also consistently stated that he would follow the law, *even though he might not like it.*  As this Court stated in <u>Kemp v. State</u>:

> It has been the holding of this court that
> there is a fundamental distinction between
> prejudice on the part of a juror . . . and the

> entertaining of an opinion . . .. [A] trial
> judge may hold a juror qualified who states
> that he can lay aside any opinion which he may
> have formed.

846 S.W.2d 289, 299 (Tex.Cr.App. 1992), cert. denied, ___ U.S. ___,
113 S.Ct. 2361, 124 L.Ed.2d 268 (1993). We will not now second-
guess the trial court which was present to view the demeanor and
judge the credibility of the veniremember. We find no abuse of
discretion in the trial court's ruling. Point of error twenty-
three is overruled.

Appellant's complaints in points twenty-four and thirty-four
concern the removal of Veniremember Barfield after she was accepted
by both sides, but before the jury was impaneled. In point twenty-
four, appellant contends that he was not allowed to make a bill of
exception regarding this removal; and in the point thirty-four,
appellant alleges that the removal itself was improper in that the
defense had prejudicially altered its voir dire strategy in
reliance on the acceptance of Barfield.

The facts surrounding these two points are as follows. On
November 2, 1992, Veniremember Barfield was questioned by both
parties and accepted as a juror by both parties.[8] The next day the
juror returned after calling the court and indicating that she felt
that she could not be a fair and impartial juror. The following
excerpts are illustrative of the proceedings had:

> [APPELLANT:] Your Honor, I actually have to
> object to the proceedings in view of the fact
> that this juror was actually accepted by both
> sides and approved by both sides, after over
> an hour of individual voir dire, not to
> mention the Court's own voir dire. And
> therefore, I object to the proceedings.
>
> THE COURT: What do y'all suggest?
>
> [APPELLANT:] I believe if there's any inquiry
> to be made, it has to be done by the Court and
> not by the attorneys. I don't believe it
> would be appropriate for the attorneys to do
> anything further since we have already done
> our questioning in this regard. I think if
> you have that information, it may be within
> your right. I don't think we have any right
> to talk to this lady any further.

---

[8]    The trial court subsequently referred to Barfield as the
tenth juror selected. However, a person-by-person check of voir
dire indicates that she might have been the ninth juror selected.
Either way, she was accepted toward the end of the process.

McCoskey - 13

THE COURT:  I'll adhere to that.

     I was going to ask her to place on the record what she was telling me on the phone. And if -- I think you missed my question, my "if."

     If you don't want to ask anything, I'll allow the State to ask.  If you have any questions, I'll ask those.  I'll excuse her, consult with you all, and make a decision.

                    *   *   *

     [N]ow whatever it is you want to tell me -- whatever it is you want to tell me, I just want it on the record, whatever it is that caused you to change your mind, what you did since you had been chosen.

JUROR:  Well, I didn't get a lot of sleep last night, and I have been under a lot of pressure, and I saw the therapist this morning.  And considering my personal problems right now, I don't think I can give this young man a fair trial.  And I think this is a very serious case, and I think that I need to tell you that.

THE COURT:  When you say you don't think you can give him a fair trial, just delineate that a little bit for me.

JUROR:  I'm not in any state to make any kind of decision right now.  I mean, my final divorce will be next week, the 60 days.  And I'll probably have to go to Court from that. And I don't think I'm in any -- I don't think I can make a fair decision in this matter. And I only think it's -- it's the fair thing for me to do.  I can't go on and not tell you this.

THE COURT:  But when you say you don't think you can make a decision, delineate that.  What are you talking about when you say you don't think you can make a fair decision?

JUROR:  I don't think I can decide, one way or the other.

THE COURT:  Okay.

JUROR:  And I don't know.  I wake up one day and I think one way, and I wake up another and I think another way.  And right now, the -- my mental state is not that good.  And I would have to work from the time I leave here, next week, until the time I finish.  And that puts more pressure on me.  And it's just not a good time for me right now.

                    *   *   *

THE COURT:  [L]et me ask you this.  This is one of my legal questions.  Do you think the frame of mind that you're in now, is different from what you were in yesterday, when we chose you, right now?

> JUROR:  Well, I'm pretty fragile, and probably so.
>
> THE COURT:  Well, as you sit there now, do you feel, that based on your own thoughts, you know you better than I, that your feelings could prevent or substantially impair your ability --
>
> JUROR:  Right, to decide.
>
> THE COURT:  To -- let me finish -- to perform your duties as a juror.
>
> JUROR:  Yes, sir.
>
> THE COURT:   Carry out, listen to the facts, and apply the law that I'm going to give you, pursuant to the oath that you took?
>
> JUROR:  Yes, sir.

The trial court then asked the juror to step outside while it consulted with the parties.   The State emphasized Barfield's expression that her feelings would prevent or substantially impair her from following the law and asked that she be excused.   The defense maintained that the parties had had plenty of time to question the juror the previous day and at no time did she say that she could not follow *the law* and that she should be retained on the jury.   The trial court then refrained from making a determination concerning Barfield until it could consult with the counsel for the district judges and proceeded to have another venire panel brought in to question.

On November 4, 1992, the court announced its readiness to make a decision regarding Barfield, but again gave the parties a chance to be heard.   The State again urged that the juror be excused while the defense adamantly maintained that the juror should remain on the jury.   Appellant then apparently assumed that the action taking place was a challenge for cause made by the State and made the following statements in that context:

> [APPELLANT:]  And I would further ask that if the Court is of the mind to grant the challenge for cause, that before you do so, we have further opportunity -- and I would then ask, under that circumstance alone, that I be given the opportunity to further consult with the prospective juror, Ms. Barfield, under oath, here in Court.
>
> [THE STATE:]  No, Your Honor, he was given the opportunity to do that yesterday, and we

attempted to do that yesterday, and he objected to it.

[APPELLANT:]  Your Honor, I'm only asking you to do it, if the Court is of a mind to strike the juror.  I don't believe we should be talking to the juror.

And Your Honor, furthermore, the issue that I would then have, if the Court is going to grant the challenge for cause, I would like to talk with the woman further, in order to establish my bill of exceptions for appeal.

THE COURT:  Now, the Court is not planning on granting the challenge for cause.

Do you have 35.03?

* * *

The Court is going to take it upon itself. Based upon the juror's statement to the Court, the Court is going to excuse her, as a matter of law.

* * *

[APPELLANT:]  Your Honor, the Defense then would request that Ms. Barfield be asked to appear so that we may create a bill of exceptions by interviewing her further.

THE COURT:  I'll decide on that later.  We won't do that today.

[APPELLANT:]  Your Honor, at this time, the Defense will move for a mistrial.

THE COURT:  Overruled.

In Butler v. State, 830 S.W.2d 125, 131 (Tex.Cr.App. 1992), we stated that "the power to grant an excusal from jury service (pursuant to Article 35.03) inheres to the trial judge from the first assemblage of the array until the juror is, at last, seated." We recently reaffirmed this in Clark v. State, 881 S.W.2d 682, 687-88 (Tex.Cr.App. 1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1114, 130 L.Ed.2d 1078 (1995).  The juror here was quite adamant that she could not be fair to the defendant as she had previously thought. Even from the cold record, we can perceive the distress the veniremember was experiencing as she spoke to the trial court. From this, we cannot say that the trial court erred in excusing Barfield from jury service.  Point of error thirty-four is overruled.

In regard to appellant's alleged denial in making a bill of exception, we also hold that no error occurred.  While the right to

make a bill of exception is absolute pursuant to Texas Rule of Appellate Procedure 52(b), the record clearly indicates that appellant was not *denied* this opportunity. The opportunity was only *deferred for an unspecified period*. Since appellant never again raised the issue, he waived any argument for appeal. <u>Wallace v. State</u>, 782 S.W.2d 854, 856 (Tex.Cr.App. 1989). Point of error twenty-four is overruled.

In his twenty-fifth point of error, appellant alleges that the trial court committed reversible error during voir dire by prohibiting him from inquiring into Veniremember Hyatt's views on the law of insanity. However, the record does not support appellant's contention. The record reveals that appellant was, in fact, allowed to question the veniremember about the law of insanity in general. What he was not allowed to ask, and of what he now complains, is the specific question illustrated in the following colloquy:

> [APPELLANT:]  People have mental images of insanity. You know, we visualize insane asylums with people standing in corners and talking to the walls or hearing voices from mysterious things in the mirror, or seeing purple elephants roosting in trees. That's not insanity in a criminal trial.
>
> In Texas, insanity is that, one, I must show you that the person suffers from a severe mental disease or defect. Severe does not mean that they have to be walking backwards or crawling around on their hands and knees all the time. It just means that you have to believe, by a preponderance of the evidence, that they have a severe mental disease or defect.
>
> And then additionally, I must show that as a result of a severe mental disease or defect, they do not know that the conduct, the crime, is wrong.
>
> Now, that doesn't mean I have to show that they don't know any part of it is wrong. By that, I mean, I don't have to show they know that all or only part of it is wrong. I have to show they don't appreciate that any part of it is wrong.
>
> You follow me? If they don't appreciate that the kidnapping aspect of an offense is wrong, then they are not guilty of capital murder, by reason of insanity, if they are --
>
> [STATE:]  Judge, I'm going to object to that as a misstatement of the law, on the basis

> that the Defense has to show, under the law of
> insanity, that the defendant did not know the
> wrongfulness of his conduct.  The law doesn't
> distinguish between any specific act that they
> commit.  So I object to that, Your Honor, as a
> misstatement of the law.

