IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JAMIE BRUCE McCOSKEY,          §
                               §
          Petitioner,          §
                               §
v.                             §
                               §     CIVIL ACTION NO. H-10-0123
RICK THALER, Director,         §
Texas Department of Criminal   §
Justice-Correctional           §
Institutions Division,         §
                               §
          Respondent.          §

### MEMORANDUM OPINION AND ORDER

Petitioner Jamie Bruce McCoskey has filed an amended petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his state court conviction and death sentence for capital murder. Respondent Rick Thaler has filed an answer with brief in support. Having carefully considered the petition, the answer, the state court record, the parties' submissions, and the applicable law, the court will deny McCoskey's amended petition.

## I.   Background[1]

Between approximately 6:00 and 6:30 pm on November 13, 1991, an engaged couple, Michael Keith Dwyer and Laurie Collins, returned to their apartment complex from a shopping trip. They went to their apartment, leaving the keys in the door while they brought

---

[1]This statement of facts is adapted from the Texas Court of Criminal Appeals ("TCCA") opinion affirming McCoskey's conviction and sentence. See McCoskey v. State, No. 71,629 (Tex. Crim. App. May 22, 1996).

groceries inside.  As Dwyer went to remove the keys, he encountered McCoskey standing in the doorway.  McCoskey unzipped his jacket to reveal a hunting knife.  When asked what he wanted, McCoskey replied that he wanted a ride and that the couple were going to take him where he wanted to go.  Dwyer agreed to take McCoskey on the condition that Collins stay behind, but McCoskey insisted that she come along.

They started out with the couple in the front seat and McCoskey in back, but McCoskey eventually switched places with Collins so that he could exit quickly if a police officer pulled them over.  McCoskey directed Dwyer to get onto a freeway.  During the drive, McCoskey made several contradictory statements, including threatening to kill the couple, and telling them that he just needed a ride, that he knew how to kill people using martial arts techniques, and that he was doing this for someone else who wanted him to steal the car.

Eventually, McCoskey told Dwyer to exit the freeway and directed him to an embankment in the middle of an empty field. After the car was parked, McCoskey took the keys and walked over to an SUV parked nearby to tell its occupants that they were on private property and had to leave.  McCoskey returned to the car, grabbed Dwyer around the neck, and put the knife to his throat.  He then ordered Collins to handcuff Dwyer's hands behind him.[2]

---

[2]Dwyer had a part-time law-enforcement related job, and the handcuffs were already in the car.

McCoskey then put Dwyer in the trunk.  He returned to the car, got in the driver's seat, and tried to figure out how to drive the manual transmission.  He ordered Collins to remove her shorts because he did not want her to jump out of the car and run.

McCoskey left the embankment, but could not find his way out of the surrounding neighborhood.  He eventually got back onto the freeway.  At some point while driving, he began fondling Collins's genitals.  When she started crying, he turned up the radio so "she would not get embarrassed and so her boyfriend could not hear." McCoskey then unzipped his pants and tried to force her to engage in oral sex, but stopped when she started gagging.  As McCoskey drove in the direction of the couple's apartment, Dwyer tried to tell him that Collins was pregnant and asked him not to hurt her. McCoskey responded that Dwyer better shut up and not make him mad.

McCoskey then told the couple that he was going to leave Dwyer with some friends, drop Collins at the apartment, and then call his friends to release Dwyer.  He thought this would ensure that they would be too scared to call the police.  As they neared the apartment, however, McCoskey turned away and drove to an empty house near the freeway.  He took Collins into the house at knife point and raped her.  He then returned to the car and took Dwyer into the house.  The next sound Collins heard was like "if somebody hit you in the stomach and you get the breath knocked out of you." She recognized the sound as coming from Dwyer.

-3-

Collins then jumped from the car and fled to a nearby house. The occupant of the house would not let her in until McCoskey showed up brandishing his knife. The occupant then let her in and locked the door. She then called 911. McCoskey fled in the couple's car. When the police arrived, they found Dwyer's body in the empty house. He had been stabbed approximately two dozen times.

When the police arrested McCoskey, they noticed knife scabbards strapped to his belt and his right leg. The knife used to stab Dwyer was on the floor a few feet away. Based on this evidence, the jury found McCoskey guilty of capital murder for murdering Dwyer during the course of kidnaping.

The State presented testimony by mental health professionals diagnosing McCoskey with antisocial personality disorder. The State also presented evidence of McCoskey's prior criminal record, prison disciplinary record, and that McCoskey, after the guilty verdict but out of the jury's presence, picked up a chair and threw it at the prosecutors. The jury answered in the affirmative the statutory special issue asking whether McCoskey posed a future danger to society, and answered in the negative the special issue asking whether the mitigating evidence was sufficient to warrant a life sentence. Accordingly, the trial court sentenced McCoskey to death.