This objection was sustained by the trial court after a rather
lengthy discussion.

It is well-settled that when a trial court does not allow a
proper question to be asked, it commits reversible error.  <u>Nunfio</u>
<u>v. State</u>, 808 S.W.2d 482, 485 (Tex.Cr.App. 1991).  A question is
proper if its purpose is to discover a juror's views on an issue
applicable to the case.  <u>McCarter v. State</u>, 837 S.W.2d 117, 121
(Tex.Cr.App. 1992).  However, when such a question is misleading or
leads to a misleading result, it is a misstatement of the law, and
thus, an improper area of inquiry.  Such was the case here.

Section 8.01 of the Texas Penal Code states that under the law
of insanity:

> (a)   It  is  an  affirmative  defense  to
> prosecution that, at the time of the conduct
> charged, the actor, as a result of severe
> mental disease or defect, did not know that
> his conduct was wrong.

> (b)  The term "mental disease or defect" does
> not include an abnormality manifested only by
> repeated  criminal  or  otherwise  antisocial
> conduct.

By the plain language of the statute, the entirety of the "conduct"
is referred to and not just specific elements, as the State pointed
out at trial.  Thus, to be adjudged "not guilty by reason of
insanity" for capital murder, appellant would have to have been
unaware that his conduct was wrong during both the kidnapping and
the murder.

Appellant's scenario of being "insane" as to the kidnapping,
but not as to the murder does not follow this analysis, and thus
would not result in a finding of "legal insanity."  Rather, a
finding by the jury that appellant did not know that the kidnapping
part of offense was wrong would simply be a negation of that
element of capital murder.  Hence, the State would not have proved
every element of the crime of capital murder beyond a reasonable
doubt, thus a verdict of "not guilty" would be the appropriate

McCoskey - 18

response rather than "not guilty by reason of insanity." See
V.T.C.A. Penal Code, § 2.01. See also Graham v. State, 566 S.W.2d
941 (Tex.Cr.App. 1978).[9]  Under this analysis, appellant's
question, as posed, was a misstatement of the law and the trial
court did not abuse its discretion in refusing to allow it.  Point
of error twenty-five is overruled.

     In points twenty-seven and twenty-eight, appellant complains
that the trial court erred in permitting the prosecutor to inform
prospective juror Jordan that the State did not have the burden of
proof on the punishment issue on mitigation.[10]  As we explain in
points of error fifteen through seventeen, infra, neither the
Legislature nor this Court has ever assigned a burden of proof on
mitigating evidence.  See Art. 37.071, V.A.C.C.P. and Barnes v.
State, 876 S.W.2d 316, 330 (Tex.Cr.App.), cert. denied, ___ U.S.
___, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994).  As such, the prosecutor
accurately stated the law and the trial court did not err in
allowing the statement.  Points twenty-seven and twenty-eight are
overruled.

                              III.

            COMPETENCY TO STAND/CONTINUE TRIAL

     In points seven through nine, appellant alleges that his due
process rights were violated in three incidents bearing upon his
competency to stand trial.  Specifically, appellant alleges in
point of error seven that the trial court violated his due process
rights by failing to adequately inquire into his competency to
stand trial after his counsel informed the court that appellant
could not rationally assist in his defense.  Appellant, in point
eight, also argues that the trial court erred in failing to order
the State to continue providing his psychotropic medication during
trial.  Finally, in point nine, appellant alleges that as a result
of being deprived of his medication, he threw a chair at the

_____

     [9]  Whether the jury could still find a defendant guilty of a
lesser-included offense or whether such a charge was even included
does not affect the analysis here.

     [10]  He alleges that this was in violation of both Article I,
§ 10 of the Texas Constitution and the Sixth, Eighth, and
Fourteenth Amendments to the United States Constitution.

McCoskey - 19

prosecutors, admission of which act at the punishment stage of
trial violated his due process rights.

The record reveals the following series of events. Appellant
was arrested November 15, 1991. On confinement, he was placed on
prescribed medication, including psychotropic drugs and lithium,
for his mental illness.[11] In September of 1992, administration of
the medication allegedly ceased. In October of 1992, appellant's
counsel filed a motion to require the Harris County Sheriff's
Department to resume its dispensing of medication to appellant,
which motion was granted by the trial court. Despite this motion,
appellant contends that he was continually denied his medication
for a two month period. On November 12, 1992, after appellant had
been adjudicated guilty of capital murder, but prior to sentencing,
appellant entered the courtroom[12], picked up a chair and threw it
at the prosecutors screaming, "That's for lying in court."

Following this incident, appellant's counsel claimed that
appellant was not competent as a result of the denial of his
medication. Counsel stated that appellant did not have a rational
understanding of the events and was no longer able to assist in his
defense or consult with counsel. Both of appellant's counsel
subsequently testified under oath that appellant was not competent
to proceed with the punishment phase of trial. The trial court
ordered the trial to continue and the chair-throwing incident was
introduced into evidence over objection at the punishment phase.

Article 46.02, Sec. 1(a) states that a person is incompetent
to stand trial if he does not have:

> (1) sufficient present ability to consult
> with his lawyer with a reasonable degree of
> rational understanding; or

> (2) a rational as well as factual
> understanding of the proceedings against him.

On raising the issue of incompetency, Article 46.02, Sec. 2(b)
provides:

> If   during   the   trial   evidence   of   the

---

[11] Appellant was also examined by a clinical psychologist at
this time and found to be competent to stand trial.

[12] The jury was not present at this time.

McCoskey - 20

> defendant's incompetency is brought to the attention of the court from any source, the court must conduct a hearing out of the presence of the jury to determine whether or not there is evidence to support a finding of incompetency to stand trial.

And finally, Article 46.02, Sec. 4(a) continues:

> If the court determines that there is evidence to support a finding of incompetency to stand trial, a jury shall be impaneled to determine the defendant's competency to stand trial. This determination shall be made by a jury that has not been selected to determine the guilt or innocence of the defendant.

Hence, a three-step process emerges for challenging and determining the competency of a defendant. First, the issue of incompetency must be raised by the evidence from any source. Second, once the issue is raised, the trial court must conduct a hearing outside the presence of the jury to determine if there is sufficient evidence of incompetency to impanel a separate jury to determine the question. In making this determination, the trial court is required to view the evidence adduced at the hearing in the light most favorable to the party with the burden of showing incompetency, disregarding all contrary evidence and inferences, in order to find whether there is some evidence, a quantity more than none or a scintilla, that would rationally lead to the conclusion of incompetency. Barber v. State, 737 S.W.2d 824, 828 (Tex.Cr.App. 1987); Williams v. State, 663 S.W.2d 832 (Tex.Cr.App. 1984). Finally, if the evidence presented to the trial court "from any source" raises the issue of incompetency, a separate jury determination is required.

After the chair-throwing incident in the present case, appellant's counsel raised the issue of incompetency and moved for a mistrial based upon appellant's apparent incompetence. This met the requirements of the first step of the process. In arguing in support of the motion for mistrial, appellant's counsel stated that appellant was deprived of necessary medication pending trial, thus appellant became unable to maintain control of himself. Counsel stated that appellant also became unable to assist counsel and had reached the level that he no longer had sufficient present ability to consult with his attorney with a rational degree of

understanding.

The State then pointed out that appellant had been found competent to stand trial prior to trial, that appellant acted in a rational manner through the four weeks of voir dire and throughout trial, and that it was only after he had been found guilty of the offense of capital murder that he acted up which actions were consistent with throwing a temper tantrum.

Continuing the proceedings outside the presence of the jury, appellant's counsel then had himself and his co-counsel sworn as witnesses in order to place their respective opinions of their client's status on the record. Counsel then testified that:

> I have observed on many occasions irrational conduct, irrational thought processes and irrational behavior. I have, however, on occasions also observed the ability to have some rational conduct and behavior. He has, at times in the past, been able to be of some assistance to me in representing him, although in many instances, the information or his conduct in my dealings with him showed that he was, in fact, not rational.

Co-counsel then testified under oath that he "wholeheartedly" agreed with his colleague's assessment of their client's behavior, adding that, on several occasions, he had to keep appellant busy doing things that would not disrupt the courtroom and that, at times, appellant did not seem focused on courtroom activities and would want to talk about other issues and topics that had nothing to do with the trial. The State was then allowed to ask counsel questions at which time it elicited that counsel was able to get appellant to sign and apparently understand an evidentiary stipulation <u>after</u> the chair-throwing incident. The trial court then asked both sides if they had anything further to which they both replied in the negative.