## II.   The Applicable Legal Standards

### A.   The Antiterrorism and Effective Death Penalty Act

This federal petition for habeas relief is governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA").  See Lindh v. Murphy, 521 U.S. 320, 335-36 (1997).  Under the AEDPA federal habeas relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Kitchens v. Johnson, 190 F.3d 698, 700 (5th Cir. 1999).  For questions of law or mixed questions of law and fact adjudicated on the merits in state court, this court may grant relief under 28 U.S.C. § 2254(d)(1) only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent]." See Martin v. Cain, 246 F.3d 471, 475 (5th Cir.), cert. denied, 534 U.S. 885 (2001).  Under the "contrary to" clause, this court may afford habeas relief only if "'the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than . . . [the Supreme Court] has on a set of materially indistinguishable facts.'"  Dowthitt v. Johnson, 230 F.3d 733, 740-

-5-

41 (5th Cir. 2000), <u>cert. denied</u>, 532 U.S. 915 (2001) (quoting <u>Williams v. Taylor</u>, 529 U.S. 362, 406 (2000)).

The "unreasonable application" standard permits federal habeas relief only if a state court decision "identifies the correct governing legal rule from [the Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." <u>Williams</u>, 529 U.S. at 406. "In applying this standard, we must decide (1) what was the decision of the state courts with regard to the questions before us and (2) whether there is any established federal law, as explicated by the Supreme Court, with which the state court decision conflicts." <u>Hoover v. Johnson</u>, 193 F.3d 366, 368 (5th Cir. 1999). A federal court's "focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence." <u>Neal v. Puckett</u>, 239 F.3d 683, 696 (5th Cir. 2001), <u>aff'd</u>, 286 F.3d 230 (5th Cir. 2002) (en banc), <u>cert. denied sub nom. Neal v. Epps</u>, 537 U.S. 1104 (2003). The sole inquiry for a federal court under the 'unreasonable application' prong becomes "whether the state court's determination is 'at least minimally consistent with the facts and circumstances of the case.'" <u>Id.</u>

-6-

(quoting <u>Hennon v. Cooper</u>, 109 F.3d 330, 335 (7th Cir. 1997)); <u>see also</u> <u>Gardner v. Johnson</u>, 247 F.3d 551, 560 (5th Cir. 2001) ("Even though we cannot reverse a decision merely because we would reach a different outcome, we must reverse when we conclude that the state court decision applies the correct legal rule to a given set of facts in a manner that is so patently incorrect as to be 'unreasonable.'").

The AEDPA precludes federal habeas relief on factual issues unless the state court's adjudication of the merits was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  <u>See</u> 28 U.S.C. § 2254(d)(2); <u>Hill v. Johnson</u>, 210 F.3d 481, 485 (5th Cir. 2000), <u>cert. denied</u>, 532 U.S. 1039 (2001).  The state court's factual determinations are presumed correct unless rebutted by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1); <u>see also</u> <u>Jackson v. Anderson</u>, 112 F.3d 823, 824-25 (5th Cir. 1997), <u>cert. denied</u>, 522 U.S. 1119 (1998).

**B.  The Standard for Summary Judgment in Habeas Corpus Cases**

"As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases." <u>Clark v. Johnson</u>, 202 F.3d 760, 764 (5th Cir.), <u>cert. denied</u>, 531 U.S. 831 (2000).  In ordinary civil cases a district court considering a motion for summary judgment is required to construe the facts in the case in

the light most favorable to the nonmoving party.  <u>See</u> <u>Anderson v.</u>
<u>Liberty Lobby</u>, 477 U.S. 242, 255 (1986).  Where, however, a state
prisoner's factual allegations have been resolved against him by
express or implicit findings of the state courts, and the prisoner
fails to demonstrate by clear and convincing evidence that the
presumption of correctness established by 28 U.S.C. § 2254(e)(1)
should not apply, it is inappropriate for the facts of a case to be
resolved in the petitioner's favor.  <u>See</u> <u>Marshall v. Lonberger</u>, 459
U.S. 422, 432 (1983); <u>Sumner v. Mata</u>, 449 U.S. 539, 547 (1981).  In
reviewing factual determinations of the Texas state courts, this
court is bound by such findings unless an exception to 28 U.S.C.
§ 2254 is shown.

### III.  <u>Analysis</u>

**A.   Penalty Phase Jury Instructions**

During the penalty phase of McCoskey's trial the court
instructed the jury to determine whether McCoskey was a future
danger to society and whether the mitigating evidence was
sufficient to warrant a life sentence.  The trial court instructed
the jury:

> You are instructed that when you deliberate on the
> questions posed in the special issues, you are to
> consider all relevant mitigating circumstances, if any,
> supported by the evidence presented in both phases of the
> trial, whether presented by the State or the defendant.
> A mitigating circumstance may include, but is not limited
> to, any aspect of the defendant's character, background,
> record, emotional instability, intelligence or circum-
> stances of the crime which you believe could make a death
> sentence inappropriate in this case.  If you find that

-8-

> there are any mitigating circumstances in this case, you
> must decide how much weight they deserve, if any, and
> thereafter, give effect and consideration to them in
> assessing the defendant's personal moral culpability at
> the time you answer the special issue.  If you determine,
> when giving effect to the mitigating evidence, if any,
> that a life sentence, as reflected by a [sic] affirmative
> finding to the issue under consideration, rather than a
> death sentence, is an appropriate response to the
> personal moral culpability of the defendant, a [sic]
> affirmative finding should be given to that special issue
> under consideration.

McCoskey v. State, No. 71,629 (Tex. Crim. App. June 25, 1993) at

29.  The jury answered the future dangerousness special issue in

the affirmative and the mitigation special issue in the negative.

McCoskey argues that this instruction violated his constitutional

rights in several ways.