Appellant has pointed us to no case, and we can find none, which precisely characterizes what constitutes a "hearing" under Article 46.02, Sec. 2(b). However, we note, as pointed out by the State, that appellant's counsel, at the outset of his sworn testimony, characterized these proceedings as a "hearing."

> Your Honor, at this time, under oath as a witness in this hearing outside the presence of the jury, . . . .

McCoskey - 22

Black's Law Dictionary (5th ed.) defines a "hearing" as a:

> Proceeding of relative formality (though generally less formal than a trial), generally public, with definite issues of fact or of law to be tried, in which witnesses are heard and parties proceeded against have right to be heard, and is much the same as a trial and may terminate in final order.

Here, both of appellant's counsel were heard and questioned as witnesses. Plus, there is absolutely no indication that the trial court would not have allowed other evidence or testimony of other witnesses on the issue of appellant's competency. Nor has appellant complained that he was denied the opportunity to present further evidence. Hence, we hold that the events qualify as fulfilling the "hearing" requirement of Article 46.02, Sec. 2(b).

The remaining question then is: Was more than a scintilla of evidence presented thus requiring the trial court to impanel a separate jury under Article 46.02, Sec. 4(a) to determine the issue of appellant's competency to continue standing trial? We hold that the trial court did not err in finding that no evidence was presented to require the court to impanel a separate jury.

The only evidence presented in this hearing were the bare assertions by appellant's attorneys as to his state of mind. Furthermore, these assertions primarily amounted to statements regarding appellant's unruly courtroom behavior, his unsubstantiated lack of medication, and his occasional failure to communicate with his attorneys or to focus on the present courtroom proceedings. Without more, these allegations are just as consistent with poor behavioral skills as they are with incompetency. As such, we cannot say that the trial court erred in finding that no evidence was presented requiring the court to impanel a separate jury. Barber, supra; Vigneault v. State, 600 S.W.2d 318, 322 (Tex.Cr.App. 1980); Burks v. State, 792 S.W.2d 835, 840 (Tex. App. - Houston [1st Dist.] 1990, pet. ref'd). Point of error seven is overruled.

His eighth point of error, in which appellant contends that the trial court erred in failing to order the State to continue providing his psychotropic medication during trial is equally

without merit.  The record reveals that the trial court <u>did</u> grant the requested motion.[13]  Appellant does not contend on appeal that said motion was, in fact, violated, but simply states in a conclusory manner that he was denied his necessary medication. Given only this, it appears that either appellant received all that he requested (i.e. a positive ruling on the motion) and thus has nothing to complain about on appeal, or that he is complaining about something which he has not adequately briefed.  Tex. R. App. Proc. 74(f).  Either way, point of error eight is overruled.

Finally, appellant argues in point nine, in relation to the two preceding points, that as a result of being deprived of his medication he threw a chair at the prosecutors, and contends that the admission of this act into evidence at the punishment stage of trial violated his due process rights since the incident was a direct result of the deprivation of medication.  The record reveals that this particular incident was placed into evidence at the punishment stage of trial via the testimony of the State's investigator who witnessed the event.

Appellant likens this situation to the one in <u>Rochin v. California</u>, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed.2d 183 (1952), where sheriff's deputies made a warrantless search of Rochin's home, and upon observing him place capsules into his mouth, forcibly attempted to remove them.  On failing in those attempts, they handcuffed Rochin and took him to the hospital where he was medically forced to vomit the contents of his stomach.  Appellant contends the present situation is just as "shocking to the conscience" as the situation in Rochin in that the State first allegedly denied appellant his medication in order to render him incompetent and then exploited that incompetency by allowing a member of the prosecution team to testify about the "psychotic" act.

Appellant's argument fails in two respects.  First, the

---

[13]   We note that the actual substance of the motion was to order the State "to dispense necessary medication to the Defendant without charging him or withholding [sic] moneys [sic] from his inmate trust fund" and not an allegation that the medication was actually being withheld from him.

McCoskey - 24

contention is based purely on speculation.  Appellant points to no
evidence that the State actually deprived him of his medication nor
have we been shown any evidence that appellant was in any state of
mind other than simply throwing a temper tantrum at the time that
he threw the chair at the prosecutors.  Secondly, the facts in this
situation  simply  do  not  approach  the  unconstitutional  level
condemned in Rochin.  No such physically intrusive procedures are
present in this case nor has any evidence been brought forth to
show that appellant wasn't engaging in exactly the type of conduct
in which he wished to engage.  Again, given nothing further, we
cannot say that the trial court erred in allowing testimony about
the incident into evidence.  Point of error nine is overruled.

IV.

GUILT/INNOCENCE PHASE

In points thirty-five and thirty-six, appellant claims that
the trial court's admission of the testimony of a "jail snitch,"
Ronald  Hernandez,  violated  his  rights  under  the  Fifth  and
Fourteenth Amendments to the United States Constitution and Article
38.22 of the Texas Code of Criminal Procedure.  Appellant contends
that  Hernandez' status as a jail "trustee" at the time that he
spoke with appellant made him an agent for the State,[14] and thus
appellant's statements were the results of custodial interrogation.
As such, appellant maintains that, to be admissible, the requisite
warnings[15] should have been given prior to him making any statement
and no such warnings were given to him at that time.

The record reveals that appellant filed a motion to suppress
Hernandez' testimony on March 10, 1992.  A pretrial hearing later
ensued  on  the  motion  which  revealed  the  following:    Ronald
Hernandez testified that he came to be in the Houston City Jail in
November of 1991 as a result of voluntarily turning himself in for
outstanding traffic warrants.  After turning himself in, Hernandez

_____

[14]    Appellant  further  contends  that  the  employment  of
Hernandez' uncle as a detective in the Harris County Homicide
Division of the Houston Police Department contributed to Hernandez'
status as an "agent" of the State.

[15]    Pursuant to Miranda v. Arizona, 384 U.S. 436, 86 S.Ct.
1602, 16 L.Ed.2d 694 (1966).

McCoskey - 25

made trustee status.[16]  A few days after his initial incarceration and gaining of trustee status, Hernandez encountered appellant waiting for the jail's fifth floor elevator.  Hernandez asked appellant what he was in jail for, to which appellant replied "murder."  When asked who he murdered[17], appellant responded that he murdered a man and raped his wife.

After this conversation with appellant, Hernandez contacted the Houston Police Department Homicide Division and told the detectives the content of the exchange.  Hernandez testified at the pretrial hearing that he was not promised, nor did he receive, any benefit, promise, or leniency for the giving of this information. On cross-examination, appellant established that, as a trustee, Hernandez had certain duties, obligations, instructions, and procedures that he was to follow.  However, appellant never pursued exactly what these duties, obligations, instructions, or procedures were or if they in any way, shape, or form included providing information to the police about other inmates.   In fact, the testimony revealed that Hernandez did not immediately call the homicide detectives.   Instead, he was first called over by a Houston police officer who observed, but was not within earshot of, the conversation, who asked about the exchange.

Macias v. State, 733 S.W.2d 192 (Tex.Cr.App. 1987), cert. denied, 484 U.S. 1079, 108 S.Ct. 1059, 98 L.Ed.2d 1021 (1988), involved a situation in which the defendant, at the request of an assistant district attorney, was moved into a cell with a prisoner; whereupon he allegedly made incriminating statements to that prisoner. At trial, the State presented evidence, over objection, of those statements as overheard by another prisoner.  This Court held that Article 38.22 did not preclude admission of those overheard custodial statements because the assistant district attorney never informed the jailer or the prisoner why he wanted

_____

[16]  It is not clear from the testimony whether Hernandez was immediately awarded trustee status or whether he earned the title over some unspecified period of time.

[17]  Appellant objected at this point on the basis of hearsay and that the statements were the result of custodial interrogation, and thus were not admissible since no warnings had been given.

McCoskey - 26

the defendant moved into the cell, and the prisoner was never asked
to question the defendant or to report his discoveries to anyone.
Id. at 195.

In Cates v. State, 776 S.W.2d 170 (Tex.Cr.App. 1989), this
Court had before it the question of whether a Texas Department of
Human Resources (hereinafter DHR) employee was an agent of the
State for purposes of that case.  We said:

> It is obvious that employment by the DHR does
> not per se invest one with the status of a law
> enforcement officer or police agent.  Rather,
> the record as a whole must clearly establish
> that the defendant's statement "'resulted from
> a calculated practice' which all agents of the
> State present or involved knew was reasonably
> likely to evoke an incriminating response from
> . . . "  [Citation omitted.]  Simply put, the
> record must establish that when the appellant
> made the admissions, the DHR employee was
> utilizing her capacity so as to accomplish
> what the police could not have lawfully
> accomplished themselves.  Moreover, in Paez[
> v. State, 681 S.W.2d 34 (Tex.Cr.App. 1984)],
> we also noted that in resolving this issue one
> must also consider whether the DHR employee
> was known to law enforcement personnel and
> whether it was reasonably likely that this
> individual would evoke or elicit an
> incriminating response within the meaning of
> Miranda v. Arizona.