     1.   Due Process

     First, he contends that his sentence violates the Eighth and

Fourteenth Amendments because, based on the instructions, the jury

answered the special issues in a way that required imposition of a

life sentence.  He argues that a proper instruction would have told

the jury to answer the future dangerousness special issue, and then

determine if the mitigating evidence was sufficient to justify a

life sentence.   Instead, the erroneous instruction[3] did not

distinguish between the two special issues, and told the jury to

answer both special issues in the affirmative if it found that the

mitigating evidence justified a life sentence.

---

     [3]The TCCA, on direct appeal, acknowledged that the instruction
was erroneous.  McCoskey v. State, slip op. at 30.

> If you determine, when giving effect to the mitigating evidence, if any, that a life sentence, as reflected by a [sic] affirmative finding to the issue under consideration, rather than a death sentence, is an appropriate response to the personal moral culpability of the defendant, a [sic] affirmative finding should be given to that special issue under consideration.

The TCCA found that the error in the jury instruction was harmless.  The court reasoned that if the jury followed the instruction, it would have answered both special issues "yes" if it believed the mitigating evidence warranted a life sentence or both "no" if it believed the evidence did not warrant a life sentence. Either way, McCoskey would have received a life sentence. McCoskey v. State, slip op. at 30-32.  Because the jury answered the future dangerousness issue "yes" and the mitigation issue "no," the TCCA reasoned that the jury meant to impose a death sentence.

McCoskey notes that juries are generally presumed to follow their instructions.  See, e.g., Richardson v. Marsh, 481 U.S. 200, 211 (1987).  As even Richardson indicates, however, this presumption is not applicable when there is good reason to believe that the jury did not do so.  Id.  In this case it is obvious that the jury did not follow the instruction.  If it had, then the answers to the two special issues would have been the same – "yes" if the jury wished to impose a life sentence, or "no" if it did not.  The fact that the jury answered one special issue "yes" and the other "no" makes it clear that the jury did not follow the instruction, and that it answered the special issues in a direct and straightforward manner, i.e., it found that McCoskey posed a future

-10-

danger to society and that the mitigating evidence did not warrant a life sentence.  The TCCA's conclusion that the error is harmless was therefore a reasonable conclusion, and it is entitled to deference.

2.  <u>Jury's Ability to Give Effect to Mitigating Evidence</u>

McCoskey next argues that the flawed instruction prevented the jury from giving effect to mitigating evidence.  The jury had to determine:  (1) whether there was a probability that McCoskey would commit future acts of criminal violence posing a continuing threat to society; and (2) whether the mitigating evidence was sufficient to warrant a life sentence rather than a death sentence.

In <u>Lockett v. Ohio</u>, 438 U.S. 586, 608 (1978), a plurality of the Supreme Court held "that the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record . . . as a basis for a sentence less than death."  438 U.S. at 604 (emphasis in original).  This holding is based on the plurality's conclusion that death "is so profoundly different from all other penalties" as to render "an individualized decision . . . essential in capital cases."  <u>Id.</u> at 605.  In <u>Penry v. Johnson</u>, 532 U.S. 782 (2001), the Supreme Court clarified that a capital sentencing jury must "be able to consider and *give effect to* a defendant's mitigating evidence in imposing sentence."  <u>Id.</u> at 797 (internal quotation marks, citation, and brackets omitted).

-11-

The jury was instructed to consider mitigating evidence "in assessing [McCoskey]'s personal moral culpability." McCoskey presented evidence to show that he would not pose a future danger to society, but argues that this evidence was not particularly relevant to the issue of his moral culpability. For example, he presented evidence about his history of institutionalization and the benefits he derived from psychological treatment in an effort to show that he would not be violent while imprisoned. McCoskey raised this argument in his state habeas application, but the TCCA rejected it. Ex parte McCoskey, No. 56-820-02 (Tex. Crim. App. March 11, 2009), pp. 531-32.

The flaw in the jury instruction was in telling the jury that it should answer both issues "yes" if it found that the mitigating evidence justified a life sentence. The instruction did not tell the jury that it could not consider such evidence. McCoskey argues that the jury could have found that his evidence supported a conclusion that he would not pose a future danger because, for example, he showed good prospects for being nonviolent in the structured setting of prison where he would receive mental health treatment, but that this evidence was not relevant to his moral culpability. Because the jury was told that it must weigh mitigating evidence "in assessing the defendant's personal moral culpability," McCoskey argues that the jury might have disregarded evidence countering the State's future dangerousness evidence if that evidence did not also reduce his moral culpability.

-12-

The instruction defined mitigating evidence: "A mitigating circumstance may include, but is not limited to, any aspect of the defendant's character, background, record, emotional instability, intelligence or circumstances of the crime which you believe could make a death sentence inappropriate in this case." Because the instruction included a broad definition of mitigating evidence and specifically told the jury to consider all such evidence, the TCCA's conclusion that the instruction did not prevent the jury from considering and giving effect to all relevant mitigating evidence is not an unreasonable application of Supreme Court precedent. It is therefore entitled to deference under the AEDPA.

Reasonable jurists could disagree, however, about whether the instruction was confusing in a way that might have led the jury to believe it could only consider mitigating evidence that reduced McCoskey's moral culpability, regardless of whether it tended to show that he would not pose a future danger. McCoskey is therefore entitled to a certificate of appealability on this issue.[4]

3.   <u>Arbitrariness</u>

In his final claim regarding the jury instruction, McCoskey contends that the instruction made the sentencing proceeding unconstitutionally arbitrary and capricious. McCoskey never presented this claim to the Texas state courts.