Id. at 172.  Just as being an employee of DHR does not
automatically make one an agent of the State, neither does being a
trustee in the jail or the nephew of a homicide officer.  Since the
only evidence we have before us as to Hernandez' alleged "agent"
status is a conversation with appellant during what appears to be
no more than a chance meeting, we cannot conclude that Hernandez
held the status of an "agent."  As such, the trial court was within
its discretion to overrule the motion to suppress and allow the
testimony.  Macias, supra; Cates, supra.  Points of error thirty-
five and thirty-six are overruled.

v.

JURY CHARGE

In his first and second points of error, appellant claims that
the trial court's failure to instruct on the lesser-included
offenses of kidnapping and non-capital murder violated appellant's
rights under the Eighth and Fourteenth Amendments to the United
States Constitution and "under Texas law."  Specifically, appellant

contends that ample evidence was presented which indicated that he might have been drifting in and out of "sanity" during the more than two hours over the course of which the events took place.  In other words, he contends, a rational jury could have found that while he might have begun his excursion while "sane," by the time the stabbing took place, he might have been "insane."[18]  Thus, such a jury could have found him not guilty of capital murder, while still finding him guilty of a lesser-included offense like kidnapping.

In Moreno v. State, 858 S.W.2d 453, 459 (Tex.Cr.App.), cert. denied, ___ U.S. ___, 114 S.Ct. 445, 126 L.Ed.2d 378 (1993), we cited the federal standard for inclusion of jury instructions on lesser-included offenses as set forth in Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980) and Cordova v. Lynaugh, 838 F.2d 764 (5th Cir. 1988).  In Moreno, we noted that the Fifth Circuit made clear in Cordova that:

> before it can be said that failure to submit the lesser included offense violates due process, the evidence must be such that "the jury could rationally *acquit on the capital crime* and convict for the noncapital crime."  [Citation omitted; emphasis in Moreno.]  Thus, it is not enough that the evidence would support a conviction for the lesser included offense, as if that were the only offense the jury was authorized to convict upon.  The record must also present a rational basis for a jury to reject conviction for the greater, capital offense.

Moreno v. State, 858 S.W.2d at 459.

Accepting that both kidnapping and non-capital murder are lesser-included offenses of the instant capital murder, we will look at each separately to see if appellant was entitled to a jury charge on the separate offense.  To be entitled to a jury charge on non-capital murder, there must have been some evidence that would have permitted a jury rationally to find that appellant had intended to murder the decedent, but not to kidnap him.

---

[18]  More precisely, appellant avers that he was diagnosed as "bipolar," meaning that he experiences mood swings from severe depression to severe mania.  He contends that by the time of the stabbing, he was in such a severe manic state that he did not know that his conduct was wrong.

Appellant's own recited theory of the case, i.e. that a rational jury could have found that he might have begun his excursion while "sane" and thus sanely committed kidnapping, absolutely forecloses this scenario.  Hence, appellant was not entitled to a separate instruction on non-capital murder.

To be entitled to a jury charge on the lesser-included offense of kidnapping, there must have been some evidence that would have permitted a jury rationally to find that appellant had intended to kidnap the decedent, but not to cause his death.  However, the evidence also belies this contention; evidence of appellant's behavior throughout the kidnapping indicated that he not only intended the murder, but contemplated it.

As the facts set out above demonstrate, appellant revealed a weapon *at the apartment* when he initiated the kidnapping.  Shortly after they were underway, he made statements indicating that he was going to kill the couple and that he knew how to kill using martial arts techniques.  Further, he actively threatened both the decedent and his girlfriend with the knife at separate points in time, including at the time that he sexually assaulted the girlfriend.  Immediately after the sexual assault, appellant placed the woman back in the car and retrieved the man with his hands still cuffed behind his back.  After taking the man inside the house and walking him through several rooms, the stabbing took place.  Thus, only minutes after he had sexually assaulted the woman, appellant used the deadly weapon in a manner that caused death.  Finally, after the stabbing and after the girlfriend had fled from the car and across a field to a nearby house, appellant appeared at the house with his knife in hand, shaking his head, which she took as forbidding her to enter the house.

Also, while mental health witnesses testified that they initially considered appellant to be bipolar (a diagnosis which would have supported appellant's theory that he was in a manic episode at the time of the murder and thus, did not know what he was doing), they eventually rejected this diagnosis for Antisocial Personality Disorder (a disorder which does not support appellant's

McCoskey - 29

"insanity" contention).  Thus, appellant was not entitled to a jury instruction on this lesser-included offense, since the jury could not have rationally rejected the greater offense of capital murder. Point of error one is overruled.

The State standard is similar to its federal counterpart and is set out in Rousseau v. State, 855 S.W.2d 666, 672 (Tex.Cr.App.), cert. denied, ___ U.S. ___, 114 S.Ct. 313, 126 L.Ed.2d 260 (1993). There we stated that a two-prong test must be met before a jury charge on a lesser-included offense must be given:  first, the lesser-included offense must be included within the proof necessary to establish the offense charged; and second, some evidence must exist in the record that if the defendant is guilty, he is guilty only of the lesser offense, and not the greater.  In determining whether the trial court erred in failing to give a charge on the lesser-included offense, we review all of the evidence presented at trial.  Rousseau, supra.  Using the analysis set out above and reviewing the record, we conclude that a rational jury simply could not have found appellant to be guilty only of the lesser-included offense of kidnapping or of the lesser-included offense of non-capital murder.  Point of error two is overruled.

VI.

PUNISHMENT PHASE

In point of error three, appellant alleges that the trial court fundamentally erred in instructing the jury at the punishment phase "to answer the first special issue affirmatively if jurors believed that appellant's mitigating evidence militated in favor of a life sentence[.]"  Specifically, the second page of the jury charge contains the abstract instruction:

> You are instructed that when you deliberate on the questions posed in the special issues, you are to consider all relevant mitigating circumstances, if any, supported by the evidence presented in both phases of the trial, whether presented by the State or the defendant.  A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character, background, record, emotional instability, intelligence or circumstances of the crime which you believe could make a death sentence inappropriate in this case.  If you find that there are any mitigating circumstances in this

case, you must decide how much weight they deserve, if any, and thereafter, give effect and consideration to them in assessing the defendant's personal moral culpability at the time you answer the special issue. If you determine, when giving effect to the mitigating evidence, if any, that a life sentence, *as reflected by a* [sic] *affirmative finding to the issue under consideration,* rather than a death sentence, is an appropriate response to the personal moral culpability of the defendant, *a* [sic] *affirmative finding should be given to that special issue under consideration.*

[Emphasis added.] Four pages later, the jury is given two special issues to answer:

SPECIAL ISSUE NO. 1

Is there a probability that the defendant, Jamie Bruce McCoskey, would commit criminal acts of violence that would constitute a continuing threat to society?

\* \* \*

SPECIAL ISSUE NO. 2

Taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, do you find that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

You are instructed that the term "mitigating evidence" or mitigating circumstances means evidence that a juror might regard as reducing the defendant's moral blameworthiness.

Both issues were then followed by the presiding juror's signature under the answer, "We, the jury, unanimously find and determine that the answer to this Special Issue is ['Yes' on No. 1 and 'No' on No. 2]."

Obviously, an affirmative answer to the first special issue does not reflect a finding that life is more appropriate. Therefore, those emphasized portions of the abstract instruction are completely erroneous as to that issue. However, our analysis does not end there. Appellant did not object to this instruction in the charge pursuant to the requirements of Article 36.14. Therefore, in order for reversal to be required, the error must be so egregious and have created such harm that appellant was denied a fair and impartial trial. Almanza v. State, 686 S.W.2d 157, 171

McCoskey - 31

(Tex.Cr.App. 1984) (opinion on rehearing); Article 36.19.  As this
Court stated in Almanza:

> [T]he actual degree of harm must be assayed in
> light of the entire jury charge, the state of
> the evidence, including the contested issues
> and weight of probative evidence, the argument
> of counsel and any other relevant information
> revealed by the record of the trial as a
> whole.

Appellant argues that the jury may have intended to give him
a life sentence, but because it was instructed to answer the future
dangerousness issue affirmatively in order to show this intention,
then its answer caused him to be deprived of the purpose of the
second special issue -- that being to narrow the class of
individuals subject to the death penalty.  However, appellant
concedes that this instruction was in perfect accord with the
second special issue.  In light of this fact, and the charge in its
entirety, we do not see appellant to have suffered any harm.

In analyzing the situation, we note that, had the jury
completely disregarded the instruction, then no harm would have
resulted because the jury would have been ignoring exactly what
appellant says caused him harm.  On the other hand, *had the jury followed
the court's instruction to the letter*[19], then two possibilities could have
occurred.  Had the jury wanted to recommend a life sentence as
opposed to death, it would have responded in the affirmative to
both of the special issues, thus yielding appellant's desired
result of a life sentence.  But, if the jury had expressly wanted
to recommend a death sentence, then under the court's instruction,
it would have answered both of the questions "no," thus also
resulting, to appellant's benefit, albeit contrary to the jury's
intention, in a life sentence.  Hence, appellant would have
suffered no harm.