---

[4]The legal standards for granting a certificate of appealability are discussed later in this opinion.

The AEDPA requires that a prisoner exhaust his available State remedies before raising a claim in a federal habeas petition.

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted unless it appears that (A) the applicant has exhausted the remedies available in the courts of the State; or (B)(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1). As the Fifth Circuit explained in a pre-AEDPA case, "federal courts must respect the autonomy of state courts by requiring that petitioners advance in state court all grounds for relief, as well as factual allegations supporting those grounds. "[A]bsent special circumstances, a federal habeas petitioner must exhaust his state remedies by pressing his claims in state court before he may seek federal habeas relief." Orman v. Cain, 228 F.3d 616, 619-20 (5th Cir. 2000); see 28 U.S.C. § 2254(b)(1) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . .").

Ordinarily, a federal habeas petition that contains unexhausted claims is dismissed without prejudice, allowing the petitioner to return to the state forum to present his unexhausted claims. Rose v. Lundy, 455 U.S. 509 (1982). Such a result in this case, however, would be futile because petitioner's unexhausted

-14-

claims would be procedurally barred as an abuse of the writ under Texas law.  On habeas review, a federal court may not consider a state inmate's claim if the state court based its rejection of that claim on an independent and adequate state ground.  <u>Martin v. Maxey</u>, 98 F.3d 844, 847 (5th Cir. 1996).  A procedural bar for federal habeas review also occurs if the court to which a petitioner must present his claims to satisfy the exhaustion requirement would now find the unexhausted claims procedurally barred.  <u>Coleman v. Thompson</u>, 501 U.S. 722, 735 n.1 (1991).

Texas prohibits successive writs challenging the same conviction except in narrow circumstances.  Tex. Code Crim. Proc. Ann. art. 11.071 § 5(a) (Vernon Supp. 2002).  The Texas Court of Criminal Appeals will not consider the merits of or grant relief on a subsequent habeas application unless the application contains sufficient specific facts establishing the following:

> (1) the current claims have not been and could not have been presented previously in an original application or in a previously considered application because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application; or

> (2) by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt.

<u>Id.</u>  The Texas Court of Criminal Appeals applies its abuse of the writ doctrine regularly and strictly.  <u>Fearance v. Scott</u>, 56 F.3d 633, 642 (5th Cir. 1995) (per curiam).

Mccoskey does not claim that he could not have presented the claim in his direct appeal or his state habeas petition because the

-15-

factual basis for the claim did not exist, or that he is actually innocent.  Therefore, his unexhausted claim does not fit within the exceptions to the successive writ statute and would be procedurally defaulted in the Texas courts.  <u>Coleman</u>, 501 U.S. at 735 n.1.  That bar precludes this court from reviewing McCoskey's claim absent a showing of cause for the default and actual prejudice attributable to the default, or that this court's refusal to review the claim will result in a fundamental miscarriage of justice.  <u>Id.</u> at 750.

McCoskey makes no showing of cause for his default.  A "miscarriage of justice" means actual innocence, either of the crime for which he was convicted or of the death penalty.  <u>Sawyer v. Whitley</u>, 505 U.S. 333, 335 (1992).  "Actual innocence of the death penalty" means that, but for a constitutional error, he would not have been legally eligible for a sentence of death.  <u>Id.</u>

> To show actual innocence,
>
> the prisoner must "show a fair probability that, in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after trial, the trier of the facts would have entertained a reasonable doubt of his guilt."

<u>Kuhlmann v. Wilson</u>, 477 U.S. 436, 455 n.17 (1986).  More succinctly, the petitioner must show that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt" in light of the evidence now presented. <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995).

-16-

McCoskey has not established that he is actually innocent of either capital murder or the death penalty.  Therefore, this court cannot review his defaulted claim.

**B.   Trial Court's Denial of Juror Strikes for Cause**

In his second claim for relief, McCoskey argues that the trial court improperly denied his requests to strike two jurors for cause.  McCoskey contends that these jurors stated that they would not consider a life sentence in his case.  The TCCA rejected this claim on direct appeal based on Morgan v. Illinois, 504 U.S. 719 (1992).  In Morgan the Supreme Court held that

> [a] juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do.  Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror.  Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views.

Id. at 729.

Among the juror statements cited by McCoskey, prospective juror Housel stated:  "as far as the death penalty, . . . I'd have to hear the circumstances and everything"; and "I don't think [the death penalty] is used as much as it should be. . . . But, I don't think all cases warrant it, that there's certain cases where the death sentence shouldn't be used . . . ."  See Amended Petition at 28-29.  As the portion of the transcript quoted in McCoskey's brief

-17-

demonstrates, juror Housel did not state that he would always vote for the death penalty in every case.  While he expressed a strong belief in the death penalty, he stated that his decision would depend on the facts and circumstances.  McCoskey acknowledges that the other juror made similar statements.

"[A] juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror . . . ." Adams v. Texas, 448 U.S. 38, 45 (1980).  McCoskey does not demonstrate that these jurors' views substantially impaired the performance of their duties as jurors.  Accordingly, McCoskey has not shown that the TCCA's decision was unreasonable.