However, because the jury unanimously answered the second
special issue in the negative, we are compelled to believe that it
fully intended to recommend that appellant receive a death

---

[19]   The jury is presumed to follow the instructions given it
by the trial court.  Black v. State, 816 S.W.2d 350, 358
(Tex.Cr.App. 1991), cert. denied, ____ U.S. ___, 112 S.Ct. 2983, 119
L.Ed.2d 600 (1992).

sentence. Since appellant has not demonstrated that he was harmed, much less egregiously so, no reversal is required. Point of error three is overruled.

Appellant complains in points of error four and five that the trial court erred in refusing to instruct the jury on Texas parole law in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, §§ 13-19 of the Texas Constitution. Specifically, appellant alleges that the thirty-five year minimum confinement for a capital life sentence would substantially influence the jury's determination of future dangerousness. In Smith v. State, 898 S.W.2d 838, 846-53 (Tex.Cr.App. 1995), cert. denied, ___U.S.___, ___S.Ct.___, 133 L.Ed.2d 80 (1995), we have previously decided the merits of these points adversely to appellant's position. Points of error four and five are overruled.

In his tenth point of error, appellant complains that the prosecutor's remarks to the jury during the closing punishment argument that the community desired a death sentence were highly prejudicial and require a reversal of his conviction. Appellant's point fails for two reasons. First, appellant concedes that he did not contemporaneously object to this argument at trial. The failure to timely object waives any error unless it is so prejudicial that no instruction could cure the harm. Banda v. State, 890 S.W.2d 42, 62-63 (Tex.Cr.App. 1994), cert. denied, ___ U.S. ___, 115 S.Ct. 2253, 132 L.Ed.2d 260 (1995); Willis v. State, 785 S.W.2d 378, 385-86 (Tex.Cr.App. 1989), cert. denied, 498 U.S. 908, 111 S.Ct. 279, 112 L.Ed.2d 234 (1990).

Secondly, the prosecutor's argument was not error. The complained-of portion of argument consists of the following[20]:

> There's absolutely nothing that's mitigating
> with regard to any child abuse. [Appellant]

---

[20] We feel compelled to note that several times throughout his brief, appellant gives us an incorrect record cite, with which the State simply goes along. Each time this occurs, we spend valuable time and resources having to locate the correct place in the record. We cannot impress upon the parties strongly enough the need to double check their citations and we thank the court reporters whose well-organized Master Indexes are extremely helpful.

has, for whatever reason, decided to go on the course that he's gone on. He has decided to go and commit the offenses, the acts, the violent acts that he's decided to commit. Where does it stop? You know, you constantly, you hear when you go home, and when you talk to your friends and neighbors, you can hear people say, "What's the matter with those folks down there? What's the matter with those judges? What's the matter with those prosecutors and police officers? Why aren't they out there trying to get this type of person off the streets to do something to make Harris County safe?" Well, in the final analysis, it's not us, folks, it's you. This decision is going to be laid at your feet, and you can make this decision only. The only proper decision to make in this case is that there's a very definite, no doubt whatsoever, probability that this defendant is indeed going to engage in criminal acts of violence in the future that would constitute a continuing threat to society. And based on the evidence that you have before you, there's no mitigating evidence in this case. There's no mitigating evidence which is not to say the defendant wasn't abused as a child, but there's no mitigating evidence in this offense, in this case, that would warrant a life imprisonment sentence being imposed, none whatsoever.

We hold this portion of the State's argument to be an appropriate plea for law enforcement. The jury is not asked to sentence appellant based upon public sentiment, which would be improper, but is properly asked to sentence him based upon the evidence. Cook v. State, 858 S.W.2d 467, 476 (Tex.Cr.App. 1993); Harris v. State, 784 S.W.2d 5, 12 (Tex.Cr.App. 1989), cert. denied, 494 U.S. 1090, 110 S.Ct. 1837, 108 L.Ed.2d 966 (1990). Point of error ten is overruled.

In point of error twelve, appellant contends that the evidence is insufficient to support the jury's negative answer[21] to the mitigation question. He further argues in points thirteen and fourteen that a meaningful appellate review of the sufficiency of mitigating evidence is impossible, therefore requiring reversal, and that the interplay of Articles 44.251(a) and 37.071, § 2(a), V.A.C.C.P., is facially unconstitutional because the former article

---

[21]  Appellant actually says "affirmative" answer, but we will give him the benefit of the doubt that he meant "negative," since under the 1991 changes to art. 37.071, V.A.C.C.P., it is a negative answer to the mitigation question that leads to the imposition of the death sentence, and the jury in fact answered the issue in the negative.

allegedly <u>requires</u> review of the latter.  Appellant has presented
us no reversible error under these points.

   We have previously held, as has the United States Supreme
Court, that a review of the mitigating evidence to determine a
defendant's deathworthiness is not required by the Eighth and
Fourteenth Amendments of the U.S. Constitution.  <u>Hughes v. State</u>,
897 S.W.2d 285, 294 (Tex.Cr.App. 1994), <u>cert. denied</u>, ___ U.S. ___,
115 S.Ct. 1967, 131 L.Ed.2d 857 (1995).  We will not revisit the
issue here.

   As for the proposed conflict which appellant claims exists
between Articles 37.071, § 2(a) and 44.251(a) -- we hold this to be
equally without merit.  Article 44.251(a) states:

> (a)  The court of criminal appeals shall
> reform a sentence of death to a sentence of
> confinement in the institutional division of
> the Texas Department of Criminal Justice for
> life if the court finds that there is
> insufficient   evidence   to   support   an
> affirmative answer to an issue submitted to
> the jury under Article 37.071(b) [22] of this
> code or a negative answer to an issue
> submitted   to   a   jury   under   Article
> 37.071(e) [23] of this code.

Appellant claims that the mandatory "shall" language of the statute
in connection with the reference to the two special issues
<u>necessarily</u> implies that a sufficiency review be conducted.
However, appellant's interpretation is mistaken.

   The mandatory language in the statute is in reference to the
reformation of the defendant's sentence.  That is, the Court is
required to take this action *if* one of these other two conditions is
met.  And each condition can only be met *if* this Court undertakes
the respective sufficiency review -- an action the statute doesn't
address, much less mandate.  In other words, the statute can be
construed as setting up a remedy for the finding of insufficient
evidence on one of the special issues, *if* such a review is
appropriate in the first place.  An appropriate interpretation

---

   [22]  Article "37.071(b)," which should technically be cited as
Article 37.071, Sec. 2(b)(1), refers to the question on future
dangerousness.

   [23]  Article "37.071(e)," which should technically be Article
37.071, Sec. 2(e), refers to the question on mitigation.

would be that the Legislature simply did not want to leave a loophole in the statute *in the event* this Court decided that section 2(e) was subject to sufficiency review.  While this Court has frequently engaged in such a review as to the issue of future dangerousness, it has not, nor do we now, find it necessary to engage in such a review regarding mitigation.  <u>Hughes</u>, <u>supra</u>.  Hence, this latter portion of the statute is simply a mechanism which has not yet been triggered under the make-up of the present scheme.  Points of error twelve through fourteen are overruled.

Appellant alleges in point fifteen that "the trial court's confusing extra-statutory charge on the burden of proof regarding the second special issue [on mitigation] created the potential for confusing a rational jury and, thus, was fundamental error in violation of the [E]ighth and [F]ourteenth [A]mendments."[24]  The complained-of portion of the charge was worded as follows:

> It is not required that the prosecution prove these issues beyond all possible doubt; it is required that the prosecution's proof excludes all "reasonable doubt" concerning the defendant.
>
> A "reasonable doubt" is a doubt based on reason and common sense after a careful and impartial consideration of all the evidence in the case.  It is the kind of doubt that would make a reasonable person hesitate to act in the most important of his own affairs.
>
> * * *
>
> The burden of proof in Special Issue No. 1 rests upon the State and it must prove the affirmative of such issue beyond a reasonable doubt.
>
> * * *
>
> [Special Issue No. 1 -- Future Dangerousness]
>
> * * *
>
> [Special Issue No. 2 -- Mitigation]

Appellant concedes that his counsel failed to object to the complained-of instruction per Article 36.14.  As such, reversal is

---

[24]   Appellant continually refers to the statutory issues of "TEX. CODE CRIM. PROC. ANN. art. 37.071 (Vernon 1994)" as having been given at his trial.  Since his trial was in 1992, we point out that the 1992 statute applies, rather than the 1994 version to which he repeatedly refers.

McCoskey - 36

required only if the error was so egregious and created such harm that appellant was denied a fair and impartial trial.  Almanza v. State, 686 S.W.2d 157, 171 (Tex.Cr.App. 1984) (opinion on rehearing).

While appellant focuses on the language in the instruction that the prosecution prove "these issues," a rational jury could just as easily and appropriately have read it simply as a definition of reasonable doubt -- that the State was not required to prove anything 100%, but only beyond a certain degree.  This interpretation is supported by the additional statement prior to the first special issue (but noticeably absent prior to the second special issue) that the burden of proof *as to the first issue* is beyond a reasonable doubt.