## C.   Competency to Stand Trial

McCoskey contends that he was incompetent to stand trial, and raises two claims in connection with his alleged incompetence. First, he contends that the trial court denied his right to procedural due process by failing to conduct a competency hearing. Next, he argues that he was denied substantive due process because he was actually incompetent to stand trial.

### 1.   Competency Hearing

In his third claim for relief, McCoskey argues that he was denied procedural due process when the trial court failed to conduct a competency hearing.  The TCCA noted the relevant facts:

-18-

[McCoskey] was arrested November 15, 1991. On confinement, he was placed on prescribed medication, including psychotropic drugs and lithium, for his mental illness. In September of 1992, administration of the medication allegedly ceased. In October of 1992, [McCoskey]'s counsel filed a motion to require the Harris County Sheriff's Department to resume its dispensing of medication to [McCoskey], which motion was granted by the trial court. Despite this motion, [McCoskey] contends that he was continually denied his medication for a two month period. On November 12, 1992, after [McCoskey] had been adjudicated guilty of capital murder, but prior to sentencing, [McCoskey] entered the courtroom, picked up a chair and threw it at the prosecutors screaming, "That's for lying in court."

Following this incident, [McCoskey]'s counsel claimed that [McCoskey] was not competent as a result of the denial of his medication. Counsel stated that [McCoskey] did not have a rational understanding of the events and was no longer able to assist in his defense or consult with counsel. Both of [McCoskey]'s counsel subsequently testified under oath that [McCoskey] was not competent to proceed with the punishment phase of trial. The trial court ordered the trial to continue and the chair-throwing incident was introduced into evidence over objection at the punishment phase.

McCoskey v. State, slip op. at 19. Counsel also brought other information to the trial court's attention, stating that

right now in the holdover cell, he is continuing to exhibit signs of a heightened agitated state, rapid pacing, he is crying, he is extremely distraught, acting in an irrational manner, all of which is consistent with the mental illness that he suffers from.

30 Tr. at 19. Counsel also specifically told the court that McCoskey was unable to consult with them with a reasonable degree of rational understanding. Id. at 20-21.

The Supreme Court has held that due process is violated when an incompetent defendant is forced to stand trial. See Cooper v. Oklahoma, 517 U.S. 348 (1996). To determine if a defendant is

-19-

incompetent, the trial court must hold a competency hearing when there is evidence that the defendant may be incompetent.  See Pate v. Robinson, 383 U.S. 375, 385 (1966).  A defendant is competent if "he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," and "he has a rational as well as factual understanding of the proceedings against him."  Dusky v. United States, 362 U.S. 402 (1960).

In denying McCoskey's claim, the TCCA noted that Texas employs a three-part process for determining incompetency.  First, counsel raises the issue.  Next, the court determines if there is sufficient evidence of incompetency to merit a hearing.  Third, if the court decides that the evidence justifies a hearing, then a jury is convened and the hearing takes place.  The TCCA concluded that the trial court moved to stage two when it took sworn testimony from McCoskey's counsel, and was justified in not proceeding to a full hearing.  The TCCA also noted that McCoskey was found competent before trial and acted rationally throughout the four weeks of trial up to that time.  It was only after he was found guilty of capital murder that McCoskey began to act out.

McCoskey argues that the court considered only some of the evidence from counsel, and ignored other evidence.  The TCCA, however, found that nothing prevented McCoskey from presenting other evidence, and McCoskey did not complain at the time that he was prevented from presenting evidence.  McCoskey v. State, slip op. at 22.

-20-

The TCCA found that the evidence presented was nothing more than the "bare assertions" of counsel regarding McCoskey's state of mind.  These consisted primarily of statements about his courtroom behavior, unsubstantiated claims that he was not receiving his medication, and occasional failure to communicate with counsel or focus on the proceedings.  Id.  The TCCA concluded that this evidence was as consistent with poor behavioral skills as it was with incompetency, and that the trial court therefore did not err in declining to empanel a jury.  The TCCA also noted that McCoskey was found competent in a pre-trial examination approximately 11 months earlier.

In light of the conclusory evidence of incompetency, which could just as easily have been attributed to behavioral issues or an emotional reaction to his conviction for capital murder, the TCCA's conclusion that the evidence did not require a full competency hearing was not an unreasonable application of Supreme Court precedent.  Therefore, McCoskey is not entitled to relief on this claim.

2.   Actual Competency

In his fourth claim for relief, McCoskey argues that he was denied due process because he was tried while he was actually incompetent.  He relies on the evidence presented during trial and on an affidavit by Dr. Patrick Lawrence submitted in support of his state habeas application.

To prevail, McCoskey must establish facts that "positively, unequivocally and clearly generate a real, substantial and legitimate doubt as to his mental competency at the time of trial." Carter v. Johnson, 131 F.3d 452, 460 (5th Cir. 1997).  The state habeas court found Dr. Lawrence's opinion unpersuasive in light of the pretrial finding of competency and McCoskey's behavior during and after the offense and during trial.  The court also noted that Dr. Lawrence examined McCoskey five years after trial.  McCoskey criticized the TCCA for relying on a competency evaluation 11 months before trial, but here argues that an examination conducted five years after trial proves that he was incompetent.  The habeas court also found that the chair-throwing incident was consistent with a finding that McCoskey has antisocial personality disorder. The state court's findings are reasonable based on the evidence presented.