We hold that a rational jury could have interpreted this instruction without undue confusion, and, thus, no egregious harm has occurred.  Point of error fifteen is overruled.

In point sixteen, appellant alleges that the trial court's refusal to grant his requested instruction on burden of proof regarding the mitigation issue was reversible error.  Further, in point seventeen, appellant contends that Art. 37.071 § 2(e), is facially unconstitutional because it "not only is silent regarding the burden of proof on aggravating circumstances, but also implies that the defense has the burden to disprove the existence of aggravating circumstances."  We disagree.  Article 37.071 § 2(c) expressly pronounces that the State shall have the burden to prove the "aggravating" circumstances under Article 37.071 § 2(b) (future dangerousness and "anti-parties" charges).

As to the burden of proof on mitigating circumstances, this Court has previously stated:

> Neither this Court nor the Texas legislature has ever assigned a burden of proof on the issue of mitigat-ing evidence.  See Article 37.071.  The Eighth and Fourteenth Amendments do not require that a burden be placed on the State.  In a plurality opinion, the United States Supreme Court in Walton v. Arizona affirmatively declined to "adopt as a constitutional imperative a rule that would require the court to consider the mitigating circumstances claimed by a defendant unless the State negated them by a preponderance of the evidence."  497 U.S. 639, at 650, 110 S.Ct. 3047, at 3055, 111 L.Ed.2d

511, at 526 (1990) (plurality opinion). The plurality in
<u>Walton</u> further held that it is not unconstitutional to
place a burden on the defendant to establish sufficient
mitigating circumstances by a preponderance of the
evidence. <u>Id</u>. U.S. at 649-651, S.Ct. at 3055-56, L.Ed.2d
at 525-27. Because neither legislation nor constitution
places a burden of proof upon the State to negate the
existence of mitigating evidence, we refuse to fault the
trial court for failing to give the jury such an instruc-
tion.

<u>Barnes v. State</u>, 876 S.W.2d 316, 330 (Tex.Cr.App.), <u>cert</u>. <u>denied</u>,

__ U.S. ___, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994). Appellant's

sixteenth and seventeenth points of error are overruled.

In his twenty-sixth point of error, appellant posits that the

punishment charge violated his constitutional rights in that the

jury was instructed that at least ten "no" votes were required for

the jury to return a negative answer to the first special issue and

at least ten "yes" votes were required for the jury to return an

affirmative answer to the second special issue. He contends the

instructions mandated by Article 37.071 §§ 2(c) and 2(f) violate

the Eighth and Fourteenth Amendments because there is a reasonable

possibility that all twelve jurors may believe that a life sentence

is appropriate, but because ten jurors can't agree to any one

issue, the jury could not return a life sentence. Therefore, he

argues that such a "majority rules" mentality could lead jurors to

change their potential "life" votes to a vote for the death

penalty. Appellant's complaints are without merit.

First, this Court has previously held that, with regard to the

Article 37.071 § 2(b) special issues, the instruction given does

not constitutionally mislead the jurors into thinking that an

affirmative answer should be given unless ten or more jurors agree

to give a negative one. <u>Draughon v. State</u>, 831 S.W.2d 331, 337-38

(Tex.Cr.App. 1992), <u>cert</u>. <u>denied</u>, __ U.S. ___, 113 S.Ct. 3045, 125

L.Ed.2d 730 (1993). We see no reason why this logic should not

also apply to the mitigation issue. Further, there is no constitu-

tional inhibition to concealing from jurors the consequences of

their deliberations, so long as they are not misled into believing

that ultimate responsibility for the verdict rests elsewhere. <u>Id</u>.;

<u>Arnold v. State</u>, 873 S.W.2d 27, 37-8 (Tex.Cr.App. 1993), <u>cert</u>.

<u>denied</u>, __ U.S. ___, 115 S.Ct. 103, 130 L.Ed.2d 51 (1994); <u>Cantu</u>

McCoskey - 38

v. State, 842 S.W.2d 667, 692-93 (Tex.Cr.App. 1992), cert. denied,
__ U.S. ___, 113 S.Ct. 3046, 125 L.Ed.2d 731 (1993).

Secondly, in addition to the statutory instructions, the jury
was charged as follows after each special issue:

> In the event the jury is unable to agree upon an
> answer to Special Issue No. (1 or 2) under the conditions
> and instructions outlined above, the Foreman will not
> sign either form of answer to the Special Issue.

Because the jury was given an avenue to accommodate the complained-
of potential disagreements or confusion, appellant's contention is
meritless.  Accordingly, appellant's twenty-sixth point of error is
overruled.

In points of error twenty-nine and thirty, appellant maintains
that the Texas death penalty has been arbitrarily imposed and is
unconstitutional because of the different capital sentencing
schemes that have been in effect since the early 1970's.  He
specifically states that the Texas death penalty is
unconstitutional under the Eighth Amendment, the Equal Protection
Clause of the Fourteenth Amendment, and Article 1, section 19 of
the Texas Constitution.

This Court has held that, when challenging the
constitutionality of a statute:

> [I]t is incumbent upon the defendant to show that in
> its operation the statute is unconstitutional as to him
> in his situation; that it may be unconstitutional as to
> others is not sufficient.

Santikos v. State, 836 S.W.2d 631 (Tex.Cr.App.), cert. denied, __
U.S. ___, 113 S.Ct. 600, 121 L.Ed.2d 537 (1992).  Since appellant
has simply made a global argument as to all capital defendants
since the 1970's, and has not shown us how his specific rights were
violated by application of the statute, his contentions are without
merit.  Points of error twenty-nine and thirty are overruled.

In points of error thirty-one and thirty-two, appellant
alleges that capital punishment is cruel and unusual under the
Eighth and Fourteenth Amendments to the United States Constitution
and Article I, § 13 of the Texas Constitution.  Specifically,
appellant seems to argue that the scheme is *per se* unconstitutional
because the consideration of mitigating evidence required under

Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256
(1989), contradicts or places into paradox, the "structured
discretion" in sentencing required by Furman v. Georgia, 408 U.S.
238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

The United States Supreme Court has often recognized the
dichotomous commandments of the Eighth Amendment of which appellant
now complains. See Graham v. Collins, ___ U.S. ___, 113 S.Ct. 892,
122 L.Ed.2d 260 (1993). In Jurek v. Texas, 428 U.S. 262, 96 S.Ct.
2950, 49 L.Ed.2d 929 (1976), the Court determined that narrowing
the categories of murders for which a death sentence may be imposed
struck an appropriate balance between not meting out punishment
"wantonly" or "freakishly" and conferring sufficient discretion on
the sentencer to take account of the "character and record of the
individual offender and the circumstances of the particular
offense" to ensure that "death is the appropriate punishment in a
specific case." Graham, supra. Thus, the U. S. Supreme Court
upheld the then existing Texas capital scheme as constitutional.

In 1989, the Court decided Penry v. Lynaugh, supra, holding
that evidence of mental retardation and child abuse could not be
given mitigating effect under the Texas scheme as it then existed.
Appellant now argues that the Penry case, while allowing the
sentencer's consideration of all evidence that bears on sentencing,
injects a quality of "mercy" or "morality" which serves to destroy
that balance between competing Eighth Amendment concerns by opening
discretion to such a width that the jury is again in a position of
meting out punishment "wantonly" or "freakishly." We disagree.

The Court in Penry specifically denied that its holding
signaled a return to unbridled jury discretion, reasoning that as
long as the class of murderers subject to the capital punishment is
narrowed, a procedure allowing a jury to recommend mercy based on
mitigating evidence introduced by a defendant raises no
constitutional infirmity. Id, 492 U.S. at 327, 109 S.Ct. at 2951,
106 L.Ed.2d at 283. The inclusion of the mitigation issue in the
present Texas scheme is merely a codification of the dictates of
Penry to give the jury the discretion necessary to take account of

the "character and record of the individual offender and the circumstances of the particular offense" within the already narrowed class of offenders subject to capital punishment. Further, this Court has specifically held that a fourth special issue is an appropriate vehicle to address the dictates of Penry without violating the Eighth and Fourteenth Amendments to the U.S. Constitution. State v. McPherson, 851 S.W.2d 846 (Tex.Cr.App. 1992), cert. denied, ___ U.S. ___, 113 S.Ct. 2414, 124 L.Ed.2d 637 (1993). Point of error number thirty-one is overruled.

Appellant further remarks that this Court has said that it can and should interpret the Texas Constitution in a more expansive manner than the federal Constitution and cites us to several cases for this proposition. See Heitman v. State, 815 S.W.2d 681 (Tex.Cr.App. 1991). He then notes that the Texas Constitution proscribes "cruel *or* unusual punishments" while the U. S. Constitution prohibits "cruel *and* unusual punishments." (Emphasis in appellant's brief.) He then, without further substantive citation or authority, claims that this is the reason we should hold his present claim meritorious. However, we hold appellant's rights under the Texas Constitution were adequately protected and his claim is without merit. Point of error thirty-two is overruled.