**D.   Impeachment Evidence**

In his fifth claim for relief, McCoskey argues that the State failed to disclose material impeachment evidence.  A prosecutor must disclose evidence favorable to an accused if it "is of sufficient significance to result in the denial of the defendant's right to a fair trial." United States v. Agurs, 427 U.S. 97, 108 (1976).  Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v.

Bagley, 473 U.S. 667, 682 (1985).  In defining the scope of the duty of disclosure, it is no answer that a prosecutor did not have possession of the evidence or that he was unaware of it.  Rather, the prosecutor "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." Kyles v. Whitley, 514 U.S. 419, 437 (1995). In Strickler v. Greene the Supreme Court framed the three components or essential elements of a Brady prosecutorial misconduct claim:  "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Banks v. Dretke, 540 U.S. 668, 691 (2004) (quoting Strickler v. Green, 527 U.S. 263, 281-82 (1999)).

Three witnesses testified about the collection, transmittal, analysis, and results of DNA testing.  McCoskey notes that the Houston Police Department Crime Lab suspended DNA testing in 2002 because of shoddy work by its employees, including one of the witnesses in this case.  That employee was fired in 2003 over her mishandling of DNA in another case.

McCoskey presents no evidence, however, that anyone associated with the prosecution, including the crime lab employees themselves, had any knowledge of this incompetence at the time of his trial. As respondent points out, independent testing of the DNA evidence

in this case, conducted after the crime lab scandal broke,
confirmed that the results presented to the jury were accurate.
Because there is no evidence that the proscutors had any knowledge
of the problems at the crime lab, there is no basis for McCoskey's
claim that the State suppressed impeachment evidence.

**E.    Ineffective Assistance of Counsel**

In his sixth claim for relief, McCoskey raises three separate
claims of ineffective assistance of counsel.  To prevail on a claim
for ineffective assistance of counsel, petitioner

> must show that . . . counsel made errors so serious that
> counsel was not functioning as the "counsel" guaranteed
> the defendant by the Sixth Amendment.  Second, the
> defendant must show that the deficient performance
> prejudiced the defense.  This requires showing that
> counsel's errors were so serious as to deprive the
> defendant of a fair trial, a trial whose result is
> reliable.

Strickland v. Washington, 466 U.S. 668, 687 (1984).  In order to
prevail on the first prong of the Strickland test, petitioner must
demonstrate that counsel's representation fell below an objective
standard of reasonableness.  Id. at 687-88.  Reasonableness is
measured against prevailing professional norms, and must be viewed
under the totality of the circumstances.  Id. at 688.  Review of
counsel's performance is deferential.  Id. at 689.

1.    Failure to Object to the Jury Instruction

In his first claim of ineffective assistance of counsel,
McCoskey argues that counsel's failure to object to the flawed

-24-

penalty phase jury instruction constituted ineffective assistance. As discussed above, the instruction was flawed, as the TCCA acknowledged.  There is no question that counsel should have recognized the internal contradictions in the instruction and objected.  On direct appeal the TCCA held that McCoskey was not harmed by the erroneous instruction.  Slip op. at 31-32.  The state habeas court concluded that this claim was "essentially raised and rejected on direct appeal."  Alternatively, the court held that McCoskey had failed to show that he had been harmed under the Strickland analysis.  Ex parte McCoskey, No. 56-820-02 (Tex. Crim. App. March 11, 2009), p. 529.

In assessing prejudice in a capital sentencing proceeding, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  Strickland, 465 U.S. at 695.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694.

On federal habeas review, however, the question is not merely whether the petitioner has proven both deficient performance and prejudice, but whether the state court's application of Strickland was itself unreasonable.

> ". . . The standards created by Strickland and [28 U.S.C.] § 2254(d) are both 'highly deferential,' id., at 689 [104 S.Ct. 2052]; Lindh v. Murphy, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when

> the two apply in tandem, review is 'doubly' so, <u>Knowles</u>
> <u>[v. Mirzayance,]</u> 556 U.S., at ----, 129 S.Ct., at 1420.
> The <u>Strickland</u> standard is a general one, so the range of
> reasonable applications is substantial.   556 U.S., at
> ---- [129 S.Ct., at 1420]. Federal habeas courts must
> guard against the danger of equating unreasonableness
> under <u>Strickland</u> with unreasonableness under § 2254(d).
> When § 2254(d) applies, the question is not whether
> counsel's actions were reasonable. The question is
> whether there is any reasonable argument that counsel
> satisfied <u>Strickland</u>'s deferential standard."

<u>Premo v. Moore</u>, ___ U.S. ___, 131 S.Ct. 733, 740 (2011).   As

discussed above, the TCCA's conclusion that the flawed instruction

did not prevent the jury from considering and giving weight to

evidence mitigating against finding that McCoskey posed a future

danger was a reasonable conclusion.   Because the TCCA's conclusions

were reasonable, its rejection of this claim is entitled to

deference, and McCoskey is not entitled to relief.   As discussed

above, however, reasonable jurists could disagree about whether the

instruction prevented the jury from considering and giving effect

to mitigating evidence.   If the jury was so prevented, then

McCoskey was also prejudiced by counsel's failure to object to the

flawed instruction.   Therefore, a certificate of appealability will

be granted on this claim.