In point of error thirty-three, appellant avers that the trial court's admission of the chair-throwing incident, described infra in our discussion of point of error nine, violated fundamental fairness for two reasons. He first complains that it was unfair because the witness was a "member of the prosecution team," thus his testimony must have been given undue credibility and weight by the jury. Secondly, appellant alleges admission of the testimony was unfair because the examining prosecutor was in effect the "complainant" of the unadjudicated extraneous offense, and thus he should have had to recuse himself and allowed another prosecutor of the district attorney's office to handle the case.

Appellant's arguments on this point are comprised entirely of conclusory statements, and unsubstantiated allegations and

McCoskey - 41

inferences.  As such, we hold this point to be inadequately briefed
under Texas Rule of Appellate Procedure 74(f).  Accordingly, we
overrule point thirty-three.

VII.

MOTION FOR NEW TRIAL

In point of error eleven, appellant alleges that the trial
court erred in overruling his Motion for New Trial in that "at
least one member of the jury had impermissibly discussed the
evidence with an alternate juror prior to deliberations and had
also reached a premature opinion on the issues at trial."  In his
argument, appellant alleges that the alternate juror Haralson
admitted that she and juror Knetser had discussed the evidence and
prematurely reached conclusions before the evidence had been
completely presented and the jury had retired to deliberate on
guilt/innocence.

The record reveals the following facts.  At the hearing on the
Motion for New Trial, appellant called two witnesses.  The first
was appellant's co-counsel Easterling.[25]  Easterling testified that
the alternate Haralson had remained around the courtroom after she
was released from service prior to jury deliberations.  Initially,
both of appellant's counsel and both of the State's counsel were
present speaking with her and then the group broke up and she spoke
with various counsel individually.  Easterling said that Haralson
told him that she was carpooling to court with juror Knetser and
that they discussed the case a great deal during the ride.  He said
that Haralson indicated that she and Knetser thought a lot alike
and would vote the same way, and she had also said that she
(Haralson) had formed an opinion after the first witness.

The second witness that appellant called was participating
juror Bruce.  According to his testimony, Haralson had "bordered
on" attempting to discuss the evidence on several occasions, but
was quickly reminded that such was not a topic of discussion per
the court's instructions.  He explained that "bordered on" meant

_____

[25] Easterling was second-chair counsel and had withdrawn from
representation of appellant immediately subsequent to the return of
a sentence of death.

that he was not sure that her comments or statements actually
concerned the evidence, but he felt it the better part of
discretion to not even come close and thus warned her to refrain
from such discussion. Bruce also testified that, to his knowledge,
no other jurors had to be warned to cease their discussions and
that the vague comments that Haralson did make did not affect his
deliberations or his verdict.

The State then called its own witnesses on this issue, one of
whom was alternate Haralson.  While Haralson admitted that she
carpooled with Knetser, she categorically denied ever discussing
the evidence with anyone else; ever forming an opinion prior to the
close of trial or relaying any opinion to anyone else; or ever
saying that she knew how Knetser would vote.  One of the
prosecutors, Lambright, testified that he remembered Haralson
commenting that she thought that Knetser was like her or thought
like her and would therefore vote as she would have.

Finally, appellant's primary counsel, Peacock, testified that
he heard Haralson state that she had formed an opinion as to the
guilt of appellant after the testimony of the first witness; that
she had conversations about the evidence in the case with Knetser,
a juror with whom she commuted; and that she, in fact, knew how
Knetser would vote in the case.  It is notable that, other than
Bruce, neither Knetser nor any of the other jurors was called to
testify at the hearing on this motion.

In Tollett v. State, this Court stated:

> At a hearing on a motion for new trial, the
> trial judge is the trier of fact and his
> findings should not be disturbed unless abuse
> of discretion has been demonstrated.
> [Citation omitted.]  "Issues of fact as to
> jury misconduct raised at a hearing on a
> motion for new trial are for determination of
> the trial judge, and where there is
> conflicting evidence there is no abuse of
> discretion where the motion for new trial is
> overruled."

799 S.W.2d 256, 259 (Tex.Cr.App. 1990).  While Haralson may or may
not have actually succeeded in discussing the evidence prior to
deliberations, appellant has presented no evidence that her
comments or statements influenced or otherwise affected any juror's

McCoskey - 43

deliberations or verdict thus denying him a fair trial.  As such, we cannot say that the trial court acted outside his discretion in overruling the Motion for New Trial.  Point of error eleven is overruled.

Finding no reversible error, the judgment and the sentence are affirmed.

OVERSTREET, J.

En Banc
Do Not Publish
Delivered:  May 22, 1996

Maloney, J., concurs in the result.

JAMIE BRUCE McCOSKEY, Appellant

No. 71,629          - - -    v.          Appeal from HARRIS County

THE STATE OF TEXAS, Appellee

<u>CONCURRING OPINION</u>

I write separately in order to address the treatment in the opinion of two of appellant's points of error. First, I believe it is incorrect to resolve appellant's twenty-fifth point of error as the majority does. The opinion holds that a jury finding that a capital murder defendant did not know his conduct in committing the underlying felony was wrong would <u>not</u> result in a verdict of not guilty of capital murder by reason of insanity, but would simply negate an element of the offense, resulting in an acquittal. Therefore, appellant's hypothetical was inappropriate, and the State's objection to it, properly sustained. I disagree. Second, I find untenable, and in any event, unnecessary, the majority's construction of Article 44.251, V.A.C.C.P., in its resolution of points of error twelve through fourteen. I will address these concerns <u>seriatim</u>.

I.

In his twenty-fifth point of error appellant alleges he was denied effective assistance of counsel in that his lawyer was not allowed to ask venireman Hyatt a proper quesiton regarding the law of insanity. In his hypothetical to Hyatt, counsel for appellant was trying to get across the point that a jury finding that a capital accused was, by reason of insanity, unaware that his commission of a single element of capital murder should result in a jury verdict of not guilty of capital murder by reason of insanity. The State objected that this was "a misstatement of the law," and the majority concurs. I do not see how. The majority says in order to acquit by reason of insanity, a jury would have to find that a capital accused failed to appreciate the wrongfulness of <u>all</u> of the conduct he committed constituting capital murder. This conclusion is said to derive from "the plain language" of V.T.C.A. Penal Code, §8.01. Slip op. at 17. It is not so plain to me.

It is clear to me, rather, that if because of his insanity a

capital defendant fails to appreciate the wrongfulness of any part
of his conduct that goes to make up a capital murder, then he is
not guilty by reason of insanity of capital murder.  He is guilty,
of course, of as much of his criminal conduct as he did appreciate
the wrongfulness of.  To use, for a convenient example, the hypo-
thetical of appellant's counsel: If a capital accused, by reason of
severe mental disease or defect, did not realize that kidnapping
his victim was wrong, but killed his victim in the full knowledge
that the murder was wrongful, it is clear enough to me that he is
not guilty of capital murder, by reason of insanity -- though he
is, undoubtedly, guilty of murder.  Why, under these circumstances,
would we want to nakedly acquit the defendant of capital murder?

     Yet this is precisely what the majority declares the law to be
when it says that "a finding by the jury that appellant did not
know that the kidnapping part of the offense was wrong would simply
be a negation of that element of capital murder[,]" and "thus a
verdict of 'not guilty' would be the appropriate response rather
than 'not guilty by reason of insanity." Slip op. at 17 & 18.
Surely not!  We would not dream of saying that a defendant indicted
for kidnapping should be acquitted outright if he did not know that
his conduct was wrong.  Why, then, would we want to say the law
contemplates acquitting a capital murderer outright (at least of
capital murder) because he was unaware that the kidnapping compo-
nent of his conduct was wrong? Would the Court not actually prefer
to declare him not guilty of capital murder (albeit guilty of mur-
der) by reason of insanity?  It seems so to me.  For that reason I
can see nothing objectionable about appellant's proposed question
to venireman Hyatt.

     If the Court is nevertheless bent on holding that it was not
reversible error to sustain the State's objection, surely it can
find a rationale that does less damage to the law.  Appellant says
he exercised a peremptorily challenge against venireman Hyatt.  He
does not tell us, however, whether he exhausted his peremptory
challenges, or, if so, whether he was granted additional peremptory

challenges.  If he did have leftover peremptory challenges, or was
granted extras, denying him intelligent use of the peremptory chal-
lenge he used against Hyatt did not wrongfully deprive him of a
peremptory challenge, and therefore did not constitute reversible
error.  See Gardner v. State, 730 S.W.2d 675, at 690 &. n. 9 (Tex.
Cr.App. 1987).

II.

In his thirteenth and fourteenth points of error appellant
complains that "Art. 44.251(a) and Art. 37.071 § 2(a), when consid-
ered in conjunction, are facially unconstitutional."  Appellant's
Brief, at 58.  He contends that because Article 44.251 requires a
review of the "sufficiency" of the evidence to support a negative
answer to Article 37.071, §2(e), but that such a review is not pos-
sible, the whole scheme somehow violates the Eighth Amendment.  He
does not say how.  The proposed majority opinion disposes of his
contention by construing Article 44.251 into oblivion.  In essence,
the majority opinion says Article 44.251(a) requires appellate ref-
ormation to life only "if" we find "insufficient evidence to sup-
port . . . a negative answer to" the §2(e) special issue; but since
we will never find the evidence "insufficient," because meaningful
review of the mitigation special issue is impossible, this aspect
of Article 44.251 will simply never come into play.  This seems a
dubious construction of Article 44.251 -- we are, after all, re-
quired by principles of statutory construction to give content and
meaning to all of a statute -- and one we can avoid in this cause.