   2.   <u>Failure to Present Psychological Evidence</u>

   In an argument comprising two sentences, McCoskey claims that

counsel failed to provide his psychological expert with psychiatric

and medical records.   The state habeas court found "that trial

counsel presented the extensive testimony of Dr. James Ray Hays

-26-

concerning his diagnosis and testing of [McCoskey] and his review of [McCoskey]'s medical records[.]" 3 SH at 507-08. Based on this, the state habeas court rejected McCoskey's claim. McCoskey does nothing to demonstrate that the state habeas court's findings or conclusions were unreasonable. These findings and conclusions are therefore entitled to deference, and McCoskey has not demonstrated that he is entitled to relief on this claim.

3. <u>Failure to Present Evidence that McCoskey was Socializing With the Victims</u>

In his final claim of ineffective assistance of counsel, McCoskey claims that counsel failed to present evidence that he was socializing with the victims before the crime. He points to a deposition given in a civil suit brought by Collins against the apartment complex. The witness, Stuart Chapple, testified that McCoskey, Collins, and Dwyer were sitting in his apartment with other guests before the crime. When Collins and Dwyer got up to go purchase food, McCoskey also left. McCoskey returned when they did, followed them up the steps, and asked for a ride. McCoskey claims that this evidence would have undermined the State's argument that he intended to kidnap the couple, instead showing that he acted impulsively.

The state habeas court rejected this claim, finding that the evidence showed that Chapple testified that Dwyer was already at his apartment when McCoskey arrived. Collins came to the door 15 to 20 minutes later, and Dwyer left with her. Chapple later saw

-27-

McCoskey follow Dwyer and Collins up the stairs and saw him standing in the doorway of their apartment.  The court found that Chapple's testimony did not contradict Collins' trial testimony, and that the fact that McCoskey and Dwyer were briefly in the same room together, along with a group of other people, did not establish that McCoskey knew his victims.  SH at 511-12.  The court therefore concluded that counsel were not deficient for not calling Chapple, and that McCoskey was not prejudiced.  McCoskey has not shown that these findings are unreasonable.

### F.    Extraneous Offense Evidence

In his seventh claim for relief, McCoskey argues that admission of Collins' testimony about the rape violated due process because the rape was not sufficiently related to the murder. McCoskey did not raise this claim in state court.  It is therefore unexhausted and procedurally defaulted for the same reasons discussed in connection with McCoskey's claim that the jury instruction was unconstitutionally arbitrary.  This court may not grant relief on the claim.

### G.    Failure to Provide Medication

In his eighth claim for relief, McCoskey contends that the State failed to provide him with needed medication before and during trial, and that this violated his Fifth, Sixth, and Fourteenth Amendment rights.  The only case he cites in support of this argument is Riggins v. Nevada, 504 U.S. 127 (1992).

-28-

In Riggins the defendant was prescribed antipsychotic drugs during his pretrial detention.  Before trial, the defense moved for an order suspending administration of the drugs until the end of trial, in part because Riggins intended to offer an insanity defense and he wanted the jury to observe him in his true mental state.  The trial court denied the motion and Riggins was medicated throughout his trial.  Id. at 129-31.  The Supreme Court held that medicating a defendant against his will could violate his due process rights absent a showing of medical necessity.  Id. at 135-37.

Riggins is not on point.  The Riggins court noted a defendant's liberty interest in being free from forcible administration of personality-altering psychotropic drugs.  The court also observed that the issue arose in the context of Riggins' wish to present an insanity defense and the accompanying need for the jury to see him in his unmedicated state.  In contrast, McCoskey does not claim that the State attempted to force him to take personality-altering medications.

The TCCA denied relief on this claim because the record did not support McCoskey's claim that the State denied him medication.  Slip op. at 22-24.  In fact, the trial court granted McCoskey's motion to provide him medication without charging his inmate trust account, and the motion that McCoskey presented at trial did not claim that McCoskey was not receiving his medication.  Id.  Because

-29-

the TCCA's findings are reasonable, McCoskey is not entitled to relief.

## H.   Dismissal of A Juror

In his tenth[5] claim for relief, McCoskey argues that the trial court denied him due process by dismissing a juror who had already been accepted by both the prosecution and the defense.  The day after being accepted by both sides, venire member Barfield returned to court and announced that she could not be fair and impartial. Under questioning by the court, Barfield stated that she was going through a divorce, was emotionally fragile, and did not think that she could properly discharge her duties as a juror.  The trial court excused her.  McCoskey claims that this violated his right to due process and an impartial jury, but neither explains how Barfield's removal violated his rights nor cites any authority in support of his claim.

The TCCA held that Texas law gives trial courts the power to excuse a juror until the time the jury is seated.  Slip op. at 15. Finding that Barfield was unequivocal in her belief that she could not be fair and impartial, the TCCA held that the trial court did not err in excusing Barfield from the jury.  McCoskey cites nothing to show that this exercise of the trial court's authority violated his rights.

---

[5]McCoskey's petition does not contain a ninth claim for relief. While that would make this claim his ninth, this opinion will follow the numbering of claims in the petition to avoid confusion.

**I.   Suppression of Exculpatory Evidence**

In his eleventh claim for relief, McCoskey expresses his disbelief of Collins' version of events and, based on that disbelief, asserts "on information and belief" that Collins and Dwyer were intoxicated during the crime.  While a prosecutor must disclose evidence favorable to an accused if it "is of sufficient significance to result in the denial of the defendant's right to a fair trial," United States v. Agurs, 427 U.S. 97, 108 (1976), McCoskey cites no evidence in support of this claim.  Instead, he postulates that the victims had opportunities to escape, and speculates that their failure to do so was because they were intoxicated.  A petitioner's speculation about the suppression of exculpatory evidence is an insufficient basis to support this claim.  Hughes v. Johnson, 191 F.3d 607, 630 (5th Cir. 1999).

**J.   Actual Innocence**

In his twelfth claim for relief, McCoskey contends that advances in diagnosis of mental illness since his trial would enable him to mount a successful insanity defense.  He argues that this shows that he is actually innocent of capital murder.  "Claims of actual innocence based on new[] . . . evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." Herrera v. Collins, 506 U.S. 390, 400 (1993).  This claim will be denied.

-31-

**K.  Mental Retardation**

In his final claim for relief, McCoskey contends that he is constitutionally ineligible for a death sentence because he is mentally retarded.  See Atkins v. Virginia, 536 U.S. 304 (2002).

The American Association on Mental Retardation ("AAMR") defines mental retardation as (1) sub-average general intellectual functioning; (2) related limitations in two or more of the following adaptive skill areas:  communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academies, leisure, and work; and (3) onset before the age of 18.  R. Luckasson, et al., Mental Retardation: Definition, Classification, and Systems of Supports (9th ed. 1992).

The Texas Court of Criminal Appeals articulated standards by which to evaluate Atkins claims, opting for a blend of the AAMR and APA standards and the standards of Texas's Persons With Mental Retardation Act, TEX. HEALTH & SAFETY CODE ANN., § 591.003(13).  See Ex parte Briseno, 135 S.W.3d 1, 7 (Tex. Crim. App. 2004).  These standards are in substantial agreement that a diagnosis of mental retardation requires:  (1) significantly sub-average intellectual functioning; (2) deficits in adaptive functioning; and (3) onset before age 18.[6]

McCoskey raised this issue in a successive state habeas application.  The trial judge entered findings of fact and

---

[6]The Supreme Court cited this definition with approval in Atkins, 536 U.S. at 309 n.3.

conclusions of law and found that McCoskey is not mentally retarded.   The TCCA adopted these findings and conclusions. Ex parte McCoskey, No. 56,820-02, slip op. at 1-2.

McCoskey's federal petition merely incorporates by reference the Atkins claim in his state petition.   Plainly, this does not meet his burden of showing by clear and convincing evidence that the state court's findings were based on an unreasonable determination of the facts in light of the evidence presented.   The state court's findings are therefore entitled to a presumption of correctness, and McCoskey is not entitled to relief on this claim.

## IV.   Certificate of Appealability

Although McCoskey has not requested a certificate of appealability ("COA"), the court may nevertheless determine whether he is entitled to this relief in light of the court's rulings.   See Alexander v. Johnson, 211 F.3d 895, 898 (5th Cir. 2000) ("It is perfectly lawful for district court's [sic] to deny a COA sua sponte.   The statute does not require that a petitioner move for a COA; it merely states that an appeal may not be taken without a certificate of appealability having been issued.").   A petitioner may obtain a COA either from the district court or an appellate court, but an appellate court will not consider a petitioner's request for a COA until the district court has denied such a request.   See Whitehead v. Johnson, 157 F.3d 384, 388 (5th Cir. 1988); see also Hill v. Johnson, 114 F.3d 78, 82 (5th Cir. 1997)

("[T]he district court should continue to review COA requests before the court of appeals does.").

A COA may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); see also United States v. Kimler, 150 F.3d 429, 431 (5th Cir. 1998). A petitioner "makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further." Hernandez v. Johnson, 213 F.3d 243, 248 (5th Cir.), cert. denied, 531 U.S. 966 (2000). The Supreme Court has stated that

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. The issue becomes somewhat more complicated where . . . the district court dismisses the petition based on procedural grounds. We hold as follows: When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

Slack v. McDaniel, 529 U.S. 473, 484 (2000). "[T]he determination of whether a COA should issue must be made by viewing the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)." Barrientes v. Johnson, 221

-34-

F.3d 741, 772 (5th Cir. 2000), <u>cert. dismissed</u>, 531 U.S. 1134
(2001).

The court has carefully considered each of McCoskey's claims
and concludes that each of the claims, with the exception of
McCoskey's jury instruction and ineffective assistance of counsel
claims, is foreclosed by clear, binding precedent, and McCoskey
thus fails to make a "substantial showing of the denial of a
constitutional right."  28 U.S.C. § 2253(c)(2).  The court grants
a COA on the jury instruction and ineffective assistance of counsel
claims (Claims 1.B. and 6.B.1).  McCoskey is not entitled to a
certificate of appealability on his other claims.

### V.  Conclusion and Order

For the foregoing reasons, it is **ORDERED** as follows:

1.    Petitioner Jamie Bruce McCoskey's First Amended
      Petition for a Writ of Habeas Corpus (Docket Entry
      No. 5) is **DENIED**; and

2.    A Certificate of Appealability shall issue only as
      to Claims 1.B. and 6.B.1.

**SIGNED** at Houston, Texas, on this the 31st day of May, 2011.

_____
        SIM LAKE
UNITED STATES DISTRICT JUDGE