I agree that meaningful appellate review of the jury's answer
to the Article 37.071, §2(e) special issue is impossible.  See
Colella v. State, 915 S.W.2d 834, 848 (Tex.Cr.App. 1995) (Clinton,
J., dissenting).  In view of that practical impossibility, the fact
that Article 44.251 seems to mandate an appellate review poses a
serious problem of statutory interpretation.  But it is a problem
we need not resolve in this case.  For even assuming that Article
44.251 mandates an impossible appellate review, that fact does not
in and of itself render our death penalty scheme unconstitutional.

McCOSKEY      Concurring Opinion                          -4-

We have said already that the Eighth Amendment does not mandate ap-
pellate review of mitigating evidence.  Burns v. State, 761 S.W.2d
353, at 356, n. 4 (Tex.Cr.App. 1988);  Hughes v. State, 897 S.W.2d
285, at 294 (Tex.Cr.App. 1994).  We do not have to construe Article
44.251 definitively in order to reject appellant's points of error
in this cause.

     A similar point of error was raised in McFarland v. State, ___
S.W.2d ___ (Tex.Cr.App., No. 71,557, decided February 21, 1996).
There we said in a per curiam opinion:

     "Next, appellant contends [that our capital murder
     scheme is unconstitutional because] Article 44.251(a) re-
     quires a sufficiency review [that cannot be performed].
     Article 44.251(a) states:

          (a) The court of criminal appeals shall re-
          form a sentence of death to a sentence of con-
          finement in the institutional division of the
          Texas Department of Criminal Justice for life
          if the court finds that there is insufficient
          evidence to support an affirmative answer to
          an issue submitted to the jury under Article
          37.071(b) of this code or a negative answer to
          an issue submitted to a jury under Article
          37.071(e) of this code.

     On its face this provision does indeed mandate a reforma-
     tion of sentence from death to life 'if' the evidence is
     not 'sufficient' to support a negative answer to the mit-
     igation issue.

     "In construing a statute, we look first to the lit-
     eral language, for that is the best indicator of the leg-
     islative intent.  Boykin v. State, 818 S.W.2d 782 (Tex.
     Cr.App. 1991).  In this case, however, we cannot take the
     statute to mean what it plainly says.  A genuine 'suffi-
     ciency' review of the jury's negative answer to Article
     37.071 §2(e) is a logical absurdity.  Because the burden
     of production (if not persuasion) under Article 37.071,
     §2(e) is on the defendant, he can only argue that the ju-
     ry's negative answer was against the great weight and
     preponderance of the evidence -- not that the evidence
     was 'insufficient' to support it.  Thus, if we hold
     Article 44.251(a) to its literal terms, this Court by
     definition will never reform a sentence of death to life
     on account of 'insufficiency' of the evidence to support
     a negative finding on mitigation.

     "In order to give Article 44.251(a) effect, we could
     interpret it to mandate reformation to life upon a find-
     ing that the jury's negative answer was against the great
     weight and preponderance of the evidence.  But as we have
     already shown, Article 37.071 §2(f)) (4) assigns to the
     jury the task of evaluating what evidence proffered in
     mitigation is 'sufficient' to warrant a life sentence.
     We cannot say that evidence is mitigating as a matter of
     law any more than we can say, in a non-capital case, that
     the evidence is insufficient to support a twenty year
     sentence, or that the great weight and preponderance of

the evidence establishes that the proper sentence would
have been ten years, probated.  There is simply no way
for an appellate court to review the jury's normative
judgment that the evidence did or did not warrant a life
sentence.

"There is one other alternative.  We could construe
Article 44.251(a) to mandate that this Court conduct an
independent, de novo review of the mitigating evidence,
and decide according to our own lights whether Article
37.071 §2(e) ought to be answered in the affirmative.  We
think it highly unlikely, however, that this construction
would jibe with the Legislature's intent.  Such a scheme
would effectively render the jury's answer to the §2(e)
special issue merely advisory.  While that would undoubt-
edly withstand Eighth Amendment scrutiny, it would con-
stitute a radical departure from our ordinary jury-defer-
ring routine in reviewing the 'sufficiency' of special
issues at the punishment phase of a capital murder trial.
See Burns v. State, 761 S.W.2d at 355-356 & n. 4.  Pre-
suming the Legislature to be cognizant of this Court's
prior caselaw, we would hardly expect it to mandate a
'sufficiency' review if by that it meant this Court
should re-evaluate and reweigh the same evidence the jury
has already heard.

"In any event, we do not believe constitutionality
of Article 37.071 is contingent upon appellate review of
the mitigation issue, whatever form that review takes.
So long as the jury is not precluded from hearing and
effectuating mitigating evidence, we have never regarded
appellate review of mitigating evidence to be an essen-
tial component of a constitutionally acceptable capital
punishment scheme.  Indeed, in Burns we 'abandoned any
pretense' of balancing mitigating evidence against aggra-
vating evidence as a matter of appellate review of the
punishment issues then extant.  We cited Pulley v.
Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984)
for the proposition that 'it is doubtful [that] Eighth
Amendment or Due Process considerations absolutely re-
quire this Court to reweigh punishment evidence . . . .'
Id., at 356, n. 4.  We now hold that appellate review of
the jury's answer to the Article 37.071 §2(e) special
issue is not constitutionally required.  Indeed, as we
have shown, it is a practical impossibility."

Id.  (Slip op at 10-12)  We should now resolve McCoskey's thir-

teenth and fourteenth points of error along these same lines,

avoiding any definitive construction of Article 44.251 unless and

until we absolutely cannot avoid it.

With these comments I concur in the judgment of the Court, but

do not join its opinion.

                                        CLINTON, Judge

(Delivered:  May 22, 1996)
EN BANC
DO NOT PUBLISH

White, J., joins.
Mansfield, J., joins Part II.

JAMIE BRUCE McCOSKEY, Appellant

NO. 71,629                    v. - - - Appeal from HARRIS County

STATE OF TEXAS, Appellee

### CONCURRING OPINION

I join the majority opinion except for its treatment of point of error twenty-five.  Regarding this point of error, I agree with Judge Clinton's analysis in part I of his concurring opinion except for the last paragraph.  Having concluded that defense counsel's question was proper, Judge Clinton speculates that the error may be harmless because defense counsel may have had leftover peremptory challenges or may have been granted extras.  The record, however, shows that defense counsel did indeed exhaust his peremptory challenges, request and was denied additional challenges, and did identify an objectionable juror that was seated on the jury.[1]

I nevertheless believe that the error was harmless.  Appellant's question addressed the concept of partial-insanity: that is, if appellant was sane as to the murder (i.e. understood that murder was wrong) but was insane as to the kidnapping (i.e. did not understand that kidnapping was wrong), then appellant would be not guilty by reason of insanity of capital murder.  Or, as Judge Clinton points out, appellant could be guilty of the lesser included offense of murder.  Elsewhere in the opinion, however, the majority addresses a complaint regarding the failure to instruct on the lesser-included offenses of kidnapping and murder, the majority holds that the issue of partial insanity was not raised by the evidence.

The erroneous refusal to permit defense counsel to ask a proper question during voir dire is harmless if the jury is never called upon to address the issue raised by the question.  Jones v. State, 843 S.W.2d 487, 498 (Tex. Crim. App. 1992), cert. denied, _ U.S. ___, 113 S. Ct. 1858 (1993).  Mays v. State, 726 S.W.2d 937, 949 (Tex. Crim. App. 1986), cert. denied, 484 U.S. 1079 (1988).  In Jones, the defendant complained that he was not permitted to

---

[1]  While appellant does not allege these facts in connection with point of error twenty-five, he does make such allegations in connection with point of error twenty-one, and he cites the appropriate record references.

McCOSKEY -- page 2

question jurors about the application of parole law to the lesser-included offense of murder. 843 S.W.2d at 498. Because the defendant was convicted of capital murder, parole as it related to the lesser-included offense of murder was never an issue in the case, and the error was harmless. Id. In Mays, the defendant complained that he was not permitted to question jurors about their attitudes regarding homosexuality. 726 S.W.2d at 949. The defendant's confession contained a reference to homosexuality, but this reference was deleted before the confession was admitted, and no other evidence relating to homosexuality was raised at trial. Id. We held that the error was harmless because the limitation on voir dire questioning did not involve any issue to be decided by the jury. Id.

Likewise, the issue of partial insanity was not an issue to be decided by the jury because partial insanity was never raised by the evidence. Hence, the error was harmless.

KELLER, J.

DELIVERED: May 22, 1996
DO NOT PUBLISH

McCormick, P.J. joins.
Mansfield, J. joins point 25